## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CANDACE VAN DER STELT,     )
                                     )
     Plaintiff,                )
                                     )   Civil Action No. 23:cv-02212-RDM
     v.                     )
                                   )   Hon. Loren L. AliKhan
GEORGETOWN UNIVERSITY,    )
GEORGETOWN UNIVERSITY MEDICAL )
CENTER, BIOMEDICAL GRADUATE  )
EDUCATION, and PETER TURKELTAUB, )
                                   )
     Defendants.           
_____ )

PETER TURKELTAUB,        )
                                   )
     Counter-Plaintiff,       )
                                   )
     v.                     )
                                   )
CANDACE VAN DER STELT,     )
                                   )
     Counter-Defendant.     )
                                   )
                                   )
_____ )

## DEFENDANT PETER TURKELTAUB'S ANSWER AND COUNTERCLAIM

Defendant Peter Turkeltaub ("Turkeltaub"), by and through his attorneys, McAllister Olivarius, as and for his Answer and Counterclaim to Plaintiff's Complaint (Compl., ECF No. 1), states as follows:

Turkeltaub generally denies each and every material allegation set forth in Plaintiff's Complaint, including its introductory and numbered paragraphs, except as specifically set forth below.

## JURISDICTION AND VENUE

1.      Admitted.

2.      Admitted.

3.      Turkeltaub denies entering into any tolling agreement in connection with Plaintiff's claims in this matter.  Turkeltaub otherwise lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

4.      Admitted.

5.      Admitted.

6.      Admitted.

## PARTIES

7.      Admitted.

8.      Admitted.

9.      Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

10.      Admitted.

11.      Admitted.

12.      Admitted in part.  Turkeltaub admits only that Georgetown is an educational institution that receives federal funding.  Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

13.      Admitted in part.  Turkeltaub admits only that Georgetown is an educational institution.  Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

14.     Admitted in part.  Turkeltaub admits only that Georgetown employs at least one individual.  Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

15.     Admitted in part.  Turkeltaub admits he has been named as an individual defendant in this matter.  Turkeltaub further admits that, at all times relevant to this matter, he was employed by Defendant Georgetown University, that he worked at Defendant Georgetown University's Washington, D.C. location, and that he acted as an agent for Georgetown University.  Turkeltaub otherwise denies the remainder of the allegation.

16.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

17.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

## FACTS

18.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

19.     Admitted in part.  Turkeltaub admits that Plaintiff worked in his lab, but Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

20.     Admitted in part.  Turkeltaub specifically denies that he is an Associate Professor with Defendants Georgetown and BGE, but admits the remainder of the allegation.

21.     Admitted in part.  Turkeltaub admits to receiving grants from the National Institutes of Health to conduct research on aphasia.  Turkeltaub otherwise lacks sufficient knowledge or

information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

22.     Admitted.

23.     Admitted in part.  Turkeltaub admits to having a working relationship with Plaintiff. Turkeltaub specifically denies the remainder of the allegation.

24.     Admitted in part.  Turkeltaub admits to engaging in several conversations with Plaintiff in and around the summer of 2019, but denies that the contents of the conversations as set forth in the allegation.

25.     To the extent the allegation presents Plaintiff's state of mind, Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.  Turkeltaub denies the remainder of the allegation.

26.     Admitted in part.  Turkeltaub admits that Plaintiff applied to a PhD program at Georgetown University and that he provided her with a letter of recommendation.  To the extent that Plaintiff relies on the contents of that written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.

27.     Admitted in part.  Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the alleged reason for deferring Plaintiff's start date in the PhD program, but otherwise admits the remainder of the allegation.

28.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

29.     Admitted in part.  Turkeltaub admits that Plaintiff rotated into his lab.  Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

30.     Admitted in part.  Turkeltaub admits Plaintiff continued her PhD research in his lab, but specifically denies exerting any pressure on Plaintiff to continue her work in his lab or making any promises of employment.  Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

31.     Admitted in part.  Turkeltaub admits only that Plaintiff presented work at one conference.  To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

32.     Admitted in part.  Turkeltaub admits that he has received a grant from the NIH on which Dr. Friedman was identified and received a supplement.  Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

33.     Admitted.

34.     Admitted in part.  Turkeltaub denies that the unidentified male regularly present in his lab was a student and the reason alleged for Plaintiff carpooling with Turkeltaub to his lab. Turkeltaub admits the remainder of the allegation.

35.     Denied.

36.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

37.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation or that any of his words or conduct was unwelcomed by Plaintiff.

38.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

39.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation or that Plaintiff indicated any discomfort with any of his words or conduct.

40.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

41.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

42.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the

allegation.  Turkeltaub specifically denies that Plaintiff in any way expressed her discomfort and any implication of inappropriateness or wrongdoing raised by the allegation.

43.     Denied.

44.     Admitted in part.  Turkeltaub admits only that the video meeting alleged occurred. To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

45.     Admitted in part.  Turkeltaub admits only that the conversation alleged occurred, but denies alluding to a sexual act and that Plaintiff in any way expressed her discomfort.  To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

46.     Turkeltaub denies conveying any thoughts of a sexual nature.  To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

47.     Denied.

48.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

49.     Admitted in part.  Turkeltaub admits to engaging in text messages with Plaintiff, but denies the remainder of the allegation.

50.     Denied.

51.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

52.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies that Plaintiff expressed any concern or discomfort with his words or conduct and any implication of inappropriateness or wrongdoing raised by the allegation.

53.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

54.     Admitted in part.  Turkeltaub admits that Plaintiff remained situated in his lab, but denies the remainder of the allegation.

55.     Denied.

56.     Denied.

57.     Denied.

58.     Denied.

59.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

60.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.  Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

61.     Admitted in part.  Turkeltaub admits that Plaintiff attended a party at his house, but denies the remainder of the allegation.

62.     Denied.

63.     Denied.

64.     Denied.

65.     Denied.

66.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies making any inappropriate or sexual comments or advances and any implication of inappropriateness or wrongdoing raised by the allegation.  Turkeltaub specifically denies.

67.     Denied.

68.     Denied.

69.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

70.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

71.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

72.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies engaging in any harassment or inappropriate conduct.

73.     Admitted in part.  Turkeltaub admits meeting with the Plaintiff, but denies the remainder of the allegation.

74.     Denied.

75.     Denied.

76.     Denied.

77.     Denied.

78.     Denied.

79.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies making sexually charged comments or avowals of affection and any implication of inappropriateness or wrongdoing raised by the allegation.

80.     Denied.

81.     Admitted in part.  Turkeltaub admits to holding Plaintiff's hand to comfort her, but denies the remainder of the allegation.  To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.

82.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

83.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

84.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

85.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

86.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the

allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

87.   Denied.

88.   Admitted in part.  Turkeltaub admits that a conversation with Plaintiff occurred, but denies suggesting his interest in a romantic relationship with Plaintiff.

89.   Admitted in part.  Turkeltaub admits to inviting Plaintiff to a coffee shop and offering her a ride home, both of which she declined.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

90.   Turkeltaub specifically denies that a lab employee expressed discomfort with Turkeltaub's conduct and otherwise lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

91.   Denied.

92.   Admitted in part.  Turkeltaub admits meeting with the Plaintiff, but denies the remainder of the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

93.   Admitted in part.  Turkeltaub admits meeting with the Plaintiff, but denies the remainder of the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

94.   Denied.

95.   Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

96.   Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

97.     Admitted in part.  Turkeltaub admits Plaintiff attended a dissertation party at his house, but denies the remainder of the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

98.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

99.     Admitted in part.  Turkeltaub admits that Plaintiff worked remotely from Europe, but denies the remainder of the allegation.

100.     Denied.

101.     Admitted in part.   Turkeltaub admits meeting with Plaintiff, but denies the remainder of the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

102.     Admitted in part.   Turkeltaub admits meeting with Plaintiff, but denies the remainder of the allegation.  Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

103.     Admitted in part.  Turkeltaub admits to hugging Plaintiff at a conference but denies the remainder of the allegation.   Turkeltaub specifically denies any implication of inappropriateness or wrongdoing raised by the allegation.

104.     Turkeltaub specifically denies that Ms. Laks expressed discomfort with his words or conduct and otherwise lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

105.     Denied.

106.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

107.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

108.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

109.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

110.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

111.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

112.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

113.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

114.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

115.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

116.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

117.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

118.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

119.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

120.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

121.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

122.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

123.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

124.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

125.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

126.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

127.     Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

128.     To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the

allegation.  Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

129.    To the extent that Plaintiff relies on the contents of a written document, the document speaks for itself and, to the extent inconsistent therewith, Turkeltaub denies the allegation.  Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

130.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

131.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

132.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

133.    Turkeltaub admits to being promoted during an investigation of Plaintiff's allegations of harassment and retaliation, but specifically denies engaging in any harassing or retaliatory conduct.

134.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

135.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

136.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

137.    Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

138.    Denied.

**COUNT I:  HARASSMENT BASED ON SEX IN VIOLATION OF TITLE IX, 20 U.S.C. §
1681 AGAINST DEFENDANTS GEORGETOWN UNIVERSITY AND GEORGETOWN
UNIVERSITY MEDICAL CENTER, BIOMEDICAL GRADUATE EDUCATION**

139.    Turkeltaub restates and incorporates all prior responses as though set forth fully

herein.

140.    Admitted in part.  Turkeltaub admits only that Georgetown is an educational

institution that receives federal financial assistance.  Turkeltaub lacks sufficient knowledge or

information to form a belief as to the truth of the remainder of the allegation and therefore denies

it.

141.    Admitted in part.  Turkeltaub admits only that Georgetown has legal obligations

under Title IX.  Turkeltaub lacks sufficient knowledge or information to form a belief as to the

truth of the remainder of the allegation and therefore denies it.

142.    Denied.

143.    Denied.

144.    Denied.

145.    Denied.

146.    Denied.

147.    Denied.

148.    Denied.

149.    Denied.

150.    Denied.

151.    Denied.

152.    Denied.

## COUNT II:  HARASSMENT BASED ON SEX (BY EDUCATIONAL INSTITUTION) IN VIOLATION OF THE DCHRA, D.C. CODE § 2-1401.41 AGAINST ALL DEFENDANTS

153.    Turkeltaub restates and incorporates all prior responses as though set forth fully herein.

154.    Admitted.

155.    Admitted.

156.    Admitted in part.  Turkeltaub admits only that Georgetown is an educational institution.  Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

157.    Admitted in part.  Turkeltaub admits that he was an agent of Georgetown, but denies the remainder of the allegation.

158.    Admitted in part.  Turkeltaub admits that, as an agent of Georgetown, he and the university have legal obligations under the DCHRA.  Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

159.    Denied.

160.    Denied.

161.    Denied.

162.    Denied.

163.    Denied.

164.    Denied.

165.    Denied.

166.    Denied.

167.    Denied.

168.   Denied.

169.   Denied.

170.   Denied.

## COUNT III:  HARASSMENT BASED ON SEX (BY EMPLOYER) IN VIOLATION OF THE DCHRA, D.C. CODE § 2-1401.11 AGAINST ALL DEFENDANTS

171.   Turkeltaub restates and incorporates all prior responses as though set forth fully herein.

172.   Admitted.

173.   Admitted.

174.   Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

175.   Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

176.   Admitted in part.  Turkeltaub admits to acting in the interest of Georgetown, but denies the remainder of the allegation.

177.   Denied.

178.   Denied.

179.   Denied.

180.   Denied.

181.   Denied.

182.   Denied.

183.   Denied.

184.   Denied.

185.   Denied.

186.   Denied.

187.   Denied.

## COUNT IV:  RETALIATION IN VIOLATION OF TITLE IX, 20 U.S.C. § 1681(a) AGAISNT DEFENDANTS GEORGETOWN UNIVERSITY AND GEORGETOWN UNIVERSITY MEDICAL CENTER, BIOMEDICAL GRADUATE EDUCATION

188.   Turkeltaub restates and incorporates all prior responses as though set forth fully herein.

189.   Admitted.

190.   Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.  Turkeltaub specifically denies engaging in any sexual advances, inappropriate behavior, harassment or retaliation.

191.   Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

192.   Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

193.   Denied.

194.   Denied.

## COUNT V:  RETALIATION (BY EMPLOYER) IN VIOLATION OF THE DCHRA, D.C. CODE § 2-1401.61 AGAINST ALL DEFENDANTS

195.   Turkeltaub restates and incorporates all prior responses as though set forth fully herein.

196.   Admitted.

197.   Turkeltaub lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

198.    Turkeltaub denies being Plaintiff's employer and otherwise lacks sufficient knowledge or information to form a belief as to the truth of the allegation and therefore denies it.

199.    Admitted in part.  Turkeltaub admits to acting in the interest of Georgetown, but denies the remainder of the allegation.

200.    Denied.

201.    Denied.

202.    Denied.

203.    Denied.

204.    Denied.

205.    Denied.

## COUNT VI:  RETALIATION (BY EDUCATIONAL INSTITUTION) IN VIOLATION OF THE DCHRA, D.C. CODE § 2-1401.61 AGAINST ALL DEFENDANTS

206.    Turkeltaub restates and incorporates all prior responses as though set forth fully herein.

207.    Admitted.

208.    Admitted in part.  Turkeltaub admits that Georgetown is an educational institution but lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegation and therefore denies it.

209.    Admitted in part.  Turkeltaub admits acting as an agent for Georgetown, but denies the remainder of the allegation.

210.    Denied.

211.    Denied.

212.    Denied.

213.    Denied.

214.    Denied.

215.    Denied.

## PRAYER FOR RELIEF

Turkeltaub expressly denies Plaintiff is entitled to any relief, damages or equitable remedies and specifically denies Plaintiff's Prayer for Relief.

## AFFIRMATIVE DEFENSES

As and for his affirmative defenses to Plaintiff's Complaint, Turkeltaub asserts:

1.      Plaintiff's complaint fails to state claims upon which relief can be granted.

2.      Plaintiff's claims may be barred, in whole or in part, by collateral estoppel and/or res judicata.

3.      Plaintiff's claims may be barred, in whole or in part, by estoppel, laches, waiver, in pari dilecto, and/or unclean hands.

4.      Plaintiff's claims are barred, in whole or in part, by applicable statutes of limitations.

5.      Plaintiff's claims may be barred or limited by the doctrine of after-acquired evidence.

6.      Turkeltaub engaged in no speech, actions or conduct that in any way discriminated against or harassed Plaintiff on account of a protected characteristic.

7.      Turkeltaub engaged in no speech, actions or conduct that in any way retaliated against Plaintiff for engaging in a protected activity.

8.      At all relevant times, Turkeltaub had legitimate non-discriminatory and non-retaliatory reasons for his speech, actions, and conduct.

9.      At all relevant times, Turkeltaub acted in good faith and did not violate any of Plaintiff's rights under federal, state, or local laws or regulations.

10.     Plaintiff's claims may be barred, in whole or in part, because any damages suffered were the result of her own actions.

11.     Plaintiff's claims may be barred, in whole or in part, by failing to reasonably mitigate her damages.

12.     Turkeltaub's good faith, nondiscriminatory, nonretaliatory speech, actions, or conduct do not give rise to an entitlement to punitive damages.

13.     Turkeltaub reserves the right to assert additional defenses as and when they become known through discovery or further investigation.

## COUNTERCLAIM

Defendant Peter Turkeltaub ("Turkeltaub"), by and through his attorneys McAllister Olivarius, as his Counterclaim to Plaintiff's Complaint (Compl., ECF No. 1) states as follows:

## INTRODUCTION

1.     Turkeltaub is a highly regarded researcher at Georgetown University, one of the leading figures in his field, with a distinguished record of patient care, publications and lab leadership. He is Professor of Neurology and Rehabilitation Medicine and Director of the Cognitive Recovery Lab ("CRL"), which focuses on research to improve care for people who live with aphasia and other language processing difficulties after suffering a brain injury, such as stroke. He is also the Director of the Neuroscience of Language Training Program, Medical Director for both the Center for Aphasia Research and Rehabilitation and the Center for Functional and Molecular Imaging, and is the Associate Director of the MD/PhD program. He is also the Director of the Aphasia Clinic at MedStar National Rehabilitation Hospital ("MedStar"). He has served on the Board of Directors for the National Aphasia Association, the main organization in the United States advocating on behalf of people with aphasia, for approximately ten years.

2.     Turkeltaub is a global leader in aphasia and brain imaging research. He frequently publishes in high-profile medical journals, including various *Nature* journals, the *Proceedings of the National Academy of Sciences*, and other top-tier neurology and neuroscience journals. He is highly successful in obtaining grants from the National Institutes of Health ("NIH"). He is the Principal Investigator ("PI") of four active NIH awards totaling over $2,300,000 in funding for Georgetown per year. He is a recipient of the Norman Geschwind Prize, the most prestigious award in behavioral neurology; the Founders Award from the American Academy of Neurology; and the Geschwind-Rodin Young Investigator Award from the Rodin Remediation Academy. He

is regularly invited to present his research at other universities and international conferences, and was the keynote speaker at the Clinical Aphasiology Conference in May 2019.  Turkeltaub also directs the NIH-funded Neuroscience of Language Training Program, which supports PhD students and postdoctoral fellows, and mentors PhD students in Georgetown's Interdisciplinary Program in Neuroscience ("IPN").

3.      CRL, which Turkeltaub directs, has a reputation for being particularly well run, productive and collegial due to his leadership.  Reviews of his lab in September 2023 were uniformly positive, including the following comments: "[W]hile many of us were initially drawn to CRL because of our research interests, Peter's skills as a mentor are what make the lab such a desirable place to work and study"; "CRL has a reputation for being the happiest lab in the Interdisciplinary Program in Neuroscience"; and "Peter offers a compassionate, understanding place to discuss issues that may be impacting our work and genuinely wants his students to achieve their own definitions of success."

4.      In July 2018, Counter-defendant Candace van der Stelt ("van der Stelt") joined CRL as Lab Manager and Research Speech-Language Pathologist ("SLP").  As Lab Manager, she was responsible for supervising the lab's Institutional Review Board ("IRB") submissions, record-keeping, and other administrative tasks. In her other role as Research SLP, she oversaw data collection and scoring in the speech patterns of research subjects for Brain-based Understanding of Individual Language Differences ("BUILD").

5.      Van der Stelt was hard-working, smart, engaging, and passionate about the lab's work. She and Turkeltaub worked well together, and van der Stelt was in many respects a co-leader of the lab, running lab operations and clinical aspects of the work.  She enjoyed it so much that she frequently said her career goal was to stay in Turkeltaub's lab "forever."

6.     Van der Stelt was accepted to the IPN PhD program in spring 2020, planning to stay at CRL.  She deferred her start date for one year, and during the deferral year gave up her position as Lab Manager to focus on her other role as Research SLP.

7.     In June 2020, Ms. Sachi Paul ("Paul") was hired to succeed van der Stelt as Lab Manager after an overlap period, and proved a good choice. Paul, Turkeltaub and van der Stelt all loved their work running the CRL and enjoyed each other's company, quickly bonding as colleagues and as friends.  They chatted, joked and texted together extensively, intensified by the COVID lockdown which meant very few others were at work.  Van der Stelt engaged actively and eagerly with her two colleagues, urging Turkeltaub repeatedly to lower his boundaries and to be less formal.  In May and June 2021, she referred to Paul and Turkeltaub as her "best friends" and "favorite people."

8.     When van der Stelt switched in July 2021 from being a co-leader of the lab to Turkeltaub's PhD student, he recognized that a more formal, typical professor-student relationship was required and cut back (but did not end) his friendly exchanges with her.

9.     Even before she changed roles, van der Stelt anticipated that she would become "jealous" of Paul, the new Lab Manager, and of Alycia Laks ("Laks"), her successor as CRL's Research SLP.  She said she feared being "replaced."  When the switch actually occurred, van der Stelt's own emails and texts record that she struggled emotionally.  She lamented that Turkeltaub had "replaced" her as a friend with Paul, and questioned why he needed different boundaries with her as a student.  She accused him of dismissing her contributions to the lab simply because he rightly recognized those of Paul and Laks.

10.     Van der Stelt's self-confessed jealousy of Paul increasingly preoccupied her.  She accused Turkeltaub and Paul of meeting up without her and of concealing things from her, making

it stressful for them to interact at work as they needed to.  She said she felt like she was going through "two best-friend breakups" with Turkeltaub and Paul, a strangely intense overreaction to a simple evolution of professional roles.  She told other lab members that a dream she had about Turkeltaub and Paul sleeping together validated her conviction that they were doing so in real life, a baseless fantasy symptomatic of her growing disconnection from reality.

11.    Van der Stelt's outbursts became more extreme and unpredictable as the year progressed.  Turkeltaub and Paul jumped through hoops to reassure her that they still valued her as a colleague and cared for her as a friend.  This would briefly assuage her, and she would profess her "love" for Turkeltaub, urge him to share personal thoughts and feelings, and praise him effusively for his support during her difficulties.

12.    But within a few weeks she would "spiral," twisting innocuous events or statements by Turkeltaub into imagined evidence that he no longer valued her and had cast her out.  She sent him angry texts late at night expressing feelings of abandonment and animosity toward Paul and/or Laks, frustration with their professor-student boundaries, and pleading with him to rely on her for emotional support.  She often went to Turkeltaub's office seeking reassurance.  Sometimes, she would close the door behind her, yell at him and cry profusely for as long as an hour.  During these sessions, Turkeltaub again tried to console her.  He told her she was a gifted student, that he valued her contributions as an SLP, and that he cared for her as a person.  She often asked for hugs, and Turkeltaub obliged.  But soon after, her disturbing and disruptive negative cycle would begin again.  This emotional rollercoaster took a heavy toll on him.

13.    In May 2022, van der Stelt and Turkeltaub agreed that a more restrained student-supervisor relationship was appropriate, but after this, she became antagonistic towards him, reprimanding him for making ordinary decisions needed to lead a new research project without

her approval, and making cutting comments at group lab meetings.  Van der Stelt's behavior caused discord and tension with other lab members.  Several expressed unhappiness working with her.  One even refused to meet with van der Stelt one-on-one due to her volatility and history of grossly misrepresenting conversations, and said she would leave the lab if she had to keep working with van der Stelt.

14.     Given the tumult van der Stelt was causing, Turkeltaub sought advice from her former supervisor, Christine Baron at MedStar National Rehabilitation Hospital.  This discussion was sobering.  Baron told him that van der Stelt had initially been an exemplary employee, but later, during a stressful time when the team was understaffed, she became volatile and "self-righteous" in a way that caused extra work and unhappiness for her colleagues.  She would not accept decisions made by Baron, and finally accosted Baron in her office with a litany of complaints, including a false accusation of an ethical violation.  The erratic way she was behaving in Turkeltaub's lab appeared to be part of a worrisome pattern.

15.     In October 2022, van der Stelt left CRL.  During her time at CRL, when she repeatedly asked Turkeltaub for more closeness, praised him effusively for his support, and shared many private thoughts and feelings with him, she never gave him any indication that he had sexually harassed her, made advances on her, or made her uncomfortable with any inappropriate behavior toward her.

16.     In particular, while her Complaint makes much of a series of comments and jokes among Turkeltaub, Paul and van der Stelt as being offensive to van der Stelt (Compl. ¶¶ 35-47), at the time van der Stelt had encouraged *more* joking, pushed Turkeltaub not to "filter," laughed enthusiastically, initiated jokes herself, and perpetuated several off-color joke chains for months.

17.     After leaving CRL, van der Stelt refused to relinquish control of a file she was not authorized to keep, a highly sensitive document linking the contact information for research participants to their anonymous study codes.  As a former Lab Manager who had completed ethics training, she knew she was prohibited from retaining it.  Finally, when University authorities requested its immediate return in December, van der Stelt did so—but first made a prohibited private copy for herself, compromising the confidentiality of CRL's research participants.  This data theft violated elementary ethical principles, Georgetown policies, and the direct instructions of the IRB.

18.     Also in October, Turkeltaub learned that an anonymous complaint had been filed with Georgetown's Office of Institutional Diversity, Equity & Affirmative Action ("IDEAA") accusing him of sexual harassment.  The complaint was based on reports van der Stelt had made to a friend who was not a member of CRL.

19.     Van der Stelt's claims of misconduct by Turkeltaub to her friend, and a subsequent formal complaint from van der Stelt herself in March 2023, launched a comprehensive Title IX investigation lasting 14 months.  The investigator interviewed 29 witnesses at length.  Turkeltaub provided multiple lengthy written responses and several hundreds of pages of evidence, including texts, emails, and other documents.  Many witnesses submitted evidence as well. The final hearing was scheduled for December 13-15, 2023.

20.     Two days before the hearing, having had several weeks to review all of the witness statements and evidence, van der Stelt withdrew her complaint against Turkeltaub and refused to participate further.

21.     IDEAA held the hearing anyway to determine if any of the allegations had merit despite van der Stelt's unwillingness to stand by them. The hearing panel was chaired by a senior

lawyer unaffiliated with Georgetown, and included two professors with no connection to Turkeltaub. Twelve witnesses and Turkeltaub were intensively questioned over three days. Eleven witnesses contradicted van der Stelt's allegations and commended him as a mentor and lab leader, while the sole witness favoring van der Stelt, who was not from CRL, had clearly relied on van der Stelt for her information rather than direct observations.

22. The panel quickly reached a unanimous verdict that Turkeltaub was "not responsible" for committing the sexual harassment van der Stelt had alleged, the Title IX equivalent of "innocent."

23. This verdict is correct. Turkeltaub never sexually harassed van der Stelt (or anyone else). Rather, she persistently sought special attention from him, reprimanded him for asserting necessary boundaries, and exploded at him repeatedly because she feared she had been supplanted by Paul and Laks. Her central allegation of a sexual advance was a single act of Turkeltaub touching her thigh, when in fact nothing sexual or suggestive was remotely involved. In fact, he and van der Stelt were standing in public in a highly trafficked location, outside two busy restrooms, easily visible from the front doors of the building and multiple busy hallways. Van der Stelt often sought comments on her fashion choices from Paul and Turkeltaub. On this day, Turkeltaub noted that she was wearing a new item of clothing, a particularly fuzzy corduroy skirt. He commented on how fuzzy it was, and briefly touched the fabric on an innocuous part of the skirt, nowhere near her "inner thigh" as she later claimed. She had previously commented on a new pair of pants he was wearing and touched them on his thigh in order to feel the fabric.

24. Nor, as multiple witnesses have attested, has the environment in CRL been in any way hostile. Quite the opposite, as many current and former lab members will testify.

25.     Van der Stelt's loss with the Title IX panel will not erase the damage done by her many other attacks on Turkeltaub's reputation.

26.     She filed a complaint about Turkeltaub with the NIH, the primary source of his research funding and the most influential body in academic science.  As a result, the NIH removed him from a prestigious grant review panel—based on the allegations alone.

27.     Van der Stelt also attacked Turkeltaub's reputation with his professional colleagues.  After leaving CRL in October 2022, she told current and former PhD students, CRL lab members and faculty at other universities that he sexually harassed her and retaliated against her for rejecting these imagined advances.  She told IPN students that he "groomed" female lab members.  On information and belief, she encouraged friends to spread her account to others in his professional circles.  This caused corrosive gossip, a drop in Turkeltaub's teaching evaluation scores, his removal from a colleague's grant application, and inquiries from colleagues around the world about whether he really was a sexual harasser.

28.     Van der Stelt also filed the federal complaint that is the basis of this lawsuit. She then publicized her complaints in Georgetown's student newspaper. The article, which contains many false claims, is among the top items listed in a Google search of Turkeltaub's name.

29.     In all these complaints, van der Stelt's portrayal of Turkeltaub is fundamentally wrong.  In fact, his postdocs, doctoral students, undergraduate students and other lab members, except for van der Stelt, uniformly credit his mentorship, his support for women and their advancement, and the excellent working relationships his leadership of CRL has engendered. His students have nominated him for a university-wide mentorship award twice, most recently in Spring 2022.  Throughout most of the period of the allegations, even van der Stelt herself

enthusiastically praised his mentorship, his support for her, and the CRL environment, in direct contrast to her *post hoc* invented claims of a harassing and hostile relationship with Turkeltaub.

30.     Van der Stelt's charges stand on their head the reality of Turkeltaub's exemplary and consistent conduct as a pro-female researcher and mentor.

31.     Turkeltaub has suffered immense emotional and reputational harm because of van der Stelt's actions.  He has lost nearly a year's research output after having to divert hundreds of hours to rebutting her shifting accusations.  He has spent more than $300,000 in legal fees.  He has been filled with anxiety, frequently unable to sleep, and has often wished he were no longer alive.  He has been concerned how once-close colleagues will receive him at professional meetings, worried and often despondent about whether his career and reputation will ever recover.

32.     In her Complaint, van der Stelt does a masterful job assembling shards of evidence to portray herself as a victim of Turkeltaub's sexual aggression, nonexistent though it was.  He is highly aware that suing her for defamation can be construed by her and others as an act of intimidation by a powerful professor against a lowly student, a man against a woman.  But this is not that.

33.     In fact, this filing is the last resort of a supportive mentor who tried hard, at considerable cost, to support a complex colleague and friend when she unaccountably felt abandoned and replaced after giving up her position as co-leader of CRL to become a PhD student.  When Turkeltaub could not fulfil her bottomless need for reassurance that she meant more to him than Paul or Laks, she turned on him, dragging him through the mud in public based on invented allegations.

34.     Since van der Stelt first falsely accused him, Turkeltaub has felt as if his life and professional reputation are circling the drain.  As the months have worn on, he has worried that he

could do nothing effective to fight back given the silence imposed on him by Georgetown's Title IX confidentiality rules.

35.     Through this public Counterclaim, Turkeltaub seeks the help of this Court in reclaiming his reputation, career and life from van der Stelt's onslaught of defamation.

## PARTIES

36.     Counter-Plaintiff Peter Turkeltaub is an individual who resides in Arlington County, Virginia.  Turkeltaub is a defendant in the underlying action.

37.     Counter-Defendant Candace van der Stelt is an individual who resides in Arlington County, Virginia.  Van der Stelt is the plaintiff in the underlying action.

## JURISDICTION AND VENUE

38.     The Court has subject matter jurisdiction over Counter-Plaintiff's counterclaims under 28 U.S.C § 1367(a) because they are so related to the Plaintiff's claims that they form part of the same case or controversy under Article III of the United States Constitution and Rule 13(a) of the Federal Rules of Civil Procedure.

39.     The Court has personal jurisdiction over Counter-Plaintiff and Counter-Defendant because they both have substantial, continuous, and systematic contacts with the District of Columbia.

40.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District of Columbia.

## FACTS

### I.     Turkeltaub's background

41.     Turkeltaub is a well-regarded teacher and mentor at Georgetown.  He directs an NIH-funded training program for PhD students and postdoctoral fellows and is the Associate Director of the MD/PhD program; he frequently mentors PhD students in the cross-campus

Interdisciplinary Program in Neuroscience ("IPN"); he co-directs and teaches the Neuroscience of Language I and II courses for PhD students; and he teaches first-year medical students in the Medical Neuroscience course.  In spring 2018 and again in 2022, he was nominated for the Gerald M. Mara Faculty Mentoring Award, a university-wide award that recognizes a faculty member who "exemplifies the spirit of *cura personalis* (or 'care of the whole person') by aiding the academic and professional development of graduate students."

42.     In April 2023, ten professional colleagues wrote their own observations of Turkeltaub in response to van der Stelt's accusations.  One described him as "among the most honest, kind, and generous people I have known, with a strong and unwavering moral conscience." Another called him "a brilliant scientist and also an exceedingly kind and thoughtful person, particularly to his students."  Another said, "My years in the workforce allow me to speak with some authority on workplace culture and lab culture, and I can say that the supportive, nurturing, and conflict-free way [Turkeltaub] manages his lab is exceptional."

43.     Also in April 2023, in response to van der Stelt's unrecognizable description of CRL contained in the Complaint, 19 current and former lab members wrote letters supporting Turkeltaub.  One described him as "a quintessential mentor and scientist, and a fantastic person to boot. I aspire to be more like him personally and scientifically. I will aim to make my lab environment like his lab, and treat my trainees like he does."  Another said Turkeltaub "is a true gem of a human being professionally and personally... I aspire to embody his scientific and clinical brilliance, empathy, professionalism, and leadership...."  Another said Turkeltaub "is the best mentor I've ever had, and continues to be one of my biggest role models and supporters."  This lab member quoted her letter of resignation, "I hope you realize how immensely supportive you are and how amazing the lab environment that you have cultivated is."  Another said, "I have only

ever heard people speak of him positively as a scientist, as a mentor, and as a person.  There are few people who can live up to the praise they receive in their best moments, but having known and worked with [Turkeltaub] for the last 10 years, I can wholeheartedly say that every positive thing said about him is true....  Having worked in positions both in and out of academia, I can honestly say that Peter is the best boss/PI I've had.... Three of my best friends are all former students of Peter's, and I know they share the same love, respect, and admiration that I have for him, first as a mentor and now as a friend."  Another said Turkeltaub "has a way of recognizing what is truly special about each person who walks into his lab.  He does so with respect, kindness, and grace. I have only seen these things in him.  And I have only seen him do this consistently and fairly with each individual in his presence.  There is no part of [Turkeltaub], that I have ever seen, who would ever abuse his status or take advantage of anyone."

## II.   Van der Stelt and Paul join the CRL

44.     In July 2018, van der Stelt joined the CRL as Lab Manager and Research Speech-Language Pathologist ("SLP").

45.     Turkeltaub and van der Stelt initially had a healthy professional relationship. Turkeltaub found her to be capable and dedicated.  He admired her organizational skills and capacity for hard work.  Likewise, van der Stelt expressed enjoyment about working alongside Turkeltaub, and repeatedly stated her desire to stay in his lab "forever."

46.     Van der Stelt applied to the IPN so she could do a PhD in Turkeltaub's lab.  Her academic background lacked exposure to neuroscience, and she did not express any ambition to run her own lab, which was unusual since most candidates seek to be leaders in the field, but Turkeltaub backed her candidacy because she was otherwise well-qualified.  She was accepted in the spring of 2020 but deferred her start to the summer of 2021.

47.     Van der Stelt wanted to focus on her Research SLP role in the year before becoming a PhD student.  Turkeltaub agreed and hired a new Lab Manager in the summer of 2020, Sachi Paul.  Meanwhile Turkeltaub promoted van der Stelt so she could focus on her work as a Research SLP.

48.     Van der Stelt and Paul quickly became close friends.  They worked well together and freely discussed personal topics, such as their romantic relationships, including when Turkeltaub was present.

49.     Shortly after Paul joined the lab, van der Stelt told her that it was "very normal for young women in the lab to have sex dreams about Peter, especially early on."  Giggling like a teenager, she requested that Paul "please tell [her]" if she ever had such a dream.  Paul was startled that van der Stelt talked about her direct supervisor in these terms.  The request made her uncomfortable and she chose not to discuss it further.

### III.     Van der Stelt persistently encourages Turkeltaub to lower his professional boundaries with her

50.     During the COVID-19 epidemic in the fall of 2020, Turkeltaub, van der Stelt and Paul were the three people, along with a male postdoctoral fellow (Dr. Andrew DeMarco), most often in the lab.  They spent a lot of time together and looked forward to each other's company while otherwise isolated from their usual social contacts.

51.     In March 2020, Turkeltaub had set up a WhatsApp Group for his CRL colleagues called "CRL Don't Go Insane Group."  His intention was to reduce the social isolation caused by the COVID-19 pandemic through a communication channel to discuss work-related matters and personal stories his colleagues might otherwise have told each other in person.  Thirty-two current and former CRL lab members and "friends of the lab" joined.  The group was very active with many people posting every day.  Many lab members, including van der Stelt, used the group to

36

share images of their family and pets as well as significant personal news, such as pregnancies and engagements.  Turkeltaub also used the group to organize social events for lab members and to announce lab accomplishments, such as publications, promotions, and grant awards.

52.     In the summer of 2020, Turkeltaub, van der Stelt and Paul started a new group text chat where the three of them discussed work-related matters and personal topics.  Van der Stelt was the first to name the group on October 8, 2020 ("Co-Bests!").  The chat was eventually renamed "Tri-BOATs!" based on a series of inside lab jokes. When van der Stelt went on a trip to Europe in April and May 2021, she created a new WhatsApp group for the three of them to keep in touch while she was away.  While away she expressed multiple times that she missed Paul and Turkeltaub.

53.     Turkeltaub, van der Stelt and Paul each messaged frequently on "Tri-BOATs!" both during and outside standard office hours.

54.     Van der Stelt frequently initiated text exchanges on the "Tri-BOATs!" group.  For example, on November 30, 2020, she messaged Turkeltaub and Paul, "I need a tri-boats pick-me-up for this Monday."

55.     Van der Stelt also complimented Turkeltaub on his ability to be both an effective boss and a friend to her.  On October 9, 2020, she told him, "Peter, you're a really good friend and a really good boss. I think you do a really good job balancing the roles and I'd seek your advice if I were ever in a boss role."  On November 12, 2020, she texted "You're literally the world's best boss."  On his birthday in April 2021, she texted "Happy birthday to the best boss in the world!"

56.     At the beginning of their friendship, Turkeltaub was especially conscientious to avoid making jokes or comments of a sexual nature with van der Stelt and Paul, given his position as their superior.

57.     However, as their friendship developed, van der Stelt and Paul frequently encouraged Turkeltaub to become less guarded and formal with them both in person and via text.

58.     For example, on October 28, 2020, van der Stelt sent a message telling Turkeltaub, "Peter don't filter."  In the same vein, on November 16, 2020, in reference to a Bollywood movie they had been discussing, van der Stelt asked Turkeltaub "did you find the lachrymose Indian men attractive?"  Turkeltaub did not respond to van der Stelt's question, prompting her to respond, "Dang it. WHY do you always filter."  Paul added, "I know cmon Peter."

59.     Turkeltaub initially resisted this encouragement.  However, van der Stelt's demands were persistent, and as the COVID shutdown continued, the group became less formal.

60.     At their urging, Turkeltaub began to joke more with van der Stelt and Paul.  This included jokes about syphilis in the fall of 2020.

61.     At no point did van der Stelt criticize Turkeltaub's jokes or say or imply that they had made her uncomfortable.  On the contrary, on November 18, 2020, in response to a joke typical of doctors that Turkeltaub had told about syphilis, van der Stelt acknowledged that the joke was a direct consequence of her and Paul's prodding ("this is Peter filtering less, so I guess we asked for it.") and asked Turkeltaub to share additional details about his experience of seeing a syphilitic chancre in real life ("I want to know that [where Turkeltaub saw one] too," to which the answer was in a medical clinic where he was working as a doctor).  This conversation also showed that casual banter was a normal component of their group dialogue; van der Stelt said to Paul, "Im still waiting to have a sex Ed lesson Sachi."  Van der Stelt made similar sexual comments on many occasions.  For example, in a text exchange with Turkeltaub on September 23, 2021, when he accidentally mistyped "stick it to the man" as "stick to the man," van der Stelt replied, "Don't worry, I'm very confident in my sexuality." Turkeltaub did not reply.

62.     Van der Stelt also initiated jokes about syphilis.  On February 4, 2021, she added an event called "Syphilis Treatment 1" to Turkeltaub's professional Google calendar.  Paul noted the two-sided nature of the syphilis jokes between Turkeltaub and van der Stelt, commenting, "you guys love syphilis."  In the same exchange, van der Stelt went on to tell the group a story about female pigs enjoying it when her brother inserted his hand into their vaginas.  She also joked about Turkeltaub's wife's former sexual partners.  Afterwards, she added additional calendar events labelled "Syphilis Treatment" to Turkeltaub's Google calendar each month through May 2021.

63.     Turkeltaub was surprised and hurt by van der Stelt's joke about his wife; but instead of getting angry at her, he characteristically checked first to make sure he was not at fault.  He texted her to ask whether his own joke had "hurt [her] feelings" which might have provoked her retaliation.  She replied that his joke had not offended her and laughed at the suggestion, implicitly acknowledging that these jokes were welcome and a normal part of their relationship ("Hahaha no, why would it hurt my feelings?").

64.     In the same period, van der Stelt, Turkeltaub and Paul socialized outside of work when COVID restrictions allowed it.  They often invited their partners and other lab members. For example, on December 8, 2020, van der Stelt invited Turkeltaub and Paul to a board game evening at her home with her husband.  Similarly, in June 2021, van der Stelt invited Paul and Turkeltuab to celebrate her 30th birthday by going out to dinner with her and her husband, which they did.

65.     Van der Stelt enjoyed the positive working environment.  On December 17, 2020, after an out-of-work social gathering, she emailed Turkeltaub, Paul and Dr. Andrew DeMarco to thank them for their friendship: "I woke up this morning feeling really happy and satisfied socially. Thanks for the hang out last night. I really appreciate you guys ❤."  On July 1, 2021, she texted

Paul and Turkeltaub, "thanks for being so incredibly wonderful. I'm so happy to have you in my life."

66.     In the context of their close friendship, van der Stelt, Turkeltaub and Paul each discussed their personal lives. This included discussing their relationships with their partners. Van der Stelt repeatedly encouraged Turkeltaub to lower his boundaries. On December 16, 2020, she texted him, "This is a safe space for you to share your feelings." Van der Stelt also often offered thoughts about religion.

67.     Turkeltaub, van der Stelt and Paul also hugged each other, as friends. Van der Stelt frequently initiated these hugs. As COVID restrictions lifted and other lab members returned to the CRL in-person, van der Stelt initiated near-daily hugs with many lab members.

## IV.    Turkeltaub establishes boundaries with van der Stelt when she begins the PhD program

68.     Van der Stelt had frequently expressed her desire to work with Turkeltaub in the long term, including after her PhD. In Summer 2020, she told Paul that she wished to remain at Georgetown after graduate school so that she and Turkeltaub could eventually be "king and queen of the lab." In June 2021, just before starting the PhD program, van der Stelt created a Google Doc she shared with Turkeltaub and DeMarco entitled "projects so we can work together forever." In her letter of resignation from her position as Research SLP, dated May 30, 2021, she wrote, "I'm excited to remind you that my reason for resigning is to pursue a PhD...with you as my mentor. Thank you for three wonderful years of mentorship thus far. I look forward to many more years of learning from, collaborating with, and sharing ideas within the CRL family."

69.     Even so, she worried about transitioning from lab leader to student. Six months earlier, on January 6, 2021, she had texted Paul and Turkeltaub, "I think there's this irrational fear in my head of being replaced, but once I'm in the student role and realize I still matter to you guys,

I think I'll be fine."  On March 18, 2021, van der Stelt told Paul that she was "possessive" over her relationship with Turkeltaub, and expressed concerns about becoming jealous of the new Research SLP (Laks).  On May 31, 2021, she texted Paul and Turkeltaub, "Thanks for being my best friends this past year. Please don't replace me."

70.    Once van der Stelt became Turkeltaub's student rather than his colleague in running the lab, it was inevitable their relationship would have to change.  Instead of her being a co-leader of the laboratory, she was now a brand-new student, without a neuroscience background, in a field where he was established as one of the world's leaders.  He had become closer with her than his other students, but could not favor her over them.  Starting in July 2021, Turkeltaub therefore made an effort to text van der Stelt less frequently about non-work-related matters and to share less information about his personal life.  However, he did not end carpooling, personal communications with her or their friendship, because he did not think that should be necessary.

## V.    Van der Stelt exhibits extreme emotional volatility and jealousy

71.    Nevertheless, the readjustment in their relationship and her loss of status as a leader of the lab caused van der Stelt to behave erratically and to seek, with increasing insistence, reassurance that Turkeltaub still valued her.

72.    Van der Stelt acknowledged that she was "depressed" and "anxious" during her first semester as she struggled to cope with the coursework of the IPN.  Turkeltaub supported her when she reported these difficulties, as he did his other graduate students, by reassuring her that she was a gifted student and that she would master the material in due course.  He and Paul provided enthusiastic encouragement through supportive "cheerleading" texts when she had exams.  Turkeltaub offered her a desk in his lab to use even when she was rotating with other labs, to which she responded enthusiastically: "OMG that would be amazing."

73.     However, it became evident that van der Stelt's struggles were not simply academic.  She was also struggling to accept the boundaries that Turkeltaub had to assert as her PhD supervisor.

74.     Her reaction was to push for even greater personal closeness with him.

75.     She initiated conversations with Turkeltaub about his marriage.  On August 10, 2021, she started an emotionally intense text exchange with Turkeltaub at 10:12 PM.  She encouraged him to open up to her ("you should never feel bad for sharing how you feel with me.").  Without invitation, she urged Turkeltaub to confront his wife, a doctor working long hours, telling him, "You need to tell [her] what you need, and tell her until she listens."

76.     Within the same August 2021 exchange, van der Stelt praised Turkeltaub in effusive terms, as she often did: "[y]ou're one of the smartest people I know, but you're also one of the kindest."  She said, "I really hope you feel how loved and appreciated you are."

77.     Van der Stelt regularly initiated hugs with and asked for hugs from Turkeltaub both in person and via text.  On July 13, 2021, she messaged Turkeltaub and Paul "[c]an't wait to hug you!"  On August 21, 2021, she messaged Turkeltaub, "Sending you a hug."  On September 19, 2021, before she took her first exam for the Neuroscience Core class, she suggested dropping a card to Turkeltaub in person at his house, explaining, "I'll probably need a hug after this exam."  On January 10, 2022, she asked Turkeltaub, "Would you require me to have a third negative covid test before I hug you?"  In a text exchange on January 26, 2022, she messaged Turkeltaub, "[s]ending you love and a hug today." On February 16, 2022, she asked him, "Can I have a hug from you at some point today?"

78.     Van der Stelt also sought frequent contact with Turkeltaub outside of work, and expressed possessive feelings.  On November 28, 2021, she initiated an exchange with Turkeltaub

at 8:57 PM on a Sunday to express that she was "jealous" that her husband "got to see you today" after Turkeltaub had run into him by chance at Target, and said that "its okay if I can't ride with you [tomorrow] but its not okay if you're not on campus."

79.     Van der Stelt reprimanded Turkeltaub when he avoided sharing personal feelings or thoughts.  For example, in a January 26, 2022 exchange, after he tried to avoid answering her question about whether they knew each other better after a stressful fall semester, she said "Remember how I said you like to avoid answering things? Such a great example" and then asked, "How am I supposed to really KNOW you if you don't answer questions like this."  He eventually replied: "I thought 'I guess I know Candace better, but also her reactions were very hard for me to predict last semester, so in that sense I almost feel like I know her less in a way.'"  She replied, "Or maybe you just know her when she's having mental health issues now."

80.     Van der Stelt also continued to carpool with Turkeltaub, which was sensible from a commuting standpoint, but also reflected her desire for concentrated time with him.  On July 23, 2021, van der Stelt created a repeating Google calendar event on both of their work calendars called "Pick up Candace" which invited Turkeltaub to pick her up to carpool with him every morning for the next five years (July 26, 2021—May 30, 2026).

81.     Once while carpooling with Turkeltaub, van der Stelt complimented him on the new pants he was wearing.  As she did so, she reached over and touched his right thigh.  He did not interpret this as a sexually charged gesture, just a friendly one.

82.     Van der Stelt also sought compliments on her clothes from Turkeltaub. On December 15, 2021, she texted Turkeltaub and Paul, "Too bad neither of you will see me today. I'm not wearing lounge/athletic clothing for once." She sometimes announced she was wearing a "Sachi outfit," by which she meant something that Paul might wear, and periodically asked him

whether he noticed that she was wearing a new outfit. Turkeltaub typically responded by providing a professionally appropriate compliment, which seemed to satisfy her desire for attention.

83.     In spring 2022, Turkeltaub preempted van der Stelt's question. He noticed she was wearing a new blue corduroy skirt that day and remarked, "Wow that's a really fuzzy skirt," and touched one of the corduroy wales near the hem to feel the fabric. Turkeltaub's intention was in no way sexual; he was complimenting a coworker who regularly sought reassurance from him, including about her fashion choices, and was mirroring her own behavior towards him. This incident occurred in a particularly busy part of the building where his lab is situated, outside of both the men's and women's bathrooms, visible from the front doors and three hallways, where people are always walking past. Van der Stelt has since claimed that Turkeltaub touched her "inner thigh" during this incident. It is the centerpiece of her sexual harassment claims against him.

84.     This characterization falsely recasts an innocent interaction into something wrong and illegal.

85.     Van der Stelt became more agitated that Paul's position as lab manager meant she had regular access to Turkeltaub. In a text exchange with Turkeltaub on February 5, 2022, she said, "in this situation I feel replaced" and lamented that "I used to be in the dynamic where there were no boundaries and for whatever reason, there are walls that I'm not [*sic*] longer allowed over." She related a conversation in which she said to Paul, "I used to be Peter's person who he vented to and came to when he needed support and it feels like he's replaced me with you." She accused him and Paul of hiding things from her ("When you and Sachi hide things from me, I literally cannot function."). She accused them of "secrecy and whispers behind my back" while also acknowledging that a lot of her fears were spun from her own imagination: "Its not about this instance at all, its about what happens in my head from the entirety of your dynamic."

86. The same exchange shows how her fears of being displaced became so great that they caused her to misinterpret events to her own disadvantage. After van der Stelt accused him of being emotionally dependent on Paul, Turkeltaub texted her, "I love Sachi dearly. I'll be extremely proud of her when she gets into grad school and leaves [the lab]", which she mistook as revealing that he favored Paul over her: "I just poured my heart out to you and told you how I've felt vulnerable and replaced by Sachi and instead of affirming me, you say 'I love Sachi dearly.'"

87. Turkeltaub then apologized for giving offense. But the exchange ended with an explosion characteristic of van der Stelt: "I FREAKING KNOW YOU LOVE SACHI. YOU SAY IT EVERY DAY PRETTY MUCH."

88. Feeling bad for her, Turkeltaub tried to assuage her by reassuring her he still cared for her, and offered to show it more and be more cautious about her feelings toward Paul, to which she responded, "Thank you."

89. To de-escalate van der Stelt's explosive volatility, Turkeltaub and Paul decided to be less friendly towards each other in her presence. Van der Stelt snapped back to her previous friendly self, writing Turkeltaub and Paul on February 14, 2022, "Can I tell you guys Happy Valentine's day because I love you?" But she soon boomeranged back towards paranoia, with a message to Turkeltaub a week later, on February 22, 2022: "why do you warm to Sachi […] but you shut me out? […] that's what's been hurting me," also expressing further unreasonable ideas about Turkeltaub's and Paul's friendship based on his supposed body language and other ephemera ("you literally turned your body toward Sachi and [p]ut out an arm up on the table toward me" and "[i]t seems like you and Sachi spend more alone time together than I'm even aware of so you're probably just more comfortable with her").

90.     Van der Stelt's waves of anger and jealousy were unpredictable.  On at least four occasions from February to March 2022, she texted Turkeltaub to complain about Sachi Paul or Laks, the new Research SLP who had filled van der Stelt's prior position in the lab.  She quickly construed Laks as a rival, which was untrue.  On March 3, 2022, she texted Turkeltaub at 10:03 PM to complain that Laks was listed as a co-author on a paper, for which van der Stelt was the fifth author and Laks the seventh of ten authors.  She texted, "the premature gifting of authorship to Alycia pisses me off."  She went on, "while I know my decision [to give up her SLP role] was the right one, I'm not sure helping Alycia get hired in the lab was" and "now that she might be here long term drives me insane."  She accused Turkeltaub of offering Laks a promotion, which he had not.  She continued to argue about authorship until 11:59 PM despite Turkeltaub's many attempts to appease her by stating that he would confirm the reasons Laks was included in the morning and would revoke her authorship if unwarranted.  At one point, when he tried to reassure her ("Don't worry I'm not mad"), she replied, "I fucking am."  Finally, near the end of this difficult exchange, van der Stelt acknowledged she did not know what Laks' contribution to the paper had been, but this self-awareness came only after nearly two hours of unprofessionalism and rage.

91.     Turkeltaub had never known such resentment regarding a co-authorship decision, especially when Laks' inclusion had no impact on the credit van der Stelt received.  He checked why Laks had been listed; the decision was perfectly reasonable, consistent with CRL protocols and scientifically justified.  But van der Stelt continued to suggest he was showing favoritism to Laks, later complaining about Laks's authorship position on another paper.

92.     During the 2021-2022 academic year, van der Stelt sought out Turkeltaub in his office on many, perhaps most days he was in there. On several occasions, she closed the door, cried profusely and sometimes yelled at him, saying she felt he no longer valued her as a lab

member or a friend. Some of these episodes lasted over an hour. She admitted that when she didn't receive regular reassurance from him, she would "spiral" downwards based on innocuous statements or other trivial events, an acknowledgment that these anxious thoughts were not based in reality.

93.     Turkeltaub tried to support van der Stelt as she was obviously being buffeted by internal demons.  However, it became increasingly difficult to moderate her complaints and emotional gusts.  By June 2022, Turkeltaub began to have panic attacks when interacting with her for fear of her unpredictable and often extreme responses to what he said and his normal interactions with other lab members, especially Paul.  He ultimately resorted to taking anti-anxiety medication before scheduled meetings with her.

94.     Nevertheless, throughout this period, van der Stelt continued to profess her love for Turkeltaub, to praise him as a boss, mentor and friend, to request hugs and to thank him for his support.  On January 12, 2022, she texted "Tri-BOATs!," "The best thing about coming back from vacation is realizing that you also don't want to leave work because you love the people so much."  On March 11, 2022, she texted, "I've told you what I need a lot lately, and you've been really receptive to it."  She asked how to make him feel "loved" in return, going so far as to suggest "physical touch."  He sidestepped this inappropriate suggestion.

95.     In April 2022, she wrote him "[I'm] really grateful for your existence, both on this planet + in my life. You really do make the world a better place. Thank you for granting me your time, your patience, your care, and your ear throughout this year. I really couldn't have done it without you."

96.     If she ever felt uncomfortable because of behavior by Turkeltaub that she viewed as sexual or inappropriate toward her, van der Stelt never expressed this to him in any way

throughout the period she was in his lab.  She confirmed that she had never told him this directly in a text to a former CRL PhD student on September 2, 2022, shortly before she left CRL.

## VI.     Van der Stelt's jealousy towards Paul explodes

97.     Despite Turkeltaub's efforts to support van der Stelt academically and emotionally, her jealousy and paranoia about his relationships with others in CRL, particularly Paul, continued to simmer and sometimes boiled over.

98.     Her enmity towards Paul culminated in an email she sent to Paul on April 27, 2022 entitled "A long time coming."  In the email, van der Stelt admitted her jealousy ("Have I felt jealous? Absolutely.").  She claimed that Turkeltaub "was becoming unhealthily attached" to Paul. She contended that Turkeltaub and Paul were "gaslighting" her by lying to her about how often they had been meeting up without her.  She also admonished Paul for "choosing an exclusive relationship with our 45-year-old boss over any close relationship with me."

99.     Paul met with van der Stelt the next day to discuss her blizzard of unfounded allegations.  The conversation lasted for approximately two hours, during which time van der Stelt became accusatory and extremely distressed. She said she dreamt that she found Paul and Turkeltaub in bed together and that this dream "sa[id] something about reality." By the end of the conversation, Paul was left with the impression that van der Stelt had lost touch with reality.  Their friendship was over.

100.     On May 5, 2022, van der Stelt and Turkeltaub met.   She likewise accused Turkeltaub of "gaslighting" her, alleged that his relationship with Paul was improperly close, and claimed that her own friendship with Turkeltaub had caused other lab members to be jealous of her, which she believed was the cause of her interpersonal difficulties with these individuals.  She also described the lab as beset with conflicts because of his friendship with Paul.  But in follow-up emails she sent to Turkeltaub that evening and the next day, van der Stelt switched course.  She

summarized the cause of her distress throughout the year, saying, "When you chose to pull away from me and simultaneously pull Sachi closer, I went through two best friend break-ups while starting my PhD."  She stated that, "I've felt that our relationship has gotten to a healthier place with better boundaries," that he had "[i]n no way […] failed [her]," and that "things have gotten better between us."  Van der Stelt said that she "should not have used the word gaslighting" to describe Turkeltaub's behavior and that she had not understood what it meant.  Her positive statements appeared to provide a foundation for a workable professional relationship going forward.  Even so, these exchanges had been tumultuous, and she and Turkeltaub agreed to cease non-professional encounters with each other.  Turkeltaub suggested this include no more carpooling, but she objected.

### VII.   CRL lab members raise serious concerns about van der Stelt

101.    Though he had doubts about van der Stelt's reliability as a reporter, Turkeltaub did not want to dismiss the possibility that she had been right during their May 5 meeting about conflicts in the lab due to his leadership.  He thus sent an anonymous feedback form to the other CRL lab members who had been physically present in the lab over the previous year, seeking to confirm whether others confirmed her criticisms and asking for feedback on how to improve the lab environment.  When he sent out the survey, he did not mention its origins in van der Stelt's complaint to avoid influencing the results.  He requested that feedback be "candid and frank" and that lab members should not "discuss your answers with each other."  Within several days, Turkeltaub had received multiple anonymous responses.

102.    The feedback about his lab and his position as PI was overwhelmingly positive. CRL was variously referred to as "the healthiest environment I've ever worked in," "supportive and laid back," and "the best culture that I've ever seen in a work environment."  As the PI, he was credited for fostering this unusually positive culture ("Peter does a really great job of fostering

collaboration and care for each other," "Peter leads by example," "Peter has created an incredibly nurturing and supportive lab atmosphere").

103.    But the respondents did have some sharp criticisms—of van der Stelt.  One said that "[t]he only couple of problems that have come up [in the lab] have been with Candace," citing her tendency to "demean" colleagues and to act in "aggressive or controlling" ways.  Another commented on the capacity of "one individual" to "just cry and get her way."  A third respondent raised concerns that Turkeltaub was spending too much of his time and energy on van der Stelt's seemingly insatiable need for attention: "I might say I am concerned about the energy going into feeding what seems like Candace's narcissistic supply."

104.    Since van der Stelt's departure from the CRL in October 2022, many of her former colleagues have offered additional criticisms.  One Research SLP noted that van der Stelt frequently made untrue criticisms about other lab members, such as Paul.  A former lab member said that from the time van der Stelt started in the lab, she made subtle belittling comments to her at group meetings, which she came to describe semi-jokingly as "elder abuse."  Dr. DeMarco has claimed that van der Stelt forcefully encouraged him to lower his professional boundaries with her, despite his evident discomfort.  He has claimed that she said, "I love you" to him in a group with colleagues outside the CRL, persistently encouraged him to hug her despite his protests, and sent him a Valentine's card out of the blue, which all made him uncomfortable.  He declined to serve as her PhD co-mentor for fear of her unsettling emotional volatility.  Another lab member said that van der Stelt's frequent hugging despite her protestations made her uncomfortable, and that she avoided entering the lab suite when van der Stelt was there.  Another lab member claimed van der Stelt bullied her, causing this person to avoid the lab when van der Stelt was present.

**VIII.   Turkeltaub tries to maintain a professional working relationship with van der Stelt**

105.     Having received feedback from lab members, Turkeltaub was aware that van der Stelt was at the root of multiple interpersonal conflicts in CRL, but he did not want to break his promise to be her PhD supervisor.  He had never experienced persistent interpersonal problems with colleagues or students before.  He believed his professional relationship with van der Stelt could also be navigated, especially after their extensive May 5 conversation when she had acknowledged that her professional experience with him had been positive.  He resolved to treat her just as he would any other graduate student.

106.     On June 4, 2022, Turkeltaub hosted a dissertation defense party at his home for a PhD student in Turkeltaub's lab from 2017 to 2022 who then stayed as a postdoctoral fellow.  Just as he had greeted his other graduate students, Turkeltaub welcomed van der Stelt to the party with a brief friendly hug which she fully reciprocated.  Turkeltaub had previously asked her "should I not be hugging you anymore?" and she had not replied.

107.     Later that night, van der Stelt spoke with Rachel Galginaitis, Manager of the Georgetown Center for Brain Plasticity and Recovery, claiming Turkeltaub had treated her inappropriately.  Van der Stelt asked Galginaitis not to repeat this to anyone and did not raise these concerns with Turkeltaub herself.

108.     Van der Stelt continued to badmouth Turkeltaub to Galginaitis and other female lab members in the following months.  Upon information and belief, many of van der Stelt's statements about Turkeltaub were untrue.

109.     In June and July 2022, van der Stelt travelled to Europe and Israel.  She worked remotely, causing some difficulties for Turkeltaub and other lab members since she was in a

different time zone.  He rescheduled several group meetings to accommodate her and they emailed frequently regarding work-related topics.

110.    Van der Stelt's troubling behavior continued when she returned from her trip in July 2022.  She told Sara Dyslin, a graduate student working in the CRL, that she was concerned about Turkeltaub's relationship with Paul.  Van der Stelt described to Dyslin the same sex dream about Turkeltaub and Paul that she had confronted Paul about in April 2022.

111.    In the same conversation, van der Stelt told Dyslin that she had asked Paul directly whether her sex dream about Turkeltaub and Paul was founded in reality.  She stated that Paul had categorically denied this, but "bit her lip when she said it," which she interpreted as a sign Paul was hiding something.

112.    From July to October 2022, van der Stelt behaved antagonistically toward Turkeltaub, reprimanding him for discussing tasks for the project funded by his new NIH grant without her present, and rebuking him for asking undergraduate research assistants to assist her with a task that she was struggling to deliver on time.  In October 2022, Turkeltaub made a statement to boost morale at a lab meeting, and van der Stelt responded with a comment that several lab members perceived as cutting.

113.    This prompted Turkeltaub to seek guidance from his mentor, Professor Elissa Newport, about how to manage van der Stelt's challenging behavior.  Newport is a world-renowned scientist who has made many fundamental discoveries about brain plasticity and language acquisition, and is a member of the prestigious National Academy of Sciences.  She was also a plaintiff in a precedent-setting Title IX and Title VII case against the University of Rochester for not disciplining a sexually harassing professor, and has advocated fiercely for protections for women at Georgetown.  She advised Turkeltaub to seek guidance from the leaders of van der

Stelt's PhD program, which he promptly did.  He spoke with the Director of the IPN and with the Chair of the Student Advisory Committee, who helps to navigate issues between students and mentors.  He reiterated his commitment to mentoring van der Stelt for her PhD in spite of the challenges she was causing.  He said he would now give more direct feedback about her disruptive behavior, which he had been fearful to provide out of concern that any criticism would provoke explosive retaliation.

114.    On October 12, 2022, Turkeltaub contacted van der Stelt's former supervisor, Christine Baron, who had worked with her at MedStar National Rehabilitation Hospital ("MedStar").  Van der Stelt had previously told Turkeltaub that she had significant conflict with Baron while working at MedStar, and Turkeltaub hoped that Baron would be able to offer advice on how to work effectively with her, including how he could share feedback with her without provoking an emotional outburst or destructive gossip.

115.    This conversation was sobering.  Baron said that van der Stelt had been an excellent employee at first, intelligent, hard-working, and a good writer.  Later on, during a stressful period in which the team was understaffed, van der Stelt became highly critical of Baron and "self-righteous" about opposing decisions Baron made as her superior, which caused extra work for her colleagues.  Van der Stelt did not respect the opinions of more experienced SLPs.  At one point, van der Stelt had an unprofessional emotional outburst when Baron needed to change her mentor for logistical reasons.  Later in her employment at MedStar, van der Stelt berated Baron at length in her office and accused her of unethical behavior.  Baron described feeling "shaken" by this experience and regretted not reporting her to Human Resources when she had the chance.  She also said she was sorry Turkeltaub had not sought a reference from her before hiring van der Stelt,

because she would have warned him about her outbursts, which she believed were brought on by stress.

116.    On October 26, 2022, van der Stelt informed Turkeltaub by email that she planned to change thesis labs due to an "ongoing uncomfortable and hostile work environment."  She did not specify further.

117.    Turkeltaub was surprised to learn that an anonymous complaint against him had been filed with IDEAA in late October 2022.

118.    Van der Stelt filed her own official complaint against Turkeltaub with IDEAA on March 28, 2023, expanding upon the prior complaint, which had been submitted on her behalf by a person unaffiliated with the CRL.

### IX.    Van der Stelt leaves CRL and violates professional ethics

119.    After leaving CRL, van der Stelt no longer participated in its research.

120.    While at CRL, she properly had access to its most sensitive information—a document that contained personal information about its research participants, who are promised anonymity in any lab output.  This document linked participants' personal information to the anonymizing ID codes used to protect their identities.  Van der Stelt had created this file when she was the Lab Manager and so was the owner of the file, which was kept in a secure Box folder shared with select authorized lab members.

121.    Possession of this information by an unauthorized person violates participants' trust, which is a cornerstone of the CRL's research and its relationship with the aphasia community.  It is a bedrock norm of laboratory work that relies on confidential medical data to obey the universally understood rules for protecting it, which are regularly reinforced by mandatory training.  As the Lab Manager and Research SLP of CRL, van der Stelt was responsible

for enforcing these rules and clearly understood them.  Others leaving CRL routinely relinquished their access to this kind of data.

122.    Van der Stelt left CRL in October 2022, but declined to relinquish control of the participant ID document when the current CRL Lab Manager requested she do so.

123.    Turkeltaub as Principal Investigator was deeply anxious about this, but was told by the Title IX Officer not to act until she was able to confirm how to proceed without risking that van der Stelt would use it to charge retaliation against him.  Nevertheless, Turkeltaub was ethically obligated to remove van der Stelt from his lab's IRB protocols, and did so in November 2022.

124.    On December 21, 2022, Shaunagh Browning, a Senior Director in the Office of Human Subject Protections at Georgetown and the head of the IRB, emailed van der Stelt instructing her to transfer ownership of the file to the CRL.  She also informed van der Stelt that she was not permitted to keep a copy of any protected information on participants.

125.    In direct violation of these instructions, van der Stelt downloaded a copy of the sensitive file to her own computer before transferring ownership of it to the lab.  Data theft of this sort is highly unusual and wrong, and demonstrates how disturbed her judgment had become concerning CRL and Turkeltaub.

126.    After this incident, Turkeltaub spent a significant amount of time communicating with the IRB about the data breach, filing the requisite documentation, and modifying his data management procedures to ensure it could not happen again.

127.    Despite his best efforts, van der Stelt's acts compromised the confidentiality of CRL's research in perpetuity.

**X.   Van der Stelt spreads false and defamatory statements about Turkeltaub at Georgetown and among his professional community**

128.    After leaving CRL, van der Stelt spread false and defamatory statements about Turkeltaub and his relationships with female lab members to current and former Georgetown PhD students and his professional colleagues.  Among many others, these included Shiva Hassanzadeh-Behbahani, Alix Fetch, and Rachel Galginaitis.

129.    In November 2022, van der Stelt spoke to Carolyn Gershman, a PhD student who rotated in the CRL in the fall semester of 2020, making vague allegations that Turkeltaub sexually harassed her.  Gershman was skeptical of van der Stelt's account, but before she could press for more details, van der Stelt burst into tears.

130.    In November 2022, Hassanzadeh-Behbahani told Dr. Maryam Ghaleh, an NIH program officer and former postdoctoral fellow in Turkeltaub's lab, that his lab was "going down" because of a sexual harassment complaint.

131.    In or around January 2023, van der Stelt asked to talk to a first-year student.  In their conversation, van der Stelt warned the student about Turkeltaub and shared a broad range of false allegations that later formed part of her federal lawsuit. This included telling her that Turkeltaub had touched her "inner thigh" and made sexual advances towards her.

132.    Van der Stelt also told this student that Turkeltaub "groomed" young female members of his lab.

133.    Upon information and belief, during the spring and summer of 2023, Hassanzadeh-Behbahani and Fetch discussed van der Stelt's allegations against Turkeltaub with other Georgetown graduate students.

134.    After January 2023, a former PhD student and current postdoctoral fellow who had been in Turkeltaub's lab for over five years, heard from various IPN students that van der Stelt

and her friends had been saying that Turkeltaub was "grooming" her and other female lab members.

135.    She knew this was not true, and on March 30, 2023 sent an email to various IPN students, including van der Stelt and Hassanzadeh-Behbahani, entitled "Things that are being said."  She wrote: "I am telling you, with full awareness of what that term [grooming] means, that it is not true….What is harmful to me is this false characterization."

136.    Nevertheless, van der Stelt continued to spread this same defamatory story and others about Turkeltaub.

137.    In Spring 2023, van der Stelt asked to speak to another IPN graduate student whom she had told the previous year that Turkeltaub had harassed her.  The student was skeptical, based on her own observations of Turkeltaub and van der Stelt.  Nevertheless, when they spoke in April 2023, van der Stelt lobbied her to remove Turkeltaub from her thesis committee because of his alleged sexual harassment.  Van der Stelt told her, "If you knew what he'd done, you wouldn't want to be associated with him."  Van der Stelt was crying. The graduate student understood that van der Stelt was alleging Turkeltaub had sexually harassed her.

138.    Still skeptical of these allegations given her own observations of van der Stelt's interactions with Turkeltaub and her own experience of Turkeltaub, the graduate student initially did not remove Turkeltaub from her thesis committee.

139.    This caused van der Stelt to intensify her campaign.  In April 2023, she told the graduate student that it was time to tell her all the details about what had happened between her and Turkeltaub.  This time she directly claimed that Turkeltaub had sexually harassed her, including that he had "touched her thigh" and intentionally followed her into the bathroom at a

party hosted at his house in June 2021.  The graduate student ultimately removed Turkeltaub from her thesis committee.

140.    In July 2023, van der Stelt asked this graduate student to act as a character witness in this lawsuit.  The graduate student replied that her testimony would be truthful and that she would thus have to state that van der Stelt's allegations against Turkeltaub did not align with her own observations of their interactions.  Van der Stelt withdrew her request.  The two of them have not spoken since van der Stelt left Georgetown.

141.    On information and belief, in spring 2023 van der Stelt asked another IPN student to remove Turkeltaub from their thesis committee due to his "sexual harassment" of van der Stelt. This student did not remove him.

142.    During the spring and summer of 2023, van der Stelt also contacted many people no longer attached to Georgetown to spread her false accounts about Turkeltaub.

143.    One person she contacted was Dr. Maryam Ghaleh, who had worked in Turkeltaub's lab between January 2015 and January 2021 before joining the NIH.  Van der Stelt told Ghaleh that Turkeltaub had sexually harassed her, including touching her thigh.  Ghaleh was shocked, having been a direct witness to van der Stelt's and Turkeltaub's friendship during the period of van der Stelt's allegations.  In an email she shared with IDEAA and with Turkeltaub, Ghaleh refuted many of van der Stelt allegations as "incorrect."  For example, she stated that van der Stelt's demeanor at the party at Turkeltaub's house in January 2021 and afterwards was "super happy," and was inconsistent with her allegations that she had been uncomfortable about Turkeltaub's behavior at the party.  She said that "Candace was the one who always wanted hugs from everyone."  She judged van der Stelt's allegations to be "totally wrong and unfair to Peter."

144.    On March 1, 2023, van der Stelt made a formal complaint about Turkeltaub to the NIH, the main funding agency for medical research, and the source of all of Turkeltaub's recent grants.  She alleged that Turkeltaub had sexually harassed her, including by "inquir[ing] about [van der Stelt's] interest in a romantic relationship with him," which was false, and "try[ing] to stroke [her] inner thigh at a location on campus," which distorts the reality of this encounter to the breaking point.  She claimed that she "directly expressed [her] discomfort with the sexual content" of her conversations and jokes with Turkeltaub in or around November 2021, which she did not. She also accused Turkeltaub of retaliating against her after she returned to the lab from her European trip in July 2022, including through a second authorship complaint about Laks.  This concerned a collaborative manuscript on which the first author of the paper, a PhD student at another university, had initially listed Laks as second author and van der Stelt as third.  Turkeltaub was not the senior author on this paper, and did not influence the order of authors on the paper. He first learned of van der Stelt's displeasure at the order of authors months after the manuscript had been submitted for publication.

145.    Consistent with NIH protocol, the contents of van der Stelt's complaint about Turkeltaub were shared with Dr. Spiros Dimolitsas, Senior Vice President for Research and Chief Technology Officer at Georgetown.

146.    On April 21, 2023, Turkeltaub was officially removed from the Language and Communication Study Section ("LCOM"), a prestigious NIH grant review panel, as a direct result of van der Stelt's complaint.  Only weeks before being removed, he had been appointed to this panel for a period of six years.

147.    Removal from LCOM hurt Turkeltaub significantly.  The panel reviews the majority of NIH grants in the United States in his field of research and carries great prestige.  The

panel includes some of the most productive researchers in his field, and being a member provides a great deal of positive visibility for its members with many researchers in the field.  Networking at LCOM often results in successful research collaborations and invited talks which are part of career advancement.  Committee members are permitted greater flexibility on the due dates for their own grant applications.  Turkeltaub lost these professional opportunities as a direct result of van der Stelt's false claims, and of course his removal has been humiliating.

148.    On April 25, 2023, van der Stelt emailed a faculty member of another university who had completed a Linguistics PhD at Georgetown.  Van der Stelt said that she was "experiencing some gender-related issues in the [IPN] program" and asked to speak, which they did on a Zoom call that day for more than two hours.

149.    During this conversation, van der Stelt described "what [she] had reported to Title IX," including that Turkeltaub "had tried to stroke my thigh," and said she had already discussed this with other IPN alumni and others she had contacted via LinkedIn.

150.    She also said she was planning to go to the press, and asked for the former graduate student's support, which was not forthcoming.

151.    Upon information and belief, in spring 2023, van der Stelt also began to attend events hosted by Georgetown's Women in Science and Education ("WISE"), a group that aims to raise awareness of gender issues in science and academia.  At WISE events attended by female graduate students from different Georgetown departments, van der Stelt further spread her false claims that Turkeltaub had sexually harassed her.

152.    Van der Stelt's lies about Turkeltaub to students, faculty, the NIH and elsewhere have significantly hurt Turkeltaub's professional reputation.

153.    In addition to being removed from the NIH panel, in 2023 Turkeltaub received the lowest teaching scores he has ever received for a lecture in the IPN Core Course.  He has delivered this lecture each year to PhD students for several years and his usual score is around 4.5/5 or higher for this lecture and all other teaching activities he engages in.  This was the first time in his career that he received a score below 4.  One student scored Turkeltaub 1 out of 5 across every category, the lowest score available, and left a sinister comment implicating van der Stelt's campaign against him: "I know what you did."  IPN students have also expressed that they received pressure from their peers not to join Turkeltaub's lab, because they viewed this as support for a sexual predator.

154.    As a result of the total upheaval van der Stelt has caused his professional life, Turkeltaub has been formally diagnosed with anxiety disorder, adjustment disorder with associated anxiety and primary insomnia, and has been prescribed three medications to manage these issues. He has suffered severe panic attacks when attending IPN events fearing that his reputation has become sullied among a professional group that used to esteem him.  He has had periods of significant weight loss due to poor appetite caused by his anxiety.  He has also often had a "passive death wish," sometimes lasting weeks at a time.  The anxiety, heightened agitation, depression, and trouble concentrating he has experienced due to van der Stelt's actions have resulted in substantially reduced productivity at work, and have caused his wife and children to worry about him at home.

### XI.    Van der Stelt continues to spread false and defamatory statements about Turkeltaub during the pendency of this action

155.    On July 31, 2023, van der Stelt published her Complaint containing false statements that Turkeltaub sexually harassed her.

156.    On August 3, 2023, Galginaitis sent a text message to Dr. DeMarco, now an Assistant Professor of Rehabilitation Medicine, writing: "You may want to take the day off after

reading this" and including a hyperlink to van der Stelt's Complaint. "If you didn't know anything, it can be a shock to the system," she continued. Around the same time, Galginaitis also sent a link to the Complaint to the Lab Manager/Research SLP in Turkeltaub's lab.

157. Upon information and belief, van der Stelt knew that Galginaitis intended to distribute the Complaint among CRL lab members and endorsed her republication of the defamatory statements it contains.

158. Shortly after van der Stelt filed the Complaint, an IPN student began to distribute a copy to other students. When asked by another IPN student whether van der Stelt knew that the Complaint was being distributed in this way, the student confirmed that van der Stelt was aware and had approved its dissemination.

159. Hassanzadeh-Behbahani also distributed the lawsuit widely among IPN students and alumni within a few days of its filing. Upon information and belief, she did this with van der Stelt's knowledge and approval. A former IPN student and current postdoctoral fellow with Dr. Turkeltaub contacted Hassanzadeh-Behbahani to ask why she had never checked in with her if she had concerns about the lab, given that they had been close friends. As this lab member recounted in notes of their meeting, Hassanzadeh-Behbahani "told me, screaming, that she intends to 'burn the world down,' that 'this is bigger than all of us,' and that I am 'collateral damage.'"

160. Fetch sent the lawsuit to an Assistant Professor of Linguistics at the University of Pennsylvania who graduated from the IPN in 2017. Upon information and belief, she did this with van der Stelt's knowledge and approval.

161. In August 2023, van der Stelt's attorneys, acting on her behalf and with her knowledge, sent a copy of the Complaint to Georgetown's student newspaper, *The Hoya*. This resulted in the newspaper republishing many of its false statements in an online article on August

24, 2023.[1]  The article stated that Turkeltaub "sexually harassed Van der Stelt between 2020 and 2022 while she worked in his on-campus lab," "subjected Van der Stelt to multiple jokes that were sexual in nature, including an ongoing joke related to syphilis," "kissed the top of her [van der Stelt's] head while he hugged her," "touched her lower back" and that van der Stelt stopped wearing skirts or dresses to lab meetings "to prevent him [Turkeltaub] from touching her bare legs."  As of January 2024, *The Hoya's* article on Turkeltaub appears as the sixth or seventh highest-ranking article on Google when his name is searched and is on the first page of search results.

162.    The distribution of the Complaint by van der Stelt's associates with her knowledge and consent and *The Hoya's* republication of its false statements at her instigation hurt Turkeltaub's standing in his trade, profession, and community.

163.    Upon information and belief, van der Stelt also discussed her allegations against Turkeltaub during Spring 2023 with Rebecca Boersma, an SLP and former patient referral source for the CRL.  Boersma had a positive relationship with CRL and communicated frequently, but abruptly stopped communicating with members of CRL in Spring 2023. Van der Stelt had begun attending an online aphasia group that Boersma organized around this time.  When two CRL members emailed Boersma in June 2023 and asked to have lunch with her to tell her about a new study they were conducting and to pay referral fees they still owed her, Boersma responded, "I'm not interested in getting lunch. And no worries about the referral money."  Boersma has stopped referring patients to CRL.

---

[1] Caitlin McLean, Georgetown University Professor Named in Sexual Harassment Lawsuit, The Hoya, (August 24, 2023), https://thehoya.com/georgetown-university-and-professor-named-in-sexual-harassment-lawsuit/.

164.     On September 30, 2023, a colleague removed Turkeltaub from a grant application fearing that reviewers would reject it otherwise due to the rapid spread of stories about him being a harasser.

165.     Researchers as geographically distant as California, New York and Australia have contacted him to ask about van der Stelt's allegations after stumbling across *The Hoya* article, the lawsuit or discussions by colleagues.

166.     All of the negative publicity and gossip about him, a total switch from his previously exemplary record over a two-decade career, has deeply embedded van der Stelt's false claims in Turkeltaub's professional reputation.

**XII.     Van der Stelt withdraws her Title IX complaint, which essentially duplicated her claims in this suit; the Hearing Panel unanimously concludes that Turkeltaub did not sexually harass her**

167.     Two days before the final hearing on van der Stelt's Title IX complaint against Turkeltaub at Georgetown, which essentially replicates her claims in this lawsuit, she withdrew the complaint and refused to participate in the hearing.

168.     It proceeded nevertheless on December 13–15, 2023.  The Hearing Panel was composed of two faculty members not connected to Turkeltaub and chaired by an external consultant, a senior lawyer with expertise in employment and civil rights disputes.

169.     The Panel heard from Turkeltaub and 12 other witnesses called by him or the Panel to examine van der Stelt's allegations of sexual harassment.  Her abandonment of her complaint meant she did not call any witnesses, but the Panel was free to call people and did so.  The Panel also reviewed 400 pages of written evidence submitted by Turkeltaub, van der Stelt and other witnesses over the course of IDEAA's 14-month investigation, and the final investigative report of over 80 pages written by Kay Bhagat-Smith, a Senior Civil Rights Investigator and Compliance Manager at Georgetown, which contained notes from her interviews with 29 witnesses.

170.     On December 18, 2023, Turkeltaub was told that the Title IX Hearing Panel had unanimously rejected van der Stelt's allegations of sexual harassment.

**XIII.   Conclusion**

171.     Turkeltaub, a brilliant and diligent professor with a record of friendly and productive relationships in his lab, developed a friendly and productive relationship with van der Stelt too.  She, Paul and Turkeltaub became texting buddies and then, in the hothouse atmosphere caused by COVID, closer friends than is typical in a professional setting.

172.     That never included any form of sexual harassment by Turkeltaub; nor was the genuine friendship they did achieve repellent in any way to van der Stelt—quite the opposite, as her own communications to Paul and Turkeltaub throughout her time in the lab repeatedly expressed.

173.     In fact, it was van der Stelt's misperception that Turkeltaub was abandoning her in favor of others in the lab that set her off on the path towards this lawsuit.  When she became a PhD student and Turkeltaub had to treat her as such, she felt, by her own admission, adrift and bereft.  She accused him of abandoning her in favor of Paul, then in favor of Laks, and behaved inappropriately with other lab members, causing conflict in CRL.  She became antagonistic and accusatory toward Turkeltaub, just as she had her supervisor in her previous job at MedStar.

174.     Finally, after failing to gain sympathy through her false allegations about his supposedly "too close" relationship with Paul, van der Stelt settled on filling a self-created emotional void with a self-created narrative of Turkeltaub as sexual aggressor and harasser.  She claimed that he not only harassed her, but that he created a hostile environment and groomed other young women.  Van der Stelt is convincing and persuasive; but she is flat wrong.  Her account evidently fulfills some important inner need, but it does not comport with reality.

175.    The reality, demonstrated throughout Turkeltaub's career, is that his behavior is consistently upstanding.  He does not harass female colleagues, he supports them.  His lab members do not complain about him for being sneaky, oppressive or retaliatory; they say they have never worked in a better environment.  They complain instead about van der Stelt, because she was consistently divisive and sowed drama and discord.

176.    For Turkeltaub, the end result of van der Stelt's campaign against him borders on catastrophe.  For a professor to be labeled a sexual harasser, groomer of young women and creator of a hostile environment is a career destroyer.  Van der Stelt has advanced her narrative not just in her Complaint but widely and repeatedly elsewhere, causing direct harm to Turkeltaub, including being removed from an NIH grant panel, being dropped as a collaborator on a grant application, and getting lower ratings as a teacher.  Anyone who searches his name online quickly learns about van der Stelt's false allegations against him.  Turkeltaub agrees that women often get the short end of the stick and that harassment is sadly commonplace in academia.  But this is not such a case.

177.    Turkeltaub seeks the Court's protection from the concerted attack van der Stelt has trained on him, and its help in restoring his reputation.

## COUNTERCLAIMS

### FIRST CAUSE OF ACTION
### DEFAMATION

178.    Turkeltaub incorporates and re-alleges each and every allegation set forth in the preceding paragraphs.

179.    Van der Stelt, personally and through authorized agents, published malicious, false, misleading and defamatory statements about Turkeltaub to third parties, including but not limited to:

a.    Telling current and former IPN students that Turkeltaub sexually harassed her, including that he touched or tried to touch her thigh one time in a sexually harassing way;

b.    Telling current and former IPN students that Turkeltaub "groomed" female members of his lab;

c.    Telling members of Turkeltaub's professional community that he had sexually harassed her, including that he had once touched or tried to touch her thigh in a sexually harassing way;

d.    Disseminating the false statements contained in the Complaint to current CRL lab members, current and former IPN students, members of Turkeltaub's professional community, and media outlets.

180.    Van der Stelt's false, misleading and defamatory statements about Turkeltaub were published with malice or wanton, reckless, and/or willful disregard for the truth, as van der Stelt knew or with reasonable diligence would have known at the time of their publication that the statements were false and misleading.

181.    At all material times, van der Stelt's false, misleading, and defamatory statements about Turkeltaub were published without privilege or legal justification.

182.    Van der Stelt's false, misleading, and defamatory statements about Turkeltaub were defamatory *per se* inasmuch as they injured Turkeltaub's standing in his trade, business, and profession as an academic and researcher.

183.    As a direct and proximate result of van der Stelt's conduct, Turkeltaub has suffered and will continue to suffer irreparable injury including, but not limited to, pain and suffering,

extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses and reputational and professional harm in amounts to be proven at trial.

184.     Turkeltaub suffered and continues to suffer injuries in the District of Columbia.

## SECOND CAUSE OF ACTION
## FALSE LIGHT

185.     Turkeltaub incorporates and re-alleges each and every allegation set forth in the preceding paragraphs.

186.     Van der Stelt, personally and through authorized agents, knowingly published false statements, representations, or imputations about Turkeltaub to third parties, including but not limited to:

a.     Telling current and former IPN students that Turkeltaub sexually harassed her, including that he touched or tried to touch her thigh one time in a sexually harassing way;

b.     Telling current and former IPN students that Turkeltaub "groomed" female members of his lab;

c.     Telling members of Turkeltaub's professional community that he had sexually harassed her, including that he had touched or tried to touch her thigh one time in a sexually harassing way;

d.     Disseminating the false statements contained within the Complaint to current CRL lab members, current and former IPN students, members of Turkeltaub's professional community, and media outlets.

187.     Van der Stelt's false statements, representations, or imputations were reasonably understood to be about Turkeltaub.

188.    Van der Stelt's false statements, representations, or imputations about Turkeltaub placed him in a false light that would be offensive to a reasonable person.

189.    Van der Stelt's false statements, representations, or imputations about Turkeltaub were published with malice or wanton, reckless, and/or willful disregard  for the truth, as van der Stelt knew or with reasonable diligence would have known at the time of their publication that the statements were false and misleading.

190.    As a direct and proximate result of van der Stelt's false statements, representations, or imputations, Turkeltaub has suffered and will continue to suffer irreparable injury including, but not limited to, pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses and reputational and professional harm in amounts to be proven at trial.

191.    Turkeltaub suffered and continues to suffer injuries in the District of Columbia.

## **PRAYER FOR RELIEF**

WHEREFORE, Turkeltaub respectfully requests that the Court:

i.    Award Turkeltaub compensatory damages in an amount to be determined at trial;

ii.    Award Turkeltaub special damages in an amount to be determined at trial;

iii.    Award Turkeltaub punitive and exemplary damages in an amount to be determined at trial; and

iv.    Award Turkeltaub pre- and post-judgment interest, legal fees, costs, and such other and further relief as this Court may deem just and proper

## <u>DEMAND FOR JURY TRIAL</u>

Defendant-Counter Plaintiff Peter Turkeltaub hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: February 1, 2024

Respectfully submitted,

**McALLISTER OLIVARIUS**

*/s/ Ann Olivarius*
Dr. Ann Olivarius
641 Lexington Avenue
13th Floor
New York, NY 10022
Telephone: (212) 433-3456
aolivarius@mcolaw.com

*Attorneys for Defendant/Counter-Plaintiff*
*Peter Turkeltaub*