# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CANDACE VAN DER STELT,

*Plaintiff*,

v.

GEORGETOWN UNIVERSITY, *et al.*,

*Defendants.*

Civil Action No. 23‑2212 (LLA)

PETER TURKELTAUB,

*Counter-Plaintiff*,

v.

CANDACE VAN DER STELT,

*Counter-Defendant.*

## MEMORANDUM OPINION AND ORDER

Candace van der Stelt brings this action against Georgetown University; the Georgetown University Medical Center, Biomedical Graduate Education; and Dr. Peter Turkeltaub (collectively, "Defendants") for violations of Title IX of the Civil Rights Act of 1964 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, and the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.* She alleges that Defendants subjected her to sexual harassment and retaliation, eventually forcing her to leave her PhD program at Georgetown University. ECF No. 1. Dr. Turkeltaub subsequently filed counterclaims for defamation and false light, alleging that Ms. van der Stelt spread knowingly

false information about him to coworkers, colleagues, and others.  ECF No. 13.[1]  Ms. van der Stelt

moves to dismiss the counterclaims under Federal Rule of Civil Procedure 12(b)(6).  ECF No. 19.

She also moves for leave to supplement her complaint with additional retaliation claims against all

Defendants.  ECF No. 25.  For the reasons explained below, the court grants in part and denies in

part Ms. van der Stelt's motion to dismiss and grants her motion to supplement.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    The Parties

The following facts, drawn from Dr. Turkeltaub's counterclaim, ECF No. 13, are accepted

as true for the purposes of the motion to dismiss, *Wharf, Inc. v. District of Columbia*, 232 F. Supp.

3d 9, 15-16 (D.D.C. 2017).[2]  Ms. van der Stelt is a clinical speech-language pathologist currently

pursuing a PhD focused on language recovery in stroke survivors.  ECF No. 1 ¶ 18; ECF No. 13

¶ 4.[3]  Dr. Turkeltaub is a professor of neurology and rehabilitation medicine, as well as the director

of the Cognitive Recovery Lab at the Georgetown University Medical Center.  ECF No. 13 ¶ 1.

Dr. Turkeltaub is "one of the leading figures in his field" of studying aphasia, which is "a condition

caused by brain damage typically following a stroke that results in the loss of the ability to

communicate."  *Id.* ¶¶ 1-2; ECF No. 1 ¶ 20; ECF No. 13, at 3 (admitted in part).  He frequently

publishes in medical journals, has won numerous awards for his work, and is the principal

---

[1] Only Dr. Turkeltaub's counterclaims are at issue in this opinion.  The court therefore does not address Ms. van der Stelt's Title IX and DCHRA claims.

[2] Because Dr. Turkeltaub's counterclaims incorporate Ms. van der Stelt's complaint, the court will also accept as true facts alleged in Ms. van der Stelt's complaint that Dr. Turkeltaub admits.  *See Kevin S. Bennett Tr. v. Bennett*, 561 F. Supp. 2d 22, 26 (D.D.C. 2008) ("The court may also consider documents that are referred to, and central to, the counterclaim.").

[3] All citations to paragraphs in ECF No. 13 are to Dr. Turkeltaub's counterclaims (which begin on page 24 of the document), not to his answer.  Citations to Dr. Turkeltaub's answer will be denoted with page numbers.

investigator of four active awards from the National Institutes of Health ("NIH").  ECF No. 13 ¶ 2. Dr. Turkeltaub also directs the Language Training Program at Georgetown University Medical Center, where he mentors PhD students in the University's Interdisciplinary Program in Neuroscience ("IPN").  *Id.*

### B.    Ms. van der Stelt and Ms. Sachi Paul Join the Cognitive Recovery Lab

Georgetown's Cognitive Recovery Lab ("CRL") "focuses on research to improve care for people who live with aphasia and other language processing difficulties after suffering a brain injury."  *Id.* ¶ 1.  It "has a reputation for being particularly well run, productive[,] and collegial."  *Id.* ¶ 3.

In July 2018, Ms. van der Stelt joined the CRL as a research speech-language pathologist ("SLP") and as the lab's manager.  *Id.* ¶ 4.  As an SLP, she oversaw data collection and scoring for the lab's research subjects.  *Id.*  As the lab manager, she supervised the lab's Institutional Review Board, record-keeping, and other administrative tasks.  *Id.*  When she first joined the CRL, Ms. van der Stelt and Dr. Turkeltaub had a positive working relationship.  *Id.* ¶ 5.  Dr. Turkeltaub described her as "hard-working, smart, engaging, and passionate about the lab's work."  *Id.*  Ms. van der Stelt said it was "her career goal . . . to stay in [Dr.] Turkeltaub's lab 'forever.'"  *Id.*

In spring 2020, Ms. van der Stelt was accepted into the IPN PhD program at Georgetown and planned to continue working in Dr. Turkeltaub's lab during her studies.  *Id.* ¶ 46.  While she deferred her PhD start date until mid-2021, she left her position as lab manager to focus primarily on her SLP position.  *Id.* ¶ 6.  In June 2020, Dr. Turkeltaub hired Sachi Paul as the new CRL lab manager.  *Id.* ¶¶ 7, 47.  Dr. Turkeltaub, Ms. van der Stelt, and Ms. Paul "quickly became close friends" and "freely discussed personal topics, such as their romantic relationships, including when [Dr.] Turkeltaub was present."  *Id.* ¶ 48.

### C.     Ms. van der Stelt, Ms. Paul, and Dr. Turkeltaub's Growing Friendship

Beginning in March 2020 and during the height of the COVID-19 pandemic, Ms. van der Stelt, Ms. Paul, and Dr. Turkeltaub spent a significant amount of time together "and looked forward to each other's company while otherwise isolated from their usual social contacts."  *Id.* ¶ 50.  For example, Dr. Turkeltaub and Ms. van der Stelt would occasionally carpool to the lab together.  ECF No. 1 ¶ 34; ECF No. 13, at 5 (admitted in part); *see* ECF No. 13 ¶ 80.  They also participated in a WhatsApp group messaging chat where they discussed both work-related and personal topics.  ECF No. 13 ¶ 52.  As the trio's friendship developed, Ms. van der Stelt and Ms. Paul encouraged Dr. Turkeltaub "to become less guarded and [less] formal with them."  *Id.* ¶ 57.  Over time, Dr. Turkeltaub began to joke more often with the women, including making "jokes about syphilis."  *Id.* ¶¶ 59-60.  Ms. van der Stelt, however, "did [not] . . . criticize [Dr.] Turkeltaub's jokes or say or imply that they had made her uncomfortable."  *Id.* ¶ 61.  Instead, "casual banter was a normal component of their group dialogue," and Ms. van der Stelt "made similar sexual comments on many occasions."  *Id.*  She also "initiated" many jokes, such as by putting an event called "Syphilis Treatment 1" on Dr. Turkeltaub's work calendar in early 2021 or "jok[ing] about [Dr.] Turkeltaub's wife's former sexual partners."  *Id.* ¶ 62.

Ms. van der Stelt, Ms. Paul, and Dr. Turkeltaub continued to socialize outside of work and grow closer.  For example, from late 2020 to mid-2021, they attended board game nights and went out to dinners, sometimes with their partners or spouses.  *Id.* ¶ 64.  Communications between the three remained positive.  *Id.* ¶¶ 65-66.

### D.     Ms. van der Stelt Begins Her PhD Program

In July 2021, Ms. van der Stelt began her PhD program and thus "switched . . . from being a co-leader of the lab to [Dr.] Turkeltaub's PhD student."  *Id.* ¶ 8.  Around this time, Dr. Turkeltaub

hired Alycia Laks in Ms. van der Stelt's place as the lab's new SLP.  *Id.* ¶ 9.  Ms. van der Stelt told Ms. Paul that she was "possessive" over her relationship with Dr. Turkeltaub and "expressed concerns about becoming jealous of the new Research SLP (Laks)."  *Id.* ¶ 69.  Dr. Turkeltaub recognized that his relationship with Ms. van der Stelt "would have to change" because "[h]e had become closer with her than his other students, but could not favor her over them."  *Id.* ¶ 70.  He therefore "made an effort to text [Ms.] van der Stelt less frequently about non-work-related matters and to share less information about his personal life."  *Id.*  Even so, the two continued to carpool to work and remained friends.  *Id.* ¶¶ 70, 80.

Ms. van der Stelt reportedly felt anxiety during her first semester as a PhD student, both due to her coursework and "her loss of status as a leader of the lab."  *Id.* ¶¶ 71-72.  She also "struggl[ed] to accept the boundaries that [Dr.] Turkeltaub had to assert as her PhD supervisor," causing her to "push for even greater personal closeness with him."  *Id.* ¶¶ 73-74.  Ms. van der Stelt continued to engage in conversations with Dr. Turkeltaub about personal topics, such as by starting discussions about his marriage.  *Id.* ¶ 75.  She also "regularly initiated . . . and asked for hugs from [Dr. Turkeltaub]."  *Id.* ¶ 77.  Throughout late 2021, she continued to press Dr. Turkeltaub to open up to her more.  *Id.* ¶ 79.

Once, while carpooling, "[Ms.] van der Stelt complimented [Dr. Turkeltaub] on the new pants he was wearing" and "reached over and touched his right thigh."  *Id.* ¶ 81.  He "did not interpret this as a sexually charged gesture, just a friendly one."  *Id.*  Ms. van der Stelt herself "also sought compliments on her clothes from [Dr.] Turkeltaub" and "periodically asked him whether he noticed that she was wearing a new outfit."  *Id.* ¶ 82.  In spring 2022, Dr. Turkeltaub commented on a skirt that she was wearing, saying "Wow that's a really fuzzy skirt" before "touch[ing] one of the corduroy wales near the hem to feel the fabric."  *Id.* ¶ 83.  Ms. van der Stelt later alleged in her

complaint that Dr. Turkeltaub had "touched her 'inner thigh' during this incident." *Id.*; *see* ECF No. 1 ¶ 91.

### E.    Ms. van der Stelt's Relationships with Ms. Paul and Ms. Laks Begin to Sour

In early 2022, Ms. van der Stelt told Dr. Turkeltaub that she "fe[lt] replaced" by Ms. Paul and lamented that she "used to be in the dynamic where there were no boundaries and for whatever reason, there are walls that I'm not [sic] longer allowed over."  ECF No. 13 ¶ 85 (alteration in original).  She also told Ms. Paul, "I used to be Peter's person who he vented to and came to when he needed support and it feels like he's replaced me with you." *Id.*  Ms. van der Stelt frequently accused Dr. Turkeltaub of "being emotionally dependent" on Ms. Paul, of refusing to "affirm[]" Ms. van der Stelt's feelings of "vulnerab[ility]" and of "shut[ting her] out." *Id. ¶¶* 86-89. Dr. Turkeltaub tried to reassure her multiple times without much success. *Id.* ¶¶ 88-89.

Ms. van der Stelt also expressed frustration with Ms. Laks, the new SLP.  When Ms. Laks was listed as a co-author on a research paper in March 2022, Ms. van der Stelt told Dr. Turkeltaub that she was "pisse[d] . . . off." *Id.* ¶ 90.  She also said that the idea of Ms. Laks's staying at the lab "long term dr[o]ve[] [her] insane." *Id.*

In April 2022, Ms. van der Stelt sent Ms. Paul an email laying out numerous frustrations with Ms. Paul's and Dr. Turkeltaub's relationship. *Id.* ¶ 98.  She accused Ms. Paul of "gaslighting" her and lying about how often Ms. Paul was spending time with Dr. Turkeltaub. *Id.*  Ms. van der Stelt also said that she had "dreamt that she [had] found [Ms.] Paul and [Dr.] Turkeltaub in bed together" and asked whether it reflected reality. *Id.* ¶ 99; *see id.* ¶ 111.  In May 2022, after Ms. van der Stelt confronted Dr. Turkeltaub about his closeness with Ms. Paul, the pair (Ms. van der Stelt and Dr. Turkeltaub) "agreed to cease non-professional encounters with each other." *Id.* ¶ 100. Dr. Turkeltaub suggested that they stop carpooling together, but Ms. van der Stelt "objected." *Id.*

In addition to these specific encounters, Ms. van der Stelt often visited Dr. Turkeltaub's office throughout the 2021-22 academic year.  *Id.* ¶ 92.  On "several occasions, she closed the door, cried profusely[,] and sometimes yelled at him, saying she felt he no longer valued her as a lab member or a friend."  *Id.*  She also told him that she would "spiral" if she did not "receive regular reassurance from him."  *Id.*  By June 2022, Dr. Turkeltaub began to experience panic attacks when interacting with Ms. van der Stelt.  *Id.* ¶ 93.  During this time, however, Ms. van der Stelt still continued to express her appreciation and praise for Dr. Turkeltaub "as a boss, mentor[,] and friend."  *Id.* ¶¶ 94-95.  As of September 2022, she had "never expressed" to Dr. Turkeltaub that she had "ever felt uncomfortable because of [his] behavior."  *Id.* ¶ 96.

Driven by Ms. van der Stelt's accusations of inappropriate closeness between himself and Ms. Paul, Dr. Turkeltaub sent an anonymous survey to other members of the CRL lab asking whether they had any concerns about the lab environment.  *Id.* ¶ 101.  The survey responses regarding both the lab and Dr. Turkeltaub's leadership were "overwhelmingly positive."  *Id.* ¶ 102.  The responses did, however, raise concerns about Ms. van der Stelt.  *Id.* ¶ 103.  Multiple individuals reported that she had a "tendency to 'demean' colleagues and to act in 'aggressive or controlling' ways" and expressed worry that Dr. Turkeltaub was "spending too much of his time and energy on [Ms.] van der Stelt's . . . need for attention."  *Id.*[4]

---

[4] After Ms. van der Stelt eventually left the CRL in October 2022, lab members expressed additional concerns.  For example, one member said that Ms. van der Stelt "frequently made untrue criticisms about other lab members, such as [Ms.] Paul."  ECF No. 13 ¶ 104.  Another "claimed that [Ms.] van der Stelt forcefully encouraged him to lower his professional boundaries with her, despite his evident discomfort."  *Id.*  And others revealed that her "bull[ying]" caused them to try and avoid the lab whenever she was there.  *Id.*

**F.     Dr. Turkeltaub Tries to Maintain Stronger Boundaries with Ms. van der Stelt**

Despite the survey's results, Dr. Turkeltaub did not want to break his commitment to be Ms. van der Stelt's PhD supervisor. *Id.* ¶ 105. He also believed that their relationship could be successfully navigated, especially in light of their May 2022 conversation where they had agreed to be more professional and less personal with one another. *Id.*

In June 2022, Dr. Turkeltaub hosted a dissertation defense party for another of his PhD students at his home. *Id.* ¶ 106. He greeted Ms. van der Stelt with a "brief friendly hug [that] she fully reciprocated." *Id.* Later that evening, Ms. van der Stelt told Rachel Galginaitis, Manager of the Georgetown Center for Brain Plasticity and Recovery, that Dr. Turkeltaub had been acting inappropriately. *Id.* ¶ 107. Ms. van der Stelt asked Ms. Galginaitis to not repeat her statements to anyone else, and she did not share her concerns with Dr. Turkeltaub. *Id.* Over the next few months, Ms. van der Stelt "continued to badmouth [Dr.] Turkeltaub to [Ms.] Galginaitis and other female lab members." *Id.* ¶ 108.

From July to October 2022, Ms. van der Stelt "behaved antagonistically toward [Dr.] Turkeltaub," such as by "reprimanding him for discussing tasks for [a] project . . . without her present[] and rebuking him for asking undergraduate research assistants to assist her with a task that she was struggling to deliver on time." *Id.* ¶ 112. Dr. Turkeltaub sought guidance on how to handle these relationship dynamics from others, including Ms. van der Stelt's former supervisor at MedStar National Rehabilitation Hospital, Christine Baron. *Id.* ¶ 114. In a "sobering" conversation, Ms. Baron explained that during periods of stress, Ms. van der Stelt "became highly critical" of others and was prone to "emotional outburst[s]." *Id.* ¶ 115.

At the end of October 2022, Ms. van der Stelt informed Dr. Turkeltaub that she planned to change labs due to an "ongoing uncomfortable and hostile work environment," but she did not further elaborate. *Id.* ¶ 116. Around the same time, someone filed an anonymous complaint

against Dr. Turkeltaub with Georgetown's Office of Institutional Diversity, Equity & Affirmative Action ("IDEAA"). *Id.* ¶ 117.[5]  In March 2023, Ms. van der Stelt filed her own IDEAA complaint against Dr. Turkeltaub. *Id.* ¶ 118.

### G.     The Aftermath of Ms. van der Stelt's Departure from the CRL

In November 2022, Ms. van der Stelt told Carolyn Gershman, a former PhD student in the CRL, that Dr. Turkeltaub had sexually harassed her. *Id.* ¶ 129.  Ms. Gershman was "skeptical" of the account but, "before she could press for more details, [Ms.] van der Stelt burst into tears. *Id.* A few months later, around January 2023, Ms. van der Stelt told a first-year PhD student that Dr. Turkeltaub "had touched her 'inner thigh,'" "made sexual advances towards her," and "groomed" young female members of his lab. *Id.* ¶¶ 131-32.  She also spread accusations that Dr. Turkeltaub was "'grooming' [a postdoctoral fellow] and other female lab members." *Id.* ¶ 134. In March 2023, the postdoctoral fellow sent an email to Ms. van der Stelt and some of her friends stating that the "grooming" allegations were "not true" and a "false characterization" of the lab. *Id.* ¶ 135.

In March 2023, Ms. van der Stelt filed a formal complaint about Dr. Turkeltaub with the NIH—the source of many of his grant funds. *Id.* ¶ 144.  She alleged that Dr. Turkeltaub had "sexually harassed her, including by 'inquir[ing] about [her] interest in a romantic relationship with him'" and "try[ing] to stroke [her] inner thigh at a location on campus," and she stated that she had "'directly expressed [her] discomfort with the sexual content' of her conversations and jokes with [him] in or around November 2021." *Id.* (first five alterations in original).  The following month, the NIH removed Dr. Turkeltaub from the Language and Communication Study

---

[5] This anonymous complaint was apparently submitted by a friend of Ms. van der Stelt's "who was not a member of CRL."  ECF No. 13 ¶ 18.

Section, a prestigious grant review panel, due to Ms. van der Stelt's complaint. *Id.* ¶ 146. He also received the lowest teaching scores in his career in 2023, with one student commenting in the performance review, "I know what you did." *Id.* ¶ 153. Other students informed Dr. Turkeltaub that they had been "pressure[d]" by their peers not to join his lab because he was a "sexual predator." *Id.*

Also in April 2023, Ms. van der Stelt contacted a faculty member at a different university who had completed a linguistics PhD at Georgetown University. *Id.* ¶ 148. She told the faculty member "what [she] had reported to Title IX," including that Dr. Turkeltaub "had tried to stroke [her] thigh." *Id.* ¶¶ 148-49 (first alteration in original).

At some point during the spring and summer of 2023, Ms. van der Stelt told Dr. Maryam Ghaleh—who had worked in Dr. Turkeltaub's lab several years earlier—that Dr. Turkeltaub had sexually harassed her and touched her thigh. *Id.* ¶ 143. Dr. Ghaleh, who had "been a direct witness to [Ms.] van der Stelt's and [Dr.] Turkeltaub's friendship" during the relevant period, was "shocked" by the allegations. *Id.* Ms. van der Stelt also discussed these accusations with Rebecca Boersma, an SLP and former patient referral source for the CRL. *Id.* ¶ 163. Ms. Boersma had frequently communicated with members of the CRL in the past but abruptly ceased contact and stopped making referrals to the CRL after talking to Ms. van der Stelt. *Id.* During this time, Ms. van der Stelt began attending events hosted by Georgetown University's Women in Science and Education, where she "further spread her . . . claims that [Dr.] Turkeltaub had sexually harassed her." *Id.* ¶ 151.

Ms. van der Stelt also encouraged an IPN student to remove Dr. Turkeltaub from her thesis committee because of his alleged inappropriate behavior. *Id.* ¶ 137. Ms. van der Stelt told the student, who was initially "skeptical," *id.*, that Dr. Turkeltaub had sexually harassed her, had

"touched her thigh," and had followed her into the bathroom at a party hosted at his house in June 2021, *id.* ¶ 139.  The student eventually removed Dr. Turkeltaub from her thesis committee.  *Id.*  In July 2023, Ms. van der Stelt asked the student to be a character witness in her forthcoming lawsuit.  *Id.* ¶ 140.  The student said that she would be truthful and thus "have to state that [Ms.] van der Stelt's allegations . . . did not align with her own observations of their interactions."  *Id.*  Ms. van der Stelt subsequently withdrew her request.  *Id.*

These allegations "to students, faculty, the NIH[,] and elsewhere have significantly hurt [Dr.] Turkeltaub's professional reputation."  *Id.* ¶ 152.  Dr. Turkeltaub has been diagnosed with "anxiety disorder, adjustment disorder," and "insomnia."  *Id.* ¶ 154.  He has also suffered severe panic attacks when attending IPN events and experiences a "passive death wish" that can last weeks at a time.  *Id.*  As a result of Ms. van der Stelt's accusations, Dr. Turkeltaub "has suffered and will continue to suffer . . . pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses and reputational and professional harm."  *Id.* ¶¶ 183, 190.

## H.    Ms. van der Stelt's Federal Complaint and Subsequent Developments

In July 2023, Ms. van der Stelt filed suit against Georgetown University, the Georgetown University Medical Center's Biomedical Graduate Education, and Dr. Turkeltaub, alleging violations of Title IX of the Civil Rights Act and the DCHRA.  ECF No. 1.  Ms. van der Stelt was aware that individuals within and outside of the CRL were distributing the complaint and "approved its dissemination."   ECF No. 13 ¶¶ 156-60 (explaining that Ms. van der Stelt "endorsed" republication by Ms. Galginaitis and two friends, Shiva Hassanzadeh-Behbahani and Alix Fetch).  Ms. van der Stelt's attorneys also sent a copy of the complaint to *The Hoya*, Georgetown University's student newspaper, which publicized many of its allegations.  *Id.* ¶ 161.

In September 2023, one of Dr. Turkeltaub's colleagues removed Dr. Turkeltaub from a grant application for fear "that reviewers would reject it . . . due to the rapid spread of stories about him being a harasser." *Id.* ¶ 164.

In fall 2023, Ms. van der Stelt transferred to the University of Pittsburgh to continue her graduate studies. ECF No. 25-1, at 2. In November 2023, Georgetown University "notified [Ms. van der Stelt] that it intended to conduct a hearing into her internal Title IX complaint on December 13, 14, and 15, 2023." *Id.* She responded that the scheduled dates would interfere with her exams at the University of Pittsburgh and asked that the hearing be rescheduled. *Id.* Georgetown University declined her request, *id.*, and Ms. van der Stelt subsequently withdrew her IDEAA complaint on December 11, two days before the hearing was set to begin, ECF No. 13 ¶ 20.

Due to her withdrawal, Ms. van der Stelt did not participate in the IDEAA hearing. ECF No. 13 ¶ 167. Georgetown University, however, proceeded with the hearing as originally scheduled. *Id.* ¶ 168. The panel reviewed written evidence and heard testimony from thirteen witnesses, including Dr. Turkeltaub. *Id.* ¶ 169.[6] On December 18, 2023, the panel unanimously concluded that Dr. Turkeltaub had not sexually harassed Ms. van der Stelt. *Id.* ¶ 170. That same day, Georgetown University filed its answer to the complaint. ECF No. 12.[7]

---

[6] While the hearing was taking place, this case was reassigned to the undersigned. *See* Dec. 15, 2023 Docket Entry.

[7] In its answer, Georgetown University explained that "Georgetown University Medical Center, Biomedical Graduate Education" is "not a legal entity capable of being sued." ECF No. 12, at 1 n.1. Georgetown University thus represents the university as a whole. *Id.*

On February 1, 2024, Dr. Turkeltaub filed an answer and counterclaims against Ms. van der Stelt for defamation and false light. ECF No. 13. He alleged that Ms. van der Stelt, "personally and through authorized agents," published numerous false statements, including:

> Telling current and former IPN students that [he] sexually harassed her, including that he touched or tried to touch her thigh one time in a sexually harassing way;

> Telling current and former IPN students that [he] "groomed" female members of his lab;

> Telling members of [his] professional community that he had sexually harassed her, including that he had once touched or tried to touch her thigh in a sexually harassing way; and

> Disseminating the false statements contained in the Complaint to current CRL lab members, current and former IPN students, members of [his] professional community, and media outlets.

ECF No. 13 ¶¶ 179, 186.

After receiving an extension of time to respond, Ms. van der Stelt filed a motion to dismiss Dr. Turkeltaub's counterclaims in April 2024. ECF No. 19. The motion is now fully briefed. ECF Nos. 19, 23, 28. Then, in August 2024, Ms. van der Stelt filed a motion to supplement her complaint with additional retaliation claims against Defendants. ECF No. 25. Defendants opposed the motion, which is also now fully briefed. ECF Nos. 25, 31, 32, 35, 36.

## II.    LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Wharf, Inc.*, 232 F. Supp. 3d at 15-16 (explaining that the same Rule 12(b)(6) standards apply to a motion to dismiss a counterclaim). A claim is facially plausible when the plaintiff pleads facts that are more than "'merely consistent with' a defendant's liability" and that "allow[] the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires 'more than a sheer possibility that a defendant has acted unlawfully.'" (quoting *Iqbal*, 556 U.S. at 678)).  "A complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'" *Banneker Ventures*, 798 F.3d at 1129 (alterations in original) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).  The court will "assume [the] veracity" of "well-pleaded factual allegations." *Iqbal*, 556 U.S. at 679. Conclusory allegations, however, are "not entitled to the assumption of truth." *Id.* at 680-81.

When ruling on a motion to dismiss, the court may only consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (alteration in original) (quoting *Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)); *see Kevin S. Bennett Tr. v. Bennett*, 561 F. Supp. 2d 22, 26 (D.D.C. 2008) ("The court may also consider documents that are referred to, and central to, the counterclaim.").

## III.   DISCUSSION

### A.   Motion to Dismiss Dr. Turkeltaub's Counterclaims

Ms. van der Stelt raises four separate grounds for dismissing Dr. Turkeltaub's defamation and false light counterclaims.  First, she argues that the statute of limitations bars any claims based on statements predating February 1, 2023—one year before Dr. Turkeltaub filed his counterclaim. Second, she asserts that all of her statements are protected by absolute privilege.  Third, she argues that this same group of statements is protected by qualified privilege.  Fourth and finally, she

claims that Dr. Turkeltaub fails to establish the elements of defamation and false light. The court addresses each argument in turn.[8]

### 1.    Statute of limitations

The statute of limitations for defamation and related false light claims is one year. D.C. Code § 12-301(4); *see Forras v. Rauf*, 39 F. Supp. 3d 45, 57 (D.D.C. 2014). A defamation or false light claim typically accrues "at the time the allegedly defamatory statement [is] published." *McFadden v. Wash. Metro. Area Transit Auth.*, 949 F. Supp. 2d 214, 221 (D.D.C. 2013) (alteration in original) (quoting *Maupin v. Haylock*, 931 A.2d 1039, 1042 (D.C. 2007)). But when the "relationship between the fact of injury and the alleged tortious conduct [is] obscure," "the statute of limitations will not run until [the] plaintiff[] know[s] or reasonably should have known that [he] suffered injury due to the defendant['s] wrongdoing." *Id.* (first alteration in original) (quoting *Mullin v. Wash. Free Weekly, Inc.*, 784 A.2d 296, 298-99 (D.C. 2001)). This is typically referred to as the "discovery rule." *Id.* "[B]ecause statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred." *McFadden*, 949 F. Supp. 2d at 222 (alteration in original) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996)).

Because Dr. Turkeltaub filed his counterclaims on February 1, 2024, Ms. van der Stelt argues that he can only sue for allegedly defamatory statements occurring after February 1, 2023. ECF No. 19, at 12-14. This would exclude Ms. van der Stelt's statements (1) to Ms. Gershman in November 2022 that Dr. Turkeltaub had sexually harassed her, ECF No. 13 ¶ 129; (2) to an

---

[8] "[W]here the plaintiff rests both his defamation and false light claims on the same allegations . . . the claims will be analyzed in the same manner." *Blodgett v. Univ. Club*, 930 A.2d 210, 222 (D.C. 2007).

unnamed first-year graduate student in January 2023 that Dr. Turkeltaub had touched her thigh and made sexual advances toward her, *id.* ¶ 131; and to a current postdoctoral fellow in January 2023 that Dr. Turkeltaub was "grooming" the fellow and other lab members, *id.* ¶ 134. Dr. Turkeltaub counters that the discovery rule applies and sweeps in statements predating February 2023. ECF No. 23, at 8-9. The court agrees with Dr. Turkeltaub.

Each of Ms. van der Stelt's relevant pre-February 2023 statements were made in private to individuals outside of Dr. Turkeltaub's presence and without his knowledge. According to his counterclaims, Dr. Turkeltaub was entirely unaware that Ms. van der Stelt felt any discomfort toward him until at least late September 2022. ECF No. 13 ¶ 96 (alleging that Ms. van der Stelt "confirmed" to a former PhD student on September 2, 2022 that "she had never told [Dr. Turkeltaub about these issues] directly"). While Ms. van der Stelt had raised concerns with Dr. Turkeltaub about his relationship with *Ms. Paul* prior to that time, *see id.* ¶ 100, there is no indication that she ever discussed the sexual harassment allegations that form the basis of his defamation and false light counterclaims with him before then.

Ms. van der Stelt argues that Dr. Turkeltaub "had direct knowledge of [her] allegations as early as June 2, 2022, when [Ms.] van der Stelt informed him of her intention to report his actions to [a] faculty member." ECF No. 19, at 13. Ms. van der Stelt cites to paragraph 93 of her complaint for support, but that paragraph does not allege that she raised the issue of sexual harassment with him or revealed that she had been discussing her allegations with others. *See* ECF No. 1 ¶ 93. Instead, it vaguely states that she told Dr. Turkeltaub about "her concerns about his actions." *Id.* Assuming that "her concerns" refers to the preceding paragraph in the complaint, that paragraph only alleges that Ms. van der Stelt "expressed to him her general concerns about his close relationships with women in the lab" and accused him of "gaslighting her over the past

year." *Id.* ¶ 92; *see* ECF No. 13, at 12 (admitting to meeting with Ms. van der Stelt but denying the substance of paragraphs 92 and 93). Again, none of these statements, even if true, would have put Dr. Turkeltaub on notice that Ms. van der Stelt was publicizing accusations about his alleged sexual harassment. Taking the counterclaim's allegations as true, which the court must do at this stage of the litigation, *Wharf, Inc.*, 232 F. Supp. 3d at 15-16, the court infers that Ms. van der Stelt's concerns centered on "feel[ing] replaced" by Ms. Paul and Dr. Turkeltaub's apparent closeness with Ms. Paul, *see* ECF No. 13 ¶¶ 85-89. Dr. Turkeltaub therefore would not have had any reason to know that Ms. van der Stelt was publicizing allegations of sexual harassment in June 2022.

Ms. van der Stelt next contends that "Georgetown's Title IX [office] contacted [Dr. Turkeltaub] and notified him that an anonymous complaint had been filed against him 'accusing him of sexual harassment.'" ECF No. 19, at 14 (quoting ECF No. 13 ¶ 18). The anonymous complaint "was based on reports [Ms.] van der Stelt had made to a friend who was not a member of CRL." ECF No. 13 ¶ 18. In Ms. van der Stelt's view, this would have alerted Dr. Turkeltaub to her allegedly defamatory statements. But Dr. Turkeltaub does not allege that he knew at the time the complaint was lodged that its allegations had originated with Ms. van der Stelt. *See id.* He therefore would not have known that he had "suffered injury due to [Ms. van der Stelt's alleged] wrongdoing." *McFadden*, 949 F. Supp. 2d at 221. Ms. van der Stelt thus cannot demonstrate that the counterclaims are "conclusively time-barred as discerned from the face of the complaint." *Id.* at 222.[9]

---

[9] Ms. van der Stelt cites *Maupin* for the proposition that Dr. Turkeltaub needed to "identify when [he] learned [of the] wrongdoing or injury" in order to "avail [himself] of the discovery rule." ECF No. 28, at 15 (citing *Maupin*, 931 A.2d at 1043). But *Maupin* was an appeal of a summary judgment decision, meaning that the court had an extensive factual record and timeline before it.

(*continued on next page*)

## 2.    Absolute privilege

Ms. van der Stelt next argues that her allegedly defamatory statements are entitled to two forms of absolute privilege: the judicial proceedings privilege and privilege under the DCHRA's anti-retaliation provision.[10]  ECF No. 19, at 14-22.  Dr. Turkeltaub counters that the statements were too attenuated from any judicial or quasi-judicial proceedings to qualify for the judicial proceedings privilege and that the DCHRA's anti-retaliation provision does not apply.  ECF No. 23, at 10-13.  Again, the court agrees with Dr. Turkeltaub.[11]

### a.    *Judicial proceedings privilege*

"The purpose of the absolute privilege accorded to participants of judicial proceedings is to ensure that they can communicate as freely as possible in efforts to resolve their disputes without being constrained by the threat of a defamation charge."  *Marsh v. Hollander*, 339 F. Supp. 2d 1, 6 (D.D.C. 2004).  The privilege thus protects defamatory statements that are made "preliminary to or in the course of a judicial proceeding so long as the defamatory matter has some relation . . . to the proceeding."  *Brown v. Collins*, 402 F.2d 209, 212 (D.C. Cir. 1968) (internal quotation marks omitted); *see* Restatement (Second) of Torts § 587 (2024) ("A party to a private litigation . . . is absolutely privileged to publish defamatory matter concerning another in communications

---

At this early stage, Dr. Turkeltaub has alleged enough to survive a motion to dismiss on timeliness grounds.  *See Associated Producers, LTD v. Vanderbilt Univ.*, 76 F. Supp. 3d 154, 172 (D.D.C. 2014) (denying a motion to dismiss where the plaintiffs alleged that they filed their complaint within one year of discovering the defamatory statements).

[10] While Ms. van der Stelt labels this part of her brief as applying to statements made "[a]fter February 1, 2023," ECF No. 19, at 14, it appears that she seeks to apply the privilege to *all* allegedly defamatory statements, *see id.* at 15 ("[Dr.] Turkeltaub's Counterclaim must be dismissed *in its entirety* on the grounds of absolute privilege." (emphasis added)).

[11] "It is appropriate for a court, in considering a [Rule] 12(b)(6) motion, to decide any preliminary questions of absolute privilege such as the judicial proceedings privilege."  *Marsh v. Hollander*, 339 F. Supp. 2d 1, 7 (D.D.C. 2004).

preliminary to . . . , or in the institution of[,] or during the course and as a part of, a judicial proceeding in which [s]he participates, if the matter has some relation to the proceeding."). "For the absolute immunity of the privilege to apply, two requirements must be satisfied: (1) the statement must have been made in the course of or preliminary to a judicial proceeding; and (2) the statement must be related in some way to the underlying proceeding." *Arneja v. Gildar*, 541 A.2d 621, 623 (D.C. 1988). The court concludes that Ms. van der Stelt's statements fail either one or both prongs.

*Relevant judicial proceeding.* As an initial matter, the court concludes that the relevant judicial proceeding is the instant federal suit. Ms. van der Stelt argues that Georgetown University's internal IDEAA process and her NIH complaint were "quasi-judicial proceedings" embraced by the privilege. ECF No. 19, at 15-17, 19-20. With respect to the IDEAA complaint, she relies primarily on cases from outside this jurisdiction, *see id.* at 15-16, but District law "has not extended [the absolute judicial] privilege to proceedings before a private party" such as a university tribunal. *Newman v. Howard Univ. Sch. of Law*, 715 F. Supp. 3d 86, 113 (D.D.C. 2024). Because Georgetown University's internal disciplinary procedures are "neither conducted by a governmental body nor closely intertwined with the judicial process," the privilege does not attach to statements that Ms. van der Stelt made in connection with her IDEAA complaint. *Id.* Although she attempts to distinguish *Newman* on the ground that the student's disciplinary hearing and subsequent lawsuit concerned different issues, ECF No. 28, at 18, the court is not persuaded. The substance of a proceeding does not determine whether it is "conducted by a governmental body" or "closely intertwined with the judicial process." *Newman*, 715 F. Supp. 3d at 113.

The NIH complaint also does not qualify because Ms. van der Stelt does not argue that that complaint led to any type of judicial or quasi-judicial proceedings. According to Dr. Turkeltaub's

counterclaim, the NIH complaint resulted in his removal from a prestigious grant-review panel seemingly without any briefings, hearings, or presentations of evidence.  ECF No. 13 ¶¶ 145-46; *id.* ¶ 26 (alleging that "the NIH removed him from [the] panel . . . based on the allegations alone").  Without more, the court concludes that the NIH proceeding was not quasi-judicial.  *See Park v. Brahmbhatt*, 234 A.3d 1212, 1215 (D.C. 2020) (listing, as considerations in the quasi-judicial inquiry: whether the proceeding has "all of the trappings of an adjudicatory tribunal," is "designed to adjust the rights or liabilities of the parties before it," and features an "impartial decisionmaker" (footnotes omitted)).

*Statements before litigation.*  With the proper frame of reference, the court begins with Ms. van der Stelt's statements before litigation commenced in July 2023.  "[C]ommunications preliminary to a proposed judicial proceeding [are protected] only when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration."  Restatement (Second) of Torts § 587 cmt. e.  "The bare possibility that [litigation] might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered."  *Id.*  As a result, the court is not convinced that Ms. van der Stelt's statements many months before she filed suit (to individuals who were not involved in the litigation) were preliminary to her subsequent civil action.

The first of Ms. van der Stelt's allegedly defamatory statements occurred in November 2022, ECF No. 13 ¶ 129, roughly seven months before litigation began.  While some statements were made closer to the filing of the complaint, *see id.* ¶¶ 148-49 (April 2023 statement to a faculty member at a different university concerning her internal IDEAA complaint), they still predated the lawsuit by multiple months.  In short, none of the statements appeared to arise in the immediate lead-up to litigation or function as a procedural precursor to legal action.  *Cf. Messina*

*v. Krakower*, 439 F.3d 755, 761 (D.C. Cir. 2006) ("[I]t is plain on the face of the letter that it was preliminary to a judicial proceeding in that it was sent for the very purpose of attempting settlement prior to litigation." (internal quotation marks omitted) (quoting *Messina v. Fontana*, 260 F. Supp. 2d 173, 178 (D.D.C. 2003))).

With one exception, Ms. van der Stelt also cannot show that her pre-litigation statements were sufficiently related to her eventual lawsuit.  Unlike communications with opposing counsel in a genuine effort to resolve legal disputes "short of litigation," *Fontana*, 260 F. Supp. 2d at 179, or to pressure an adversary to reach a resolution, *Conservative Club of Wash. v. Finkelstein*, 738 F. Supp. 6, 9 (D.D.C. 1990), Ms. van der Stelt's statements to members of the CRL, the larger Georgetown University community, and even individuals at other universities did not clearly bear a sufficient relationship to her subsequent judicial proceeding.  Her accusations certainly related to the "*facts involved*" with her eventual lawsuit, but that is not enough to invoke the significant protections afforded by the privilege.  *Brown*, 402 F.2d at 213 (emphasis added).

Ms. van der Stelt argues that she made her statements "to persons with a connection or interest in the investigations or related proceedings, such as individuals who may have witnessed or known of [Dr.] Turkeltaub's sexually harassing behavior," and was therefore "entitled to have discussion[s] with [them] in order to develop and litigate her claims effectively."  ECF No. 19, at 18.  But there is a difference between communicating in the name of legal strategy and communicating to circulate accusations.  According to Dr. Turkeltaub's counterclaim, many of the individuals Ms. van der Stelt spoke to were entirely unaware that any inappropriate behavior was taking place.  *See* ECF No. 13 ¶¶ 129, 137, 143.  Some even expressed skepticism about the accusations.  *Id.* ¶¶ 129, 137.  Dr. Turkeltaub alleges that Ms. van der Stelt's goal was not to

"develop and litigate her claims effectively," ECF No. 19, at 18, but instead to "lobb[y]" others to distance themselves from him or harm his reputation, ECF No. 13 ¶¶ 137, 141.

The *only* statement covered by the privilege was Ms. van der Stelt's request, in July 2023, that a specific graduate student "act as a character witness in this lawsuit." *Id.* ¶ 140.[12] This communication was clearly made in anticipation of litigation and directly solicited the person's participation. *See Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.*, 774 A.2d 332, 345 (D.C. 2001) (explaining that a statement is protected "so long as litigation is truly under serious consideration and the communications bear a sufficient relationship to that potential litigation"), *overruled on other grounds by McNair Builders, Inc. v. Taylor*, 3 A.3d 1132 (D.C. 2010). The remainder of her communications, however, do not qualify.

"Especially where no judicial proceeding has begun, caution is warranted" in applying the judicial proceedings privilege. *Id.* at 341 (quoting Charles W. Wolfram, *Modern Legal Ethics* 231 (1986)). District law thus makes clear that the privilege is not an excuse to broadcast information related to a potential future lawsuit to anyone who agrees to hear it. Instead, the statements must further some litigation-related goal. *See, e.g.*, *id.* ("We . . . hold that communications during preliminary consultations with prospective clients, including contacts that may be characterized as client solicitations, are within the coverage of the judicial proceedings privilege."); *Fontana*, 260 F. Supp. 2d at 178 ("Statements made in settlement efforts prior to trial are covered by the judicial proceedings privilege."). In the attorney context, the privilege is meant "to encourage attorneys to speak freely and candidly . . . in their efforts to secure justice for their clients." *Id.* (quoting

---

[12] The counterclaims do not specify whether this communication occurred before or after Ms. van der Stelt filed her federal complaint. But because it occurred "[i]n July 2023" and the complaint was filed on July 31, 2023, ECF No. 13 ¶ 140, the court assumes that the interaction took place prior to litigation. In either case, the relationship analysis is the same.

Restatement (Second) of Torts § 586 cmt. a).  A lawyer who simply publicizes potentially defamatory facts without a "genuine" eye toward litigation would therefore not be protected by the privilege.  *Park*, 234 A.3d at 1215; *see Conservative Club of Wash.*, 738 F. Supp. at 14 (applying the privilege where "the statements were made in contemplation of litigation *to the very individuals* who would have an interest in the outcome of such litigation" (emphasis added)).  By the same logic, a party cannot hide behind the privilege as an excuse to spread defamatory statements when there is no actual litigation purpose behind those communications.

     *Statements during the pendency of litigation.*  For many of the same reasons, Ms. van der Stelt's statements during the pendency of this suit are not sufficiently related to her suit.[13]  While the "relation" prong of the inquiry is to be "very liberally construed," *Arneja*, 541 A.2d at 624, it is not limitless.  The defendant must do more than "merely . . . show[] that the defamatory comments were triggered by some . . . lawsuit or the facts involved therein."  *Brown*, 402 F.2d at 213.  Accordingly, there must be "a 'reasonable nexus' between the statement and the judicial proceeding."  *Gonzalez Ramos v. ADR Vantage, Inc.*, No. 21-CV-592, 2022 WL 870585, at *3 (D.D.C. Mar. 21, 2022) (quoting *Am. Petroleum Inst. v. Technomedia Int'l, Inc.*, 699 F. Supp. 2d 258, 268 (D.D.C. 2010)); *id.* at *3-4 (concluding that statements made in legal briefs were protected by the privilege because they were "central to the parties' competing theories of the

---

[13] While most of the statements after the suit was filed were apparently made by Ms. van der Stelt's friends and associates, *see* ECF No. 13 ¶¶ 156-62, "[t]he original publisher of a defamatory statement is liable for a republication . . . if the republication was reasonably foreseeable," *Foretich v. Glamour*, 753 F. Supp. 955, 961 (D.D.C. 1990).  Dr. Turkeltaub alleges that, for each statement, Ms. van der Stelt "endorsed," "approved," or "consent[ed]" to the republications.  ECF No. 13 ¶¶ 156-62.  At this stage, that is sufficient to make out defamation and false light claims against Ms. van der Stelt.  *See Caudle v. Thompson*, 942 F. Supp. 635, 639 (D.D.C. 1996) (holding that allegations that the defendant "'knew, or in the exercise of reasonable care should have known, that such republication would occur' . . . unquestionably satisf[ied]" the foreseeability test at the motion-to-dismiss stage).

case"). "Th[is] inquiry requires 'particularly close attention to the factual circumstances.'" *Id.* (quoting *Am. Petrol. Inst.*, 699 F. Supp. 2d at 268).

While the entirety of Ms. van der Stelt's complaint is absolutely privileged, the repeated republications of her complaint's contents to individuals with no direct involvement in the litigation are not. In *Newmyer v. Sidwell Friends School*, 128 A.3d 1023 (D.C. 2015), the D.C. Court of Appeals held that a plaintiff's "act of publicizing [his] complaint to media organizations immediately after filing" did not fall within the judicial proceedings privilege. *Id.* at 1042. Such publication "was gratuitous and b[ore] no relevance whatsoever to the judicial proceedings." *Id.* As the court continued: "We can discern no purpose behind this act other than to brand [the defendant] with a scarlet letter by increasing public awareness of the lawsuit." *Id.* The same is true here, where the court cannot discern a legitimate, litigation-related reason for disseminating the contents of the complaint far and wide, including to individuals no longer affiliated with the CRL or to people at other universities. ECF No. 13 ¶¶ 159-60.[14] Therefore, Ms. van der Stelt's republications to CRL lab members, IPN students, members of Dr. Turkeltaub's professional community, and media outlets, ECF No. 13 ¶¶ 156-163, are not absolutely privileged.

The absolute judicial proceedings privilege "is not lightly conferred . . . [because] it [can] protect[] deliberate lies told with intent to destroy reputation." *Finkelstein*, 774 A.2d at 341 (quoting *Brown*, 402 F.2d at 213). The privilege does not exist to give parties and attorneys carte blanche to spread falsities merely because those falsities bear a tenuous connection to a potential suit. Rather, the privilege is meant to be a shield to enable litigants to seek justice in the courts, not a sword to defame others under the guise of the judicial process.

---

[14] While the court concludes that the republication of Ms. van der Stelt's complaint is not automatically protected by the judicial proceedings privilege, the court further discusses this republication under the qualified "fair reporting" privilege below. *See infra* Part III.A.3.a.

b.    *Privilege under the DCHRA*

Ms. van der Stelt next argues that, because she brings claims under the DCHRA, ECF No. 1 ¶¶ 153-87, 195-215, her statements are protected under that statute's anti-retaliation provision, which makes it unlawful for anyone to "retaliate . . . against a person[] because that person has . . . participated in any manner in an investigation, proceeding[,] or hearing authorized under [the DCHRA]."  D.C. Code § 2-1402.61(b).  The court disagrees.

In support of this argument, Ms. van der Stelt primarily relies on *Egei v. Johnson*, 192 F. Supp. 3d 81 (D.D.C. 2016), for the proposition that Dr. Turkeltaub cannot sue her for allegedly defamatory statements that she made in the course of exercising her statutory rights.  ECF No. 19, at 20-22.  While *Egei* involved Title VII, that statute's anti-retaliation provision mirrors the DCHRA's.  *See Lewis v. District of Columbia*, 161 F. Supp. 3d 15, 34 (D.D.C. 2015).  In *Egei*, an employee at the Federal Emergency Management Agency submitted an Equal Employment Opportunity ("EEO") complaint accusing her supervisors of sexual and national-origin discrimination.  192 F. Supp. 3d at 83.  An administrative law judge later denied the complaint after finding substantial discrepancies and inconsistencies in the complainant's testimony.  *Id.* at 84.  Two years later, the agency terminated the plaintiff for falsifying records and a "lack of candor" during the EEO proceedings.  *Id.*  She then submitted a second EEO complaint alleging that her termination was retaliatory and, once that complaint was denied, filed a federal lawsuit under Title VII.  *Id.* at 84-85.  The district court eventually concluded that under Title VII's anti-retaliation provision, the agency could not terminate the plaintiff based on "the substance of testimony or claims she ma[de] in the course of [her] EEO proceedings."  *Id.* at 86.

The court finds this case distinguishable for several reasons.  First, the DCHRA's anti-retaliation provision is offensive: it gives individuals the right to sue when they suffer retaliatory actions by their employers.  But Ms. van der Stelt does not point to any authority suggesting that

the provision *preemptively* prohibits other parties from suing her. Even *Egei* does not help her on this point; the plaintiff there was suing *the agency* for retaliation. 192 F. Supp. 3d at 85. Nothing in *Egei* stands for the principle that a plaintiff would be immune from suit *as a defendant*. In other words, the relevant DCHRA provision gives Ms. van der Stelt a legal remedy if she faces retaliation, but it does not immunize her from claims of defamation or false light.

Next, *Egei* only offered protections to "statements made *in the course* of EEO proceedings"—specifically, ones the plaintiff made in her formal filings or as part of her sworn testimonies. 192 F. Supp. 3d at 89 (emphasis added). Even if this principle were to extend beyond the EEO context, it would not cover the statements Ms. van der Stelt made outside the bounds of her suit. As explained above, *supra* Part III.A.2.a, many of the allegedly defamatory statements came well before this litigation began and/or were disconnected from the litigation process.

Finally, the other cases upon which Ms. van der Stelt relies only appear to protect individuals from being retaliated against for *filing* EEO complaints. *See, e.g.*, *Blistein v. St. John's Coll.*, 860 F. Supp. 256 (D. Md. 1994); *Shabazz v. PYA Monarch*, 271 F. Supp. 2d 797 (E.D. Va. 2003). But Dr. Turkeltaub is not suing Ms. van der Stelt for the act of filing a federal complaint. ECF No. 23, at 13 ("[Dr.] Turkeltaub's defamation claims do not rest on [Ms.] van der Stelt['s] having exercised her right to file her Title IX action."). Instead, he claims that she defamed him in other ways, separate from the institution of legal proceedings, by spreading accusations of his alleged sexual harassment to students, faculty, and others within the Georgetown University community and beyond. ECF No. 13 ¶¶ 173, 186. Ms. van der Stelt is therefore not absolutely immune from Dr. Turkeltaub's defamation counterclaim.

### 3.    Qualified privilege

Having failed to establish absolute privilege for all but one conversation, Ms. van der Stelt next resorts to two forms of qualified privilege: the fair reporting privilege and the common interest privilege.  ECF No. 19, at 22-30.  The court concludes that neither applies.

### a.    *Fair reporting privilege*

The fair reporting privilege protects statements that are "accurate and complete" publications of "official proceeding[s]" if they are published without "malice" and "for the purpose of informing the public as to a matter of public concern."  *Oparaugo v. Watts*, 884 A.2d 63, 81 (D.C. 2005) (quoting *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 88 (D.C. 1980)).[15] "In order to avail [one]self of the privilege, the publisher must give fair attribution to the source of the alleged official record."  *Id.*   The privilege even shields "the accurate report of false information" as long as it is "obtained from an official record and proper attribution is given to its source."  *Id.*   The D.C. Court of Appeals "has adopted the minority rule that pleadings filed in judicial proceedings qualify as official records under the privilege" even before the court acts on them.  *Harper v. Walters*, 822 F. Supp. 817, 824 (D.D.C. 1993) (citing *Johnson v. Johnson Publ'g Co.*, 271 A.2d 696, 699 (D.C. 1970)).

Ms. van der Stelt claims that the fair reporting privilege "protects any alleged dissemination of [her] complaint to *The Hoya*, CRL lab members, IPN students, or other Georgetown students or faculty."  ECF No. 19, at 23.  Dr. Turkeltaub's primary response is to invoke the self-reporting exception, a relatively obscure principle that a "person cannot confer [the fair reporting] privilege

---

[15] "Malice" is defined as "knowledge that [the statement] was false" or a "reckless disregard of whether it was false or not."  *Harper v. Walters*, 822 F. Supp. 817, 824 (D.D.C. 1993) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)).

upon [her]self by making the original defamatory publication [her]self and then reporting to other people what [s]he had stated." Restatement (Second) of Torts § 611 cmt. c. The District of Columbia has not officially recognized such an exception. And while Dr. Turkeltaub cites to an unreported case from another judge of this court, *see* ECF No. 23, at 15 (citing *Myers v. D.C. Hous. Auth.*, No. 20-CV-700, 2021 WL 1167032 (D.D.C. Mar. 26, 2021), the District's local law controls the adjudication of defamation claims, *see U.S. Dominion, Inc. v. Byrne*, 600 F. Supp. 3d 24, 30 (D.D.C. 2022).

Putting aside the self-reporting exception, the court concludes that Ms. van der Stelt can avail herself of the qualified fair reporting privilege for some, but not all, of her statements. Specifically, absent a showing of malice, the qualified privilege would extend to Ms. van der Stelt's distribution of her complaint to CRL lab members, IPN students, and *The Hoya* newspaper. ECF No. 13 ¶¶ 156-62; *Johnson*, 271 A.2d at 699 ("[A] qualified [fair reporting] privilege extends to reports of charges contained in pleadings filed in court.").[16] While the presence of malice "is ordinarily a question of fact for the jury," *Oparaugo*, 884 A.2d at 82, Dr. Turkeltaub only alleges malice in a conclusory fashion in his counterclaims, ECF No. 13 ¶¶ 180, 189. The court therefore will not credit those allegations, *see, e.g.*, *Hindu Am. Found. v. Viswanath*, 646 F. Supp. 3d 78, 99 (D.D.C. 2022), and will apply the fair reporting privilege to dismiss Dr. Turkeltaub's counterclaims against Ms. van der Stelt's dissemination of her federal complaint.

But the privilege does not apply to Ms. van der Stelt's pre-complaint communications because those communications could not have been "fair and accurate report[]" of the then-

---

[16] To clarify the interaction of the fair reporting and judicial proceedings privileges: the court's discussion of *Newmyer*, *see supra* Part III.A.2.a, demonstrates that gratuitously publicizing a complaint is not covered by the absolute judicial proceedings privilege because doing so is not sufficiently related to the proceeding itself. That publication, however, may still be covered by the qualified fair reporting privilege as long as it is done with proper attribution and without malice.

nonexistent complaint. *Harper*, 822 F. Supp. at 824 (quoting *Dameron v. Wash. Mag., Inc.*, 779 F.2d 736 (D.C. Cir. 1985)). Nor could they have been "attributed to the official source." *Id.* Accordingly, only Ms. van der Stelt's distribution of her federal complaint is shielded under the fair reporting privilege.

### b.  Common interest privilege

The common interest privilege recognizes the merit in providing "true information . . . whenever it is reasonably necessary for the protection of the actor's own interests, the interests of a third person[,] or certain interests of the public." *Payne v. Clark*, 25 A.3d 918, 924-25 (D.C. 2011) (quoting *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990)). It protects a statement that is "(1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which [s]he has or honestly believes [s]he has a duty (3) to a person who has such a corresponding interest or duty." *Id.* at 925 (quoting *Moss*, 580 A.2d at 1024). There are two exceptions to the privilege: (a) excessive publication—defined as "publication to those with no common interest in the information communicated, or publication not reasonably calculated to protect or further the interest"—and (b) publication with malice—"the equivalent of bad faith." *Moss*, 580 A.2d at 1024-25.

Ms. van der Stelt argues that "all of the people to whom [she] made allegedly defamatory statements ha[d] a common interest in preventing sexual harassment in educational settings." ECF No. 19, at 26. Dr. Turkeltaub responds that Ms. van der Stelt publicized her accusations excessively by disseminating them to individuals who had no connection to the CRL, the IPN, or even Georgetown University.

At this early stage, the court concludes that Dr. Turkeltaub has alleged enough facts to show that Ms. van der Stelt committed excessive publication. Even assuming that current CRL

lab members and IPN students had a "common interest" in learning about Dr. Turkeltaub's alleged sexual harassment, it is unclear how Ms. van der Stelt's revealing these accusations to faculty at different universities, ECF No. 13 ¶¶ 148-49, to individuals without any ongoing affiliation with Georgetown University, *id.* ¶¶ 129, 143, or to people who had no connection to Dr. Turkeltaub, *id.* ¶ 151, would "be necessary for the protection of other students in the program," ECF No. 19, at 26. Dr. Turkeltaub plausibly alleges Ms. van der Stelt's statements to these groups were "not reasonably calculated to protect or further [her purported] interest." *Moss*, 580 A.2d at 1024.

Ms. van der Stelt maintains that "common interest" must be interpreted broadly. But most courts analyzing the potentially excessive publication of alleged wrongdoing do so on a motion for summary judgment, not on motion to dismiss, and even then, the courts require a closer nexus between the interest and the recipient of the communication. *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858-59 (D.C. Cir. 2006) (holding, at summary judgment, that there was no excessive publication where statements about the plaintiff's misconduct were only provided to the employee's supervisors and individuals directly involved in resolving personnel matters); *Alade v. Borg-Warner Protective Servs. Corp.*, 28 F. Supp. 2d 655, 657 (D.D.C. 1998) (holding, at summary judgment, that there was no excessive publication where the plaintiffs' wrongdoing was announced at an internal company meeting and there was no proof that the plaintiffs were mentioned by name).[17]

The court is particularly persuaded by *Tacka v. Georgetown University*, 193 F. Supp. 2d 43 (D.D.C. 2001). There, the plaintiff, a music professor, applied for tenure several years after

---

[17] Ms. van der Stelt's citation to *Stark v. Zeta Phi Beta Sorority, Inc.*, 587 F. Supp. 2d 170 (D.D.C. 2008), ECF No. 28, at 24, is not helpful. The plaintiff in that case "d[id] not contest the application of [the common interest] privilege" and never raised an argument about excessive publication. *Stark*, 587 F. Supp. 2d at 176.

joining the university.  *Id.* at 46.  While his application was pending, a professor at another university accused the plaintiff of plagiarism and sent a corresponding report to the chair of Georgetown University's music department.  *Id.*  Although the plaintiff had asked for the plagiarism charge to be resolved before any ruling on his tenure application, the chair shared the report with the committees considering the plaintiff's tenure application.  *Id.*  The university denied the plaintiff tenure, and the chair thereafter referred the plagiarism accusation to the committee responsible for adjudicating charges of plagiarism.  *Id.*  The plaintiff subsequently sued for defamation, arguing that the chair had defamed him by sending the plagiarism report to the tenure committees.  *Id.* at 49.  The university raised the common interest privilege as a defense because distributing the plagiarism report "enable[d] the University to make an informed decision about promotion and tenure."  *Id.* at 53.  The plaintiff countered that there was a genuine dispute as to excessive publication, and the district court agreed.  *Id.*  It held that the chair's decision to "broadcast the allegation throughout the musicology community," "rather than [only to] the [plagiarism committee]," may have been excessive.  *Id.* (internal quotation marks omitted).[18]

The tenure committees in *Tacka* were integral parts of the university community and undoubtedly had a general interest in the plaintiff's character and integrity.  But even that was not enough to sweep them into the ambit of the university's purported common interest.  As *Tacka* shows, keeping potentially defamatory information within the institution's walls does not guarantee the absence of excessive publication.  The *Tacka* court's holding casts serious doubt on the assertion that members of a single community will always share a sufficiently "common interest" to invoke the privilege.

---

[18] Of note, *Tacka* was a summary judgment disposition, *see* 193 F. Supp. 2d at 46, meaning that the plaintiff's burden of proof was much higher than Dr. Turkeltaub's.

Like the defendant in *Tacka*, Ms. van der Stelt argues that she did not spread her accusations more than necessary or to individuals who lacked a genuine interest in the allegations. But Dr. Turkeltaub claims that she communicated with individuals well beyond the immediate orbit of the CRL or the IPN. And while *Tacka* calls into question the propriety of her statements to at least *some* members of the Georgetown University community, it plainly undermines the common interest argument with respect to faculty from other universities or people who have no connection to Dr. Turkeltaub.

Ms. van der Stelt's only response is that Dr. Turkeltaub's invocation of *Tacka* "minimize[s] the applicable standard" for showing excessive publication. ECF No. 28, at 23. She insists that he must either "provide 'extrinsic proof'" of malice or "demonstrate that it is 'so excessive, intemperate, unreasonable, and abusive'" as to rule out anything other than express malice. ECF No. 28, at 23 (quoting *Blodgett v. Univ. Club*, 930 A.2d 210, 224 (D.C. 2007)). But she is mistaken for two reasons. First, this standard—derived from *Blodgett*—applies to *malice*, not to excessive publication; the two are distinct principles. *See Moss*, 580 A.2d at 1024 (explaining that one can defeat the common interest privilege with a showing of malice *or* excessive publication). Indeed, the Court in *Blodgett* observed that "[t]here [was] no genuine issue of material fact as to 'excessive publication'" in that case and thus had no reason to address it. 930 A.2d at 225 n. 15. Second, this heightened standard applies to summary judgment, not a motion to dismiss. *See id.* at 215. At this stage, Dr. Turkeltaub need only allege sufficient facts to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Requiring Dr. Turkeltaub to provide the substantial proof Ms. van der Stelt demands would be premature. Instead, the court concludes that Dr. Turkeltaub has alleged enough to "plausibly suggest[]" that Ms. van der Stelt publicized her

allegations to individuals lacking a common interest, or in ways that were not reasonably calculated to further that interest.  *Id.* at 557.

### 4.    Sufficiency of the defamation claim

Finally, Ms. van der Stelt argues that Dr. Turkeltaub has failed to adequately plead the elements of a defamation claim.  ECF No. 19, at 30-35.  To state such a claim, the plaintiff must allege:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (quoting *Oparaugo*, 884 A.2d at 76).  At this stage, Ms. van der Stelt only disputes the first, third, and fourth elements—specifically, whether her statements were verifiably false, whether Dr. Turkeltaub must plead actual malice, and whether the accusations harmed Dr. Turkeltaub.  ECF No. 19, at 30-35.  The court concludes that Dr. Turkeltaub has alleged sufficient facts to survive a motion to dismiss.

### a.    Whether the statements were "false and defamatory"

For "a challenged statement to be actionable as defamation, 'it must at a minimum express or imply a verifiably false fact'" about the plaintiff.  *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 276 (D.D.C. 2017) (quoting *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001)).  The crux of Ms. van der Stelt's argument under this first element is that Dr. Turkeltaub admits to the underlying facts of his conduct (such as hugging Ms. van der Stelt, touching her skirt, and carpooling with her).  As a result, she claims that her allegations of sexual

harassment are (1) substantially true and (2) her own "subjective view[s] and interpretation[s]" of those actions. ECF No. 19, at 30-31.

Substantial truth "will succeed as a defense if 'a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn.'" *Armstrong v. Thompson*, 80 A.3d 177, 184 (D.C. 2013) (quoting *White v. Fraternal Ord. of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990)). In his counterclaim, Dr. Turkeltaub states that he hugged Ms. van der Stelt on multiple occasions, ECF No. 13 ¶¶ 12, 67, 106, touched Ms. van der Stelt's skirt, *id.* ¶¶ 23, 83, and had "non-professional encounters" with her, *id.* ¶ 100.[19] If Ms. van der Stelt had merely told others that these events had occurred and that they had made her uncomfortable, that would certainly be an unverifiable opinion. But a communication can still be "defamatory by implication if, 'by the particular manner or language in which the true facts are conveyed, [the communication] supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference.'" *Armstrong*, 80 A.3d at 184 (alteration in original). If the speaker "has done something beyond the mere reporting of true facts to suggest that [she] . . . endorses the [defamatory] inference," the speaker cannot hide behind claims of substantial truth. *Id.* Here, Dr. Turkeltaub alleges that Ms. van der Stelt took her statements one step further by affirmatively accusing him of committing an illegal act. Rather than only providing

---

[19] Ms. van der Stelt states that Dr. Turkeltaub "admitted to the [*The*] *Hoya* newspaper that he walked in on Ms. van der Stelt when she was in the bathroom at his home during a party." ECF No. 28, at 6-7. Dr. Turkeltaub, however, expressly denies this allegation in his answer. *See* ECF No. 1 ¶ 61; ECF No. 13, at 9 (admitting only that Ms. van der Stelt attended a party at his house). Ms. van der Stelt attached *The Hoya* article to her motion to dismiss, *see* ECF No. 19-1, but the court can only take judicial notice of newspaper articles "for the fact that they were published," "*not* for their truth." *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 132 n.1 (D.D.C. 2016) (emphasis added). Accordingly, the court does not treat this specific allegation as admitted.

a factual accounting of what took place and allowing *others* to make a potentially defamatory inference, Ms. van der Stelt supplied that inference herself.

The rest of Ms. van der Stelt's response is more accurately characterized as an opinion-based argument. In other words, she claims that her allegedly defamatory meaning was a subjective interpretation of real events. Generally, opinions are not actionable in defamation because they are often "so imprecise or subjective that [they are] not capable of being proved true or false." *Farah v. Esquire Mag.*, 736 F.3d 528, 534-35 (D.C. Cir. 2013); *see Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000) (explaining that if a "speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts," the statement is entitled to First Amendment protection (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993))). That being said, the Supreme Court has made clear that there is no blanket "defamation exemption for anything that might be labeled [an] 'opinion.'" *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18 (1990). This is because "expressions of 'opinion' may often imply an assertion of objective fact." *Id.*; *see Stevens v. Tillman*, 855 F.2d 394, 398 (7th Cir. 1988) ("Every statement of opinion contains or implies some proposition of fact, just as every statement of fact has or implies an evaluative component."). Therefore, an opinion is only protected if it "lend[s] [itself] to varying interpretations . . . [and] cannot be proved false." *Clemmons v. Acad. For Educ. Dev.*, 70 F. Supp. 3d 282, 308 (D.D.C. 2014) (internal quotation marks omitted).

Deciding whether a statement implies verifiably false facts or an unactionable opinion is a question of law. *See Farah*, 736 F.3d at 534-35. "The line between fact and opinion is not always bright," *Armstrong*, 80 A.3d at 187, because statements tend to exist on "a spectrum with respect to the degree to which they can be verified," *Ollman v. Evans*, 750 F.2d 970, 982 (D.C. Cir. 1984)

(en banc). In conducting this inquiry, the court primarily looks to the ordinary meaning of the statement's words and its overall context. *Ollman*, 750 F.2d at 979-84; *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 11 (D.D.C. 2019).

Ms. van der Stelt relies on *Armstrong* and *Rosen v. American Israel Public Affairs Committee, Inc.*, 41 A.3d 1250 (D.C. 2012), for support. Both cases generally stand for the proposition that "remarks on a subject lending itself to multiple interpretations cannot be the basis of a successful defamation action because[,] as a matter of law[,] no threshold showing of 'falsity' is possible in such circumstances." *Rosen*, 41 A.3d at 1258 (quoting *McClure v. Am. Fam. Mut. Ins. Co.*, 223 F.3d 845, 853 (8th Cir. 2000)). But the allegedly defamatory statements in both cases were far more abstract than Ms. van der Stelt's. In *Armstrong*, for example, the defendant said that the plaintiff had engaged in "serious integrity violations" and "unethical behavior." 80 A.3d at 187-88. The D.C. Court of Appeals held that these were "one person's subjective view of the underlying conduct and [thus] not verifiable as true or false." *Id.* at 188. In *Rosen*, the statements were even less definite: the defendant organization said that the plaintiff's actions "did not comport with the standards that [it] expect[ed] of its employees." 41 A.3d at 1256.

Here, according to the counterclaims, Ms. van der Stelt did not merely say that Dr. Turkeltaub acted inappropriately or irresponsibly. She told members of the Georgetown University community and beyond that he had "sexually harassed her," "made sexual advances towards her," and "groomed" female members of the lab. ECF No. 13 ¶¶ 129, 131-32, 151.[20] While these certainly may have been Ms. van der Stelt's opinions about Dr. Turkeltaub's conduct, they still "imply an assertion of objective fact"—that Dr. Turkeltaub violated the law by

---

[20] According to the counterclaims, Ms. van der Stelt also said that Dr. Turkeltaub "inquir[ed] about [her] interest in a romantic relationship with him." ECF No. 13 ¶ 144. She does not seem to argue that this statement—which strikes the court as a provable or disprovable fact—was unverifiable.

discriminating against her on the basis of sex.  *Milkovich*, 497 U.S. at 18.  Even if these statements contained an evaluative component, they had sufficient specificity to make them actionable.  *See Passantino v. Weissmann*, 752 F. Supp. 3d 168, 178 (D.D.C. 2024) ("[A]ccusing someone of being unethical, more generally, is different than charging them with a specific, [unlawful] act."). Indeed, other judges of this court have said that accusations of sexual harassment can be "demonstrably false."  *Blazy v. Tenet*, 979 F. Supp. 10, 22 (D.D.C. 1997).  Opinions may receive enhanced protections under the law, but the law does not "create a wholesale defamation exemption for anything that might be labeled [an] 'opinion.'"  *Milkovich*, 497 U.S. at 18.  Whether Dr. Turkeltaub in fact sexually harassed Ms. van der Stelt—one of the central questions in her suit—is verifiably true or false.  Ms. van der Stelt presumably would not have sued if she believed otherwise.

### b.    *Whether Dr. Turkeltaub is a public figure who must plead actual malice*

The applicable fault standard under the third element of defamation "turns upon whether the plaintiff is a public or a private figure."  *Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 504 (D.C. 2020).  If the plaintiff is a private figure, he must plead that the defendant acted negligently. *Salem Media Grp. v. Awan*, 301 A.3d 633, 646 (D.C. 2023).  If he is instead a public figure, then the plaintiff must show that the challenged statement was made with actual malice—meaning "with knowledge that it was false or with reckless disregard of whether it was false or not."  *Id.* (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)).  There are two broadly recognized categories of "public figures": (1) a general-purpose public figure, who "achieve[s] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts," and (2) a limited-purpose public figure, who "voluntarily injects himself or is drawn into a particular public

controversy and thereby becomes a public figure for a limited range of issues." *Id.* (alteration in original) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)).[21]

To determine whether a plaintiff is a limited-purpose public figure, the court employs a three-prong test: (1) first, it identifies whether a public controversy exists and defines its scope; (2) second, if one exists, the court must decide if the plaintiff "[was] shaping or [was] trying to shape the outcome of [the] public controversy"; and (3) third, the court asks "whether the alleged defamation was germane to the plaintiff's participation in the controversy." *Moss*, 580 A.2d at 1031.[22]  All three requirements must be met. *See id.* at 1030-31.  While there exists a public controversy, the court holds that Dr. Turkeltaub did not play a sufficient role in shaping its outcome to become a limited-purpose public figure.

*Public controversy.* "A public controversy is 'not simply a matter of interest to the public . . . [but] a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way . . . because its ramifications will be felt by persons who are not direct participants.'" *Salem Media Grp.*, 301 A.3d at 648 (alterations in original) (quoting *Moss*, 580

---

[21] The parties seem to agree that Dr. Turkeltaub is not a general-purpose public figure, and the court concurs. *See Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 260 (D.D.C. 2013) ("A person becomes a general purpose public figure only if he or she is 'a well-known celebrity [such that] his name [is] a household word.'" (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987))).

[22] Ms. van der Stelt claims that Dr. Turkeltaub "concedes that he is some sort of a public figure, [because] he pleads the heightened standard for malice . . . and otherwise describes his national and international prominence in the counterclaim." ECF No. 19, at 33.  The court disagrees.  It interprets Dr. Turkeltaub's argumentation of actual malice as a strategic precaution in the event that the court labels him a public figure, rather than a concession.  And while Dr. Turkeltaub's prominence in his specific professional field may play a role in the limited-public-figure analysis, it is not dispositive.  The analysis evaluates the plaintiff's prominence vis-à-vis the relevant controversy (here, the sexual harassment allegations), not his prominence as general matter.  *See Salem Media Grp.*, 301 A.3d at 649 (examining "the nature and extent of an individual's participation in the particular controversy *giving rise to the defamation*" (emphasis added) (quoting *Gertz*, 418 U.S. at 352)).

A.2d at 1030-31). "[T]he court 'must examine whether persons actually were discussing some specific question,' looking to 'see if the press was covering the debate, reporting what people were saying[,] and uncovering facts and theories to help the public formulate some judgment.'" *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (D.C. Cir. 2016) (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980)). Sexual harassment and sex-based discrimination in academia is undoubtedly a public controversy. *See, e.g.*, *Elliott v. Donegan*, 469 F. Supp. 3d 40, 53 (E.D.N.Y. 2020) (concluding that sexual harassment and the #MeToo movement are public controversies); *Coleman v. Grand*, 523 F. Supp. 3d 244, 257 (E.D.N.Y. 2021) (similar). And "a reasonable person would . . . expect[] persons beyond the immediate participants in the dispute"—here, Ms. van der Stelt and Dr. Turkeltaub—"to feel the impact of its resolution." *Fridman*, 229 A.3d at 505 (quoting *Moss*, 580 A.2d at 1030). While Dr. Turkeltaub attempts to limit the controversy's reach only to Georgetown University, even "a narrow controversy may be a phase of another, broader one." *Id.* (quoting *Waldbaum*, 627 F.2d at 1297 n.27).

*Dr. Turkeltaub's role in the public controversy*. A plaintiff voluntarily becomes a limited-purpose public figure when he "achieve[s] a special prominence in the debate" and "tr[ies] to influence the outcome or could . . . have an impact on its resolution." *Moss*, 580 A.2d at 1031. The court examines "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Salem Media Grp.*, 301 A.3d at 649 (quoting *Gertz*, 418 U.S. at 352). Dr. Turkeltaub describes himself as "a highly regarded researcher at Georgetown University [and] one of the leading figures in his field, with a distinguished record of patient care, publications[,] and lab leadership." ECF No. 13 ¶ 1. He directs a prestigious lab at Georgetown University Medical Center, has won multiple awards for his research, and receives several grants

from the NIH.  *Id.* ¶¶ 2, 4.  But while these establish his stature in his dedicated field of study, it does not make him a limited-purpose public figure for the purposes of the *relevant* public controversy: sexual harassment in academia.  Dr. Turkeltaub certainly did not "achieve[] a special prominence in [that] debate," nor did he "purposely try[] to influence [its] outcome."  *Moss*, 580 A.2d at 1031.  And while Dr. Turkeltaub did give a comment to *The Hoya* about his counterclaim, "engagement with the media simply in order to respond to defamatory statements is not enough" to make him a limited-purpose public figure.  *Id.*

In her reply brief, Ms. van der Stelt tries a different approach and argues that Dr. Turkeltaub became an "*involuntary*" limited-purpose public figure because he was "caught up in the controversy . . . against his will."  ECF No. 28, at 27 (emphasis added) (quoting *Fridman*, 229 A.3d at 505).  The D.C. Court of Appeals has recognized such a category of "exceedingly rare" public figures, but "ha[s] never applied it to a particular plaintiff."  *Salem Media Grp.*, 301 A.3d at 653.  This is because "public figure status normatively is limited to those who in some way have earned it by their own choices."  *Id.*  The D.C. Circuit, in contrast, has applied the label before.  In *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736 (D.C. Cir. 1985), it held that the sole air traffic controller on duty at the time of a commercial airline crash, "[b]y sheer bad luck" and "through no desire of his own," "became embroiled . . . in the ensuing controversy over the causes of the accident."  *Id.* at 742.  As a result, he "was an involuntary public figure for the very limited purpose of discussion of the [airplane] crash."  *Id.* at 743.  Even so, the Court was "confident" that the circumstances sufficient to create an involuntary public figure would be "few and far between."  *Id.*

Putting aside that the D.C. Court of Appeals has expressed "reservations about [*Dameron*'s] analysis," *Salem Media Grp.*, 301 A.3d at 655, this court is unconvinced that Dr. Turkeltaub's

notoriety has risen to the requisite level.  While Ms. van der Stelt's sexual harassment allegations have made their way into the Georgetown University student newspaper and received some media coverage, they do not come close to the scale of the controversy in *Dameron*: a catastrophic airline crash that gained national—perhaps international—attention and resulted in nearly one hundred fatalities.  *See* 779 F.2d at 738.  Dr. Turkeltaub is therefore not an involuntary public figure.  Accordingly, he only needs to plead that Ms. van der Stelt acted with negligence in making her allegedly defamatory statements.  But because Ms. van der Stelt focuses solely on actual malice and does not make any arguments with respect to negligence, Dr. Turkeltaub has adequately pleaded this element of defamation.

<em>c.</em>     <em>Whether Dr. Turkeltaub was harmed by Ms. van der Stelt's statements</em>

Ms. van der Stelt's final argument—that her allegedly defamatory statements did not harm Dr. Turkeltaub—plainly fails.  She asserts that Dr. Turkeltaub's decision to file counterclaims makes *him* responsible for the injuries he has suffered.  The court is unpersuaded for two reasons.  First, this attempts to turn the defamation inquiry on its head.  The publisher of allegedly defamatory statements cannot wait for the injured party to sue and then use that lawsuit to undermine the defamation claim.  By that logic, no defamation lawsuit or counterclaim could ever succeed.  Second, Dr. Turkeltaub's counterclaims allege that he had already suffered harm well before the filing of the counterclaim, publication of news articles, or even Ms. van der Stelt's original lawsuit.  Ms. van der Stelt began spreading accusations about Dr. Turkeltaub's conduct to various individuals as early as November 2022.  ECF No. 13 ¶ 129.  His public counterclaims that those accusations were false do not immunize Ms. van der Stelt from raising the accusations in the first instance.

As a result of the allegedly defamatory statements, Dr. Turkeltaub lost a prestigious grant-review panel position at the NIH, ECF No. 13 ¶ 146, funding opportunities, *id.* ¶ 164, and a critical patient-referral source for CRL, *id.* ¶ 163.  In addition, he was diagnosed with "anxiety disorder, adjustment disorder," and "insomnia," suffers panic attacks when attending public events, and experiences a "passive death wish" due to the psychological and reputational effects of Ms. van der Stelt's accusations.  *Id.* ¶¶ 152, 154.[23]  These allegations are more than sufficient to allege an injury.  *See, e.g.*, *Parnigoni v. St. Columba's Nursey Sch.*, 681 F. Supp. 2d 1, 18 (D.D.C. 2010).  Indeed, Ms. van der Stelt does not seem to dispute that these consequences were harmful.  *See* ECF No. 19, at 34-35.

*    *    *

In sum, the court concludes that: Dr. Turkeltaub's defamation claims are not barred by the statute of limitations because of the discovery rule; neither absolute nor qualified privilege applies (except to the extent that Dr. Turkeltaub bases his claims on Ms. van der Stelt's solicitation of a potential character witness or the dissemination of her federal complaint); and Dr. Turkeltaub has sufficiently pleaded the elements of defamation to survive a motion to dismiss.  Because defamation and false light rise and fall together when they "rest . . . on the same allegations," Dr. Turkeltaub's false light counterclaim survives for the same reasons.  *Blodgett*, 930 A.2d at 222.

---

[23] Ms. van der Stelt also argues that Dr. Turkeltaub's defamation claim was not pleaded with "sufficient specificity" because he failed to include the "content" of the defamatory statements, "to whom [they] w[ere] directed," or "when [they] occurred."  ECF No. 28, at 30-31 (quoting *Libre by Nexus v. BuzzFeed, Inc.*, 311 F. Supp. 3d 149, 154 (D.D.C. 2018)); ECF No. 19, at 7-8.  The court disagrees.  Dr. Turkeltaub alleged that, throughout the fall of 2022 and spring and summer of 2023, Ms. van der Stelt told specific individuals or entities, like Carolyn Gershman, Dr. Maryam Ghaleh, Rebecca Boersma, the NIH, and others, that Dr. Turkeltaub had sexually harassed her.  ECF No. 13 ¶¶ 129, 143-44, 151, 163.  At the motion-to-dismiss stage, such allegations are sufficient to make out a plausible claim.  *See Williams v. District of Columbia*, 9 A.3d 484, 492 (D.C. 2010) (holding that defamation allegations were sufficiently specific even though they did not "allege a specific date or dates on which defamatory statements were made").

**B.    Motion to Supplement Ms. van der Stelt's Complaint**

Ms. van der Stelt seeks to supplement her complaint and add retaliation claims under the DCHRA premised on Georgetown University's alleged refusal to reschedule her IDEAA hearing and Dr. Turkeltaub's filing of his defamation and false light counterclaims.  ECF No. 25.  The court will grant the motion.

Under Federal Rule of Civil Procedure 15(d), the court may, "permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  The rule "is used to set forth new facts that update the original pleading or provide the basis for additional relief [or] to put forward new claims or defenses based on events that took place after the original complaint or answer was filed."  *Thorp v. District of Columbia*, 325 F.R.D. 510, 513 (D.D.C. 2018) (quoting *United States v. Hicks*, 283 F.3d 380, 386 (D.C. Cir. 2002)).  A district court retains "broad discretion in determining whether to allow supplemental pleadings," but will ordinarily provide leave when justice so requires.  *Id.* (quoting *Jones v. Bernanke*, 685 F. Supp. 2d 31, 35 (D.D.C. 2010)).  Courts should generally grant leave to supplement unless there is a "compelling reason" to deny the motion, such as "undue delay, bad faith or dilatory motive . . . , [or] futility of amendment."  *Firestone*, 76 F.3d at 1208 (second alteration in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

**1.    Retaliation claim against Georgetown University**

While there are numerous grounds on which to deny a motion to supplement, the parties only dispute futility.  A motion to supplement should be denied on this basis "if the proposed claim would not survive a motion to dismiss."  *Clean Water Action v. Pruitt*, 315 F. Supp. 3d 72, 79 (D.D.C. 2018).  Georgetown University argues that the very correspondence upon which Ms. van

der Stelt relies disproves her retaliation claims, thereby making supplementation futile.  The court disagrees.

The court begins by providing additional context, primarily supplied by the relevant email exchange between Ms. van der Stelt and Samantha Berner, Georgetown University's Title IX coordinator.  The parties vigorously dispute whether the court may properly consider the exchanges, but the court concludes that it may.  When evaluating a motion to amend or supplement a complaint, the court may evaluate materials that are "incorporated by reference into the plaintiff's complaint." *Said v. Nat'l R.R. Passenger Corp.*, 183 F. Supp. 3d 71, 79 n.9 (D.D.C. 2016), *aff'd*, 815 F. App'x 561 (D.C. Cir. 2020) (per curiam).  "Incorporation by reference can . . . amplify pleadings where the document is not attached by the plaintiff, but is 'referred to in the complaint and [] integral to [the plaintiff's] claim.'"  *Banneker Ventures*, 798 F.3d at 1133 (alterations in original) (quoting *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)).  Because Ms. van der Stelt's proposed retaliation claim is entirely premised on the argument that "Georgetown University retaliated against [her] by refusing to [re]schedule a Title IX hearing," ECF No. 25, at 1, the communications between her and the university regarding that scheduling are "integral to [her] claim" and therefore incorporated by reference, *Banneker Ventures*, 798 F.3d at 1133.

In late October 2023, Ms. Berner emailed Ms. van der Stelt providing access to the final investigative report for her IDEAA claim and inviting her to provide a response.  ECF No. 32-2, at 8.[24]  On November 9, Ms. van der Stelt replied and attached a letter from her attorney, which she "incorporate[d] . . . as her response."  *Id.*  The letter explained that the IDEAA complaint was "moot because Ms. van der Stelt ha[d] filed a civil action in [federal court]."  ECF No. 32-3. Ms. Berner asked whether Ms. van der Stelt intended to withdraw the IDEAA claim, and Ms. van

---

[24] These citations are to the document's ECF-generated page numbers.

der Stelt asked for additional time to respond.  ECF No. 32-2, at 7.  On November 17, Ms. Berner informed Ms. van der Stelt that the hearing would take place on December 13, 14, and 15.  *See id.* at 3.  On November 28, Ms. van der Stelt asked to reschedule the hearing to accommodate her final exams at the University of Pittsburgh and because her attorney could not attend the specified dates.  *Id.* at 6.  In response, Ms. Berner did not offer to move the hearing date, but instead offered to contact the University of Pittsburgh's Title IX office "to request academic adjustments so that [Ms. van der Stelt would be] able to participate in the hearing."  *Id.* at 5.

Ms. van der Stelt's attorney replied on December 1, stating that she "ha[d] no desire for [the University of] Pittsburgh to learn of her Title IX complaint," and that Georgetown University's "refusal to reschedule the hearing violate[d] [her] rights" and prevented her from "prosecut[ing] her complaint effectively."  *Id.* at 4.  On December 4, Ms. Berner then asked Ms. van der Stelt to provide a copy of her exam schedule and said that Georgetown University "w[ould] make adjustments to the hearing, if possible."  *Id.* at 3.  While there was no official exam schedule for her classes, Ms. van der Stelt supplied a link to the academic calendar and explained that she had "two final papers, a final exam, and a grant deadline . . . from 12/11/23 - 12/15/23." *Id.*  On December 7, Ms. Berner again requested a specific exam date and time, offering to "make adjustments to the hearing, if possible, to allow for [Ms. van der Stelt's] attendance at the exam." *Id.* at 2.  In her final email on December 11, Ms. van der Stelt formally withdrew her IDEAA complaint.  *Id.*

Georgetown University does not appear to dispute whether Ms. van der Stelt meets the legal test for a retaliation claim.  Indeed, it does not mention the relevant standard at all.  Instead, the university asserts that the incorporated email communications demonstrate the falsity of Ms. van der Stelt's proposed supplementation.  Specifically, the university argues that it "expressly

agreed to make adjustments to the hearing to accommodate Plaintiff's final exam on two separate occasions." ECF No. 32, at 8. The court is not convinced. Based on the content of the email communications, there appears to be a factual dispute as to whether Georgetown University was willing to change the date of the hearing. Ms. Berner initially did not offer to adjust the hearing dates and instead suggested contacting the University of Pittsburgh's Title IX office to move Ms. van der Stelt's *exams*—something she expressly did not wish to do because she did preferred to keep the existence of the IDEAA claim private. *See id.* at 3, 5.

While Georgetown University softened its position somewhat after receiving an email from Ms. van der Stelt's attorney, the university still did not make an express offer to change the hearing date. To the contrary, almost all of Ms. Berner's preceding emails indicated the opposite. *See id.* at 5 (declining to move the hearing date despite Ms. van der Stelt's explicit "request [for] rescheduling the hearing in the New Year"); *id.* at 5-6 ("The University does not alter timelines to accommodate advisors' schedules. If your advisor is not able to move conflicting obligations, you are welcome to choose another with availability to serve in this capacity."). Even the "offers" of rescheduling were noncommittal and were extended only a week before Ms. van der Stelt's final exam period was set to begin. *Id.* at 2 ("[W]e will make adjustments to the hearing, *if possible*, to allow for your attendance at the exam." (emphasis added)); *id.* at 3 ("[W]e will make adjustments to the hearing, *if possible*." (emphasis added)).

The court is also not convinced that Ms. van der Stelt would be estopped from alleging retaliation on account of her attempted withdrawal of the IDEAA claim on November 9 and official withdrawal on December 11. The first "withdrawal," which took the form of a letter from her attorney, purported to "moot" out the IDEAA process. *Id.* at 8; ECF No. 32-3. But when Ms. Berner pressed Ms. van der Stelt on whether she was withdrawing her formal complaint,

Ms. van der Stelt walked back her previous representation and later continued with the IDEAA process. ECF No. 32-2, at 7. Ms. Berner seemingly accepted the retraction, first indicating that the university would "move forward with the process" while awaiting Ms. van der Stelt's final decision, *id.*, and subsequently continuing to communicate as if the IDEAA claim had not been withdrawn, *id.* at 5-6. Of course, Ms. van der Stelt fully and unequivocally withdrew her claim on December 11, just days before the hearing took place. But she alleges that she only did so because the university was unwilling to accommodate her schedule and would have required her to attend without counsel or retain a new advisor. ECF No. 19, at 5 n.2; ECF No. 35, at 6-7. That Ms. van der Stelt "voluntarily" removed herself from a process that would have been incredibly difficult— or perhaps impossible—to participate in does not necessarily foreclose her retaliation claim. If Georgetown University's allegedly retaliatory refusal to accommodate Ms. van der Stelt forced her hand, she may still have a viable claim.

To establish a prima facie case of retaliation under the DCHRA, "a plaintiff must demonstrate that: (1) she was engaged in protected activity; (2) the employer took a materially adverse employment action; and (3) there is a causal connection between the protected activity and the materially adverse action." *Jones v. District of Columbia*, 314 F. Supp. 3d 36, 54-55 (D.D.C. 2018). Because Georgetown University may not have been truly willing to accommodate Ms. van der Stelt, because Ms. Berner did not explicitly provide a non-retaliatory reason for refusing to reschedule the hearing, and because the university does not now provide such a reason, the court concludes that Ms. van der Stelt has likely alleged enough to survive a motion to dismiss. Making all reasonable inferences in Ms. van der Stelt's favor, as the court must, whether the university refused to reschedule the hearing or was motivated by retaliatory animus remains to be resolved. Recognizing that the purpose of the Federal Rules is "to facilitate a proper decision on

the merits," *Williams v. Savage*, 569 F. Supp. 2d 99, 105 (D.D.C. 2008) (quoting *Foman*, 371 U.S. at 182), and passing no judgment on Ms. van der Stelt's eventual likelihood of proving the allegation, the court will permit her to supplement her complaint.[25]

### 2.        Retaliation claim against Dr. Turkeltaub

With respect to the proposed retaliation claim against Dr. Turkeltaub, the parties again focus on futility.  Dr. Turkeltaub rests his argument entirely on the notion that, "as a matter of law, the filing of a counterclaim cannot state a colorable claim for retaliation."  ECF No. 31, at 1.  In support, he cites *Gross v. Akin, Gump, Strauss, Hauer, & Feld LLP*, 599 F. Supp. 2d 23 (D.D.C. 2009), which observed that "[t]he D.C. Circuit has never found that the filing of a counterclaim constitutes an adverse employment action."  *Id.* at 33.

Dr. Turkeltaub appears to overstate the law.  While the *Gross* court observed that the D.C. Circuit had yet to determine that a counterclaim could constitute an adverse employment action, that is different than categorically holding that counterclaims can *never* be adverse employment actions.  This part of the opinion also appeared to be dicta, because the court went on to separately

---

[25] Georgetown University also argues that Ms. van der Stelt's undue delay in seeking to supplement her complaint is an independent ground for denial.  ECF No. 32, at 10-11.  While the allegedly retaliatory conduct occurred in November and December 2023, Ms. van der Stelt did not move to supplement until August 2024, approximately eight months later.  ECF No. 25.  The court expects parties to be diligent about the timing of their filings, and an eight-month delay is a lengthy one.  The court is also troubled by Ms. van der Stelt's failure to explain the delay.  *See James Madison Project v. Dep't of Just.*, 208 F. Supp. 3d 265, 277 (D.D.C. 2016) ("Whether there has been an 'unexplained delay in pleading' previously-known allegations is 'another important consideration.'" (quoting *Societe Liz, S.A. v. Charles of the Ritz Grp.*, 118 F.R.D. 2, 4 (D.D.C. 1987))).  Even so, the court does not believe that the prejudice to Georgetown University in responding to a slightly modified retaliation claim will be so substantial as to require denial.  Given that discovery has yet to begin, the court will permit Ms. van der Stelt to supplement her claims despite her tardiness.

conclude that the defendant was compelled to file its counterclaim, meaning that it could not have been retaliatory.  *Id.* at 34.

To the extent that the *Gross* court intended its observation about adverse employment actions to be a formal holding, this court declines to follow it.  In the context of retaliatory conduct, the Supreme Court has defined adverse employment action as any action that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  Critically, "[t]he scope of the antiretaliation provision extends *beyond* workplace-related or employment-related retaliatory acts and harm."  *Id.* at 67 (emphasis added).  In *Gross*, the court reasoned that "filing a counterclaim will not chill plaintiffs from exercising and enforcing their statutory rights because by the time the employer files its counterclaim, plaintiffs have already made their charges and initiated a lawsuit."  599 F. Supp. 2d at 34 (quoting *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 834 (N.D. Ill. 2006)).  But punishing an employee with the burden and potential liability of a counterclaim after she has filed suit is still retributive.  It could also have downstream chilling effects.  For example, it could pressure the employee to drop her lawsuit, settle the claim, or discourage her from vindicating her rights in the future.  Retaliation is, by its very nature, reactionary.  That an employer's retaliatory action comes *after* the employee has exercised her rights does not eliminate the harm of that action.

Because Dr. Turkeltaub does not raise any other grounds to deny the motion, the court will permit Ms. van der Stelt to supplement her complaint as to this claim.

## IV.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Ms. van der Stelt's motion to dismiss Dr. Turkeltaub's counterclaims, ECF No. 19, is **GRANTED** in part and **DENIED** in part. Any defamation or false light counterclaims premised on Ms. van der Stelt's (1) solicitation of a potential character witness for her federal lawsuit or (2) dissemination of her federal complaint are **DISMISSED**.  The remainder of Dr. Turkeltaub's counterclaims survive.  It is further

**ORDERED** that Ms. van der Stelt's motion for leave to file her supplemental complaint, ECF No. 25, is **GRANTED**.  The Clerk of Court shall docket ECF No. 25-3 as Ms. van der Stelt's Supplemental Complaint.  It is further

**ORDERED** that Georgetown University and Dr. Turkeltaub shall respond to Ms. van der Stelt's supplemental complaint on or before April 14, 2025.

**SO ORDERED.**

_____
LOREN L. ALIKHAN
United States District Judge

Date:   March 31, 2025

50