## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CANDACE VAN DER STELT,<br>1001 N Vermont St Apt 614<br>Arlington, VA 22201<br><br>     Plaintiff,<br>v.<br><br><br>GEORGETOWN UNIVERSITY<br>3700 O St NW<br>Washington, DC 20057,<br><br>GEORGETOWN UNIVERSITY<br>MEDICAL CENTER, BIOMEDICAL<br>GRADUATE EDUCATION<br>3900 Reservoir Road NW<br>Washington, DC 20057,<br><br>PETER TURKELTAUB<br>1401 N Greenbrier St.<br>Arlington, VA 22205<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 23:cv-02212-RDM<br><br>Hon. Loren L. AliKhan<br><br>JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

Plaintiff, Candace van der Stelt ("Plaintiff" or "Ms. van der Stelt"), brings this action against Defendants Georgetown University ("Georgetown" or "the University"), Georgetown University Medical Center, Biomedical Graduate Education ("BGE"), and Dr. Peter Turkeltaub to seek redress for willful violations of Title IX of the Civil Rights Act of 1964, 20 U.S.C. § 1681 *et seq.* ("Title IX") and the D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq.* ("DCHRA").

Ms. van der Stelt is a successful clinical speech language pathologist ("SLP") who is currently pursuing her PhD in clinical research with a focus on language recovery in stroke

1

survivors.  Ms. van der Stelt is dedicated to helping stroke survivors find their voices again in recovery, and her research is expected to have a widespread practical impact on both survivors and practitioners.  However, Defendants subjected Ms. van der Stelt to sexual harassment and denied Ms. van der Stelt equal access to an education, ultimately ousting her from her PhD program, both because of her sex and in retaliation for reporting sexual harassment against a prominent faculty member, Dr. Peter Turkeltaub, an employee and agent of Defendants Georgetown and BGE.  Dr. Turkeltaub, Ms. van der Stelt's advisor and supervisor during the relevant time, sexually harassed Ms. van der Stelt throughout her time as an employee and student with the University, and then retaliated against her when she objected to his conduct. Specifically, Dr. Turkeltaub subjected Ms. van der Stelt to frequent sexual innuendos and comments, repeatedly professed his love for her, and physically touched her in a romantic or sexual manner, including by giving her lengthy and intimate hugs, kissing her on the top of her head, and attempting to stroke her inner thigh.  Moreover, Dr. Turkeltaub made clear to Ms. van der Stelt that he was solely responsible for the grades she received and that her success in the program was contingent on her acceptance of his inappropriate conduct.  When Ms. van der Stelt rejected his advances, Dr. Turkeltaub retaliated against her by undermining her work and research when, for example, he minimized her contributions in publications and presentations, suggested that she no longer work for him even though her graduate research was connected to his lab, spoke to her in a demeaning and disrespectful manner, and excluded her from meetings and decisions which explicitly involved her thesis research.

After Ms. van der Stelt reported the sexual harassment to which Dr. Turkeltaub subjected her, including to Georgetown's Title IX office and to Georgetown faculty and staff who served as mandatory reporters, Defendants forced her to leave Dr. Turkeltaub's lab and abandon the

research she had conducted there, and refused to provide her with another advisor or opportunity to effectively complete her research, thereby further denying her access to educational resources. Moreover, instead of taking any remedial action to address the harassment, Defendants Georgetown and BGE permitted professors to, expressly *because of* Ms. van der Stelt's reports about Dr. Turkeltaub's conduct, reject Ms. van der Stelt's requests to join their labs and continue her education and her work therein. Specifically, even though they initially indicated a willingness to mentor Ms. van der Stelt and welcome her into their labs *before* they learned of her Title IX complaint, Georgetown professors explicitly stated *after* learning of her complaint that they would not let her join their labs because they were concerned associating with her would adversely impact their professional relationships with Dr. Turkeltaub in light of her complaints against him.

Ultimately, Defendants ousted Ms. van der Stelt from its PhD program and set her on a difficult and painful path towards finding some other means of continuing and completing her education. Defendants refused to prevent, address, and/or remedy the sexual harassment to which Dr. Turkeltaub – a well-regarded, male Georgetown professor in a position of significant authority – relentlessly subjected Ms. van der Stelt – a young female Georgetown student and employee over whose education and career Dr. Turkeltaub exercised significant influence and power. Instead, Defendants accepted, acquiesced to, and thereby sanctioned the known retaliatory actions of Dr. Turkeltaub's colleagues, who each refused to provide Ms. van der Stelt refuge in their labs for fear that doing so would jeopardize their own professional relationships with Dr. Turkeltaub, and thereby forced Ms. van der Stelt to leave Defendants' program entirely. At the same time, Defendants promoted Dr. Turkeltaub from Associate Professor to Professor, and took no meaningful action in response to Ms. van der Stelt's reports regarding his

inappropriate, and indeed unlawful, conduct towards her and other female students and employees working in his lab.

Defendants Georgetown and BGE's actions – or lack thereof – reflect a widespread practice by Defendants of condoning, and/or intentionally overlooking, a culture in their Department of Neurology in which sexual harassment of young, female students and employees is pervasive.  As a result, Defendants caused Ms. van der Stelt grievous and irreversible harm personally and professionally, for which she seeks to recover compensatory damages, consequential damages, punitive damages, attorneys' fees, and any other legal or equitable relief that this Court deems just and proper to redress Defendant's unlawful actions.

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case involves claims arising under federal law, specifically Title IX.

2.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), as this case involves claims arising under District of Columbia law, specifically the DCHRA.

3.      On April 25, 2023, the Parties entered into a tolling agreement, tolling the statute of limitations for all claims, including the Title IX and DCHRA claims noted herein, for a period of ninety days.

4.      Neither the DCHRA nor Title IX require exhaustion of administrative remedies prior to filing a civil action, and this Court therefore has jurisdiction presently over the timely pleaded claims included in the instant Complaint. D.C. Code § 2-1401.01 et seq.; 20 U.S.C. § 1681 et seq.

5.      The Court has personal jurisdiction over Defendants because Defendants have substantial, continuous, and systematic contacts with the District of Columbia and

4

conduct substantial business within the District of Columbia.

6.      This Court is the proper venue because Defendants are located in the District of Columbia and a substantial part of the events or omissions giving rise to these claims occurred within the District of Columbia.

## PARTIES

7.      Ms. van der Stelt is an adult resident of Arlington County, Virginia.

8.      Defendant Georgetown is a university located at 3700 O St NW, Washington, DC 20057.

9.      Defendant BGE is a separate administrative department within Georgetown located at 3900 Reservoir Road NW, Washington, DC 20057.

10.     Defendant Peter Turkeltaub is an individual adult resident of Arlington County, Virginia.

11.     Defendants Georgetown and BGE are educational institutions that receive federal funding from various sources, including research grants and student financial aid, to provide education programs or activities as defined under Title IX, 20 U.S.C. §§ 1681, 1687.

12.     Defendants Georgetown and BGE are educational institutions as defined under the DCHRA, D.C. Code § 2-1401.02(8).

13.     Defendants Georgetown and BGE do business in the District of Columbia.

14.     Defendants Georgetown and BGE employ at least one individual for compensation, and therefore constitute employers under the DCHRA, D.C. Code § 2-1401.02(10).

15.     Defendant Peter Turkeltaub is named individually pursuant to DCHRA, D.C. Code § 2- 1404.03(a).  At all times relevant, Dr. Turkeltaub was employed by Defendants

Georgetown and BGE, worked at their locations in Washington, D.C., and served as their agent within the meaning of § 2-1404.03(a).

16. At all times relevant to this Complaint, Ms. van der Stelt worked for Defendants Georgetown and BGE for compensation.    As such, she was an employee of Defendants Georgetown and BGE under the DCHRA, D.C. Code § 2-1401.02(9).

17. Beginning in or around July 2021, Ms. van der Stelt was a PhD student of Defendant BGE within the Department of Neurology, Georgetown University Medical Center, an education program receiving federal financial assistance.

## FACTS

### Background

18. Ms. van der Stelt is an experienced SLP.  She has focused her career on helping stroke survivors who have lost the ability to communicate re-learn how to speak, comprehend language, read, and write.  Ms. van der Stelt is passionate about her work and research, and she has found much fulfillment in her work and ability to improve the lives of stroke survivors.

19. Ms. van der Stelt began her employment with Defendants Georgetown and BGE in or around July 2018 as a lab manager/research SLP in the lab of Dr. Turkeltaub.

20. Dr. Turkeltaub is an Associate Professor with Defendants Georgetown University and BGE.  He is the Director of the Cognitive Recovery Lab and the Medical Director for the Center for Aphasia Research and Rehabilitation.  Dr. Turkeltaub is a highly regarded and leading researcher in studying aphasia, a condition caused by brain damage typically following a stroke that results in loss of the ability to communicate.

6

21.    Dr. Turkeltaub operated the largest and one of the most, if not the most, well-funded lab in Defendants' Department of Neurology, and he has received multiple prestigious grants from the National Institutes of Health ("NIH") to conduct research on aphasia. Out of all the professors in the Department of Neurology, Dr. Turkeltaub is the recipient of the largest grants from NIH.

22.    While she was employed as a lab manager/research SLP, Dr. Turkeltaub was Ms. van der Stelt's first-level supervisor.

23.    Initially, Ms. van der Stelt and Dr. Turkeltaub had a positive working relationship, and Ms. van der Stelt shared with him that her long-term goal was to complete a PhD program in clinical research.

24.    In or around the summer of 2019, Ms. van der Stelt shared with Dr. Turkeltaub that she wanted to apply to PhD programs, including in neuroscience and in Communication Science and Disorders. In response, Dr. Turkeltaub became teary-eyed and told her that he hoped she would change her mind and stay in his lab. He sought to induce her to remain at his lab by offering her a long-term career proposition with many promises to assist in her career growth, including allowing her to define her role and duties in the lab and eventually making her faculty at Georgetown without a PhD.

25.    Nonetheless, Ms. van der Stelt's academic and career goal was to obtain a PhD. Thus, she declined Dr. Turkeltaub's job proposition. When Ms. van der Stelt reiterated that she would be pursuing a PhD, Dr. Turkeltaub offered her employment in his lab after she acquired her PhD to lead the research SLP team. Ms. van der Stelt verbally accepted this offer and was excited about the opportunity

because it was a prestigious position that aligned with her interests and would greatly further her professional goals.

26.    Ultimately, Ms. van der Stelt applied to the PhD program with BGE's Interdisciplinary Program in Neuroscience ("IPN"). Dr. Turkeltaub wrote a glowing letter of recommendation in support of her application, and in the letter confirmed that he "would be happy to take her as a thesis student" if she was admitted to the program.

27.    Ms. van der Stelt accepted a PhD offer at Georgetown in the spring of 2020, but she deferred her start date to the summer of 2021 because of her spouse's career. Between the time of her acceptance in the PhD program and her start date, Ms. van der Stelt continued to work in Dr. Turkeltaub's lab as a research SLP.

28.    Ms. van der Stelt began a PhD program at Georgetown in or around July 2021. During this time, she received a paid stipend from the University.

29.    During Ms. van der Stelt's first year in Georgetown's PhD program, she rotated between different labs in the Department of Neurology with the goal of identifying a lab in which she would complete her thesis work. In addition to Dr. Turkeltaub's lab, Ms. van der Stelt had the opportunity to rotate in the labs of Dr. Rhonda Friedman, Vice Chair of Georgetown's Department of Neurology and Director of the Center for Aphasia Research and Rehabilitation, and Dr. Anna Greenwald, Georgetown Research Assistant Professor who heads the Right Hemisphere Emotion, Cognition, and Recovery Lab within the Center for Brain Plasticity and Recovery. Ms. van der Stelt was extremely successful during both rotations, and both Dr. Friedman and Dr. Greenwald invited her to join their labs for her thesis

research, both during informal conversations, and in written feedback. For example, in Dr. Greenwald's Post-Rotational Report, she responded "absolutely" to a question about whether she would "take [Ms. van der Stelt] into [her] laboratory for [her] thesis research." Both Dr. Friedman and Dr. Greenwald also made clear that, if Ms. van der Stelt opted to continue her research in Dr. Turkeltaub's lab, they were interested in serving as her co-mentor.

30.     However, given Ms. van der Stelt's extensive experience in Dr. Turkeltaub's lab, that his ongoing research best aligned with her thesis work, and the pressure he exerted on her to continue her work there, including his promises of prestigious employment after completion of the PhD program, Ms. van der Stelt agreed to conduct her PhD research in Dr. Turkeltaub's lab under his mentorship.  Dr. Turkeltaub also made clear to Ms. van der Stelt that he would be upset with her if she chose someone other than him as her mentor and, given his status at the University and in the field, Ms. van der Stelt worried that jeopardizing her relationship with Dr. Turkeltaub would negatively impact her career.

31.     At all times, Ms. van der Stelt's performance in her PhD program was outstanding. In Dr. Turkeltaub's Post-Rotational Report he commented that, "[Ms. van der Stelt"] is an outstanding young investigator with an ideal background for my lab," and that "[he] was please[d] with [Ms. van der Stelt's] productivity during the rotation given the difficult coursework . . .." Ms. van der Stelt's success was reflected in her grade point average, which was 3.94 during her time as a PhD student. In addition, at the end of the first year of her PhD program, Ms. van der Stelt was one of two students who received the highest exam scores in her entire

class. Additionally, Ms. van der Stelt presented work from two of her rotations at two conferences, a testament to the importance and quality of her work, and she used work from the third rotation to teach a graduate level class as a guest lecturer.

32.    Ms. van der Stelt's thesis research focused on alexia, a condition related to aphasia, but which focuses on the loss of reading abilities.  Ms. van der Stelt's research idea and proposal, to investigate reading comprehension, was included as part of a large grant proposal submitted by Dr. Turkeltaub to NIH.  NIH ultimately awarded the grant to Dr. Turkeltaub's lab, which included funding for Ms. van der Stelt's research, in or around Spring 2022.  Dr. Friedman was identified as an investigator on the grant and subsequently, Dr. Friedman received a supplemental grant to conduct related research.

**Dr. Turkeltaub Subjected Ms. van der Stelt to Unwelcome, Inappropriate Sex Based Conduct**

33.    In or around the summer of 2020, Dr. Turkeltaub hired a new lab manager, Sachi Paul, a recent college graduate, to take over Ms. van der Stelt's lab manager responsibilities while Ms. van der Stelt transitioned into a role that focused on her SLP research duties.

34.    Throughout the fall of 2020, Ms. van der Stelt, Ms. Paul, and Dr. Turkeltaub worked closely to ensure that the lab began to run normally again despite the COVID-19 pandemic.  Due to the pandemic, Ms. van der Stelt, Ms. Paul, and Dr. Turkeltaub were among the few people on campus during this period, and there was only one other male, post-doctoral student who was regularly physically present in the lab during this time.  As a result of their shared isolation, Ms. van der Stelt, Ms. Paul, and Dr. Turkeltaub began to socialize.  Dr. Turkeltaub and Ms. van der Stelt

also began to carpool because public transportation ran infrequently during the pandemic and because using public transportation during the pandemic significantly increased the risk of exposure to COVID-19.

35.    Shortly thereafter, Dr. Turkeltaub began making comments, both verbally and in a group text message chat with Ms. Paul and Ms. van der Stelt, that were sexual in nature.  These inappropriate comments continued throughout the remainder of Ms. van der Stelt's time in Dr. Turkeltaub's lab.

36.    For example, in one message, Dr. Turkeltaub wrote, "I'm resisting starting up again about fornication."

37.    Dr. Turkeltaub made a recurring comment about him contracting syphilis.  In one text message, Dr. Turkeltaub recounted a conversation in which he told Ms. Paul he "got syphilis again."  On other occasions, he suggested that he contracted the sexually transmitted disease from Ms. van der Stelt's mother.  Ms. van der Stelt explicitly informed Dr. Turkeltaub that his comments about having a sexual relationship with her mother were "unwelcome" and that she had to "filter [them] . . . out of her head." Nonetheless, Dr. Turkeltaub continued to reference contracting syphilis from Ms. van der Stelt's mother, including responding to Ms. van der Stelt's text informing him that his comments were "unwelcome" by texting that her mother "must carry a particularly virulent strain."  In another text message, he told Ms. van der Stelt that her mother needed to get treatment for syphilis "so she doesn't give it to me again."

38.    On one occasion, Dr. Turkeltaub described giving Ms. van der Stelt's mom "pleasure." In response, Ms. van der Stelt sent a gif of someone gagging and wrote

11

"absolutely no" and noted that she did not think Dr. Turkeltaub and her mother "would like each other very much."

39.     On another occasion, Dr. Turkeltaub described seeing a "syphilitic chancre in real life" and noting "it was so much grosser than the pictures google shows." He also described treating "a guy with anal warts that [he] had to burn off" and calling the experience "the worst." In response, Ms. van der Stelt indicated her discomfort with the conversation, writing that she "wish[ed] she had stopped reading" the text messages Dr. Turkeltaub sent.

40.     In yet another text message, Dr. Turkeltaub referenced his "sex ed[ucation]."

41.     Dr. Turkeltaub also texted Ms. van der Stelt and Ms. Paul about conducting rectal exams and asked whether they had "heard of the anal wink."

42.     In another text message, Dr. Turkeltaub described Ms. Paul's body as "hairless," to which Ms. van der Stelt expressed her discomfort by responding with a vomiting emoji and writing, "I do not even want to know."

43.     On another occasion, Dr. Turkeltaub referenced that Ms. Paul was having "vaginal tears" when thinking about her future kids.

44.     In or around January 2021, during a video meeting with Dr. Turkeltaub, Ms. Paul, and Ms. van der Stelt, Ms. Paul accidentally lifted her arms over her head while wearing a cropped sweater, which inadvertently revealed her bra. The same day, in reference to glimpsing Ms. Paul's bra, Dr. Turkeltaub texted Ms. Paul and Ms. van der Stelt and wrote, "I feel so lucky to be alive today" and suggested that "a higher power intervened to make it happen." Dr. Turkeltaub subsequently brought up the incident on multiple occasions to Ms. Paul and Ms. van der Stelt, even though he

also acknowledged that he should not "really joke about it being your boss and all." In the group text, Dr. Turkeltaub told Ms. Paul that she would not be able to forget the incident because he intended to "keep refreshing [her] memory." He went on to say, "nothing better could have happened from my perspective." He continued to reference the incident for months and, in a text message months later in the group chat between Dr. Turkeltaub, Ms. Paul, and Ms. van der Stelt, Dr. Turkeltaub stated that he got "a pretty good look" at Ms. Paul's bra and referred to this incident as being "the best day of [his] life."

45.     On one occasion, Dr. Turkeltaub suggested that Ms. van der Stelt would need to adopt children in order for them to have a sense of humor. When Ms. van der Stelt responded that she did not appreciate the comment, Dr. Turkeltaub indicated that he wished he could make a sexual reference, but that he was not "permitted to respond the way I'd like to" which he described as "unfair" and "a shame." Ms. van der Stelt again expressed her discomfort with his alluding to a sexual act, stating that it was "[d]efinitely not unfair" that he felt prohibited from responding with a sexual comment.

46.     Dr. Turkeltaub also frequently acknowledged that he should not make sexual comments, but in doing so conveyed that he had thoughts which were sexual in nature. For example, in one text message to Ms. Paul and Ms. van der Stelt, Dr. Turkeltaub wrote that his "brain was going to explode from inhibiting inappropriate responses." In another message concerning research in the lab involving a stimulus, Dr. Turkeltaub wrote, "Goddamn I hate being the boss" and that he had "deleted" the messages he wanted to send. Dr. Turkeltaub then wrote, "I think this one is

okay: When we say stimulus item, we mean it."

47.    On one occasion in the lab and within earshot of multiple employees in the lab, Dr.
Turkeltaub joked that he was going to dress up as a vagina for Halloween.

48.    Ms. Paul relayed to Ms. van der Stelt that Dr. Turkeltaub shared details of his sexual
relationship with his wife and stated he had fantasies about cheating on his wife.
Ms. Paul also told Ms. van der Stelt that Dr. Turkeltaub told her he bought a sex toy
for his wife and left it under her pillow, and that his daughter asked him what an
orgasm was.

49.    In addition to the sexually charged comments and innuendos, Dr. Turkeltaub also
began to profess his adoration and love for Ms. van der Stelt.  Consistent with his
expressed desire to have a relationship outside of the workplace, Dr. Turkeltaub
began texting Ms. van der Stelt separately about non-work, personal topics,
including religion and his home life.  He would often text outside working hours
and late at night, and suggest he was unable to sleep because he was thinking about
Ms. van der Stelt and his conversations with her.

50.    Dr. Turkeltaub often expressed his desire to spend all his time with Ms. van der
Stelt, and he told her he felt sad when he had to end a meeting with her to meet with
other colleagues or employees of the lab.

51.    In a text message in December 2020, Dr. Turkeltaub sent Ms. Paul and Ms. van der
Stelt three heart emojis and explained the emojis represented how he felt about
them.

52.    Around the same time, Dr. Turkeltaub sent Ms. van der Stelt a lengthy email
outlining his frustrations with her religious beliefs. In response, Ms. van der Stelt

explained that she was concerned talking with him about her religion may "make [him] lose respect for [her] (as a person or as a scientist)" and indicated that she was not comfortable with the conversation because she was "[his] employee and student," referring to the influence he had over the outcome of her success in the PhD program. In response, Dr. Turkeltaub wrote, "I love you as a person . . . no matter what you believe," and after apologizing for making her feel disrespected, he stated, "I'm crying right now, and I desperately want to give you a hug the next time I see you."

53.    On another occasion, prior to starting the rotation in Dr. Turkeltaub's lab for her PhD program, he wrote to her, "I know you are going to do great.  And if you don't, I'm still going to love you and respect you as much as I do now anyway."  In the same email, Dr. Turkeltaub requested that she not share his email with anyone, implying that he was aware of the inappropriate nature of his comments.

54.    When Ms. van der Stelt began her first rotation in Dr. Friedman's lab as part of her PhD program in the summer of 2021, she remained physically housed in Dr. Turkeltaub's lab because Dr. Turkeltaub pressured her not to leave physically for the rotation.  Dr. Turkeltaub repeatedly requested that Ms. van der Stelt remain physically close under the guise that he needed her present to answer questions from her job successor, even though she could have been available to answer questions by telephone and/or email.  Dr. Turkeltaub later admitted to Ms. van der Stelt that he was "jealous" when she rotated to a new lab, that he was "too attached" to Ms. van der Stelt, and that his attachment to her was impacting his mental health and well-being.

55.    Dr. Turkeltaub's conduct quickly escalated to uninvited physical contact. Specifically, Dr. Turkeltaub began hugging Ms. van der Stelt on a near daily basis and, if she was not in close physical proximity, he frequently asked if he could come to her location for the sole purpose of hugging her, and/or told her that he desired a hug from her.

56.    On days when Ms. van der Stelt did not carpool with Dr. Turkeltaub, Dr. Turkeltaub would, upon arriving at the University, first stop at the lab – as opposed to going directly to his office where he worked – for the sole purpose of hugging Ms. van der Stelt and Ms. Paul. If Ms. van der Stelt did not come to accept a hug from Dr. Turkeltaub, he would pout his lip and suggest that he would not leave until he was able to hug her.

57.    When Dr. Turkeltaub hugged Ms. van der Stelt, the hugs were frequently lengthy and intimate. Often while hugging her, Dr. Turkeltaub would lay his cheek on the top of Ms. van der Stelt's head. During other hugs, Dr. Turkeltaub placed his hand on Ms. van der Stelt's lower back. Ms. van der Stelt often squirmed in the hug to try to move away and tried to end the hug early.

58.    On one occasion, Dr. Turkeltaub kissed the top of Ms. van der Stelt's head. Ms. van der Stelt immediately pulled away and said words to the effect of "that's enough."

59.    Dr. Turkeltaub also requested group hugs with Ms. Paul and Ms. van der Stelt. On one occasion, he texted both and instructed them, "[d]on't leave today without a big group hug."

60.    Colleagues expressed that witnessing these extended hugs made them uncomfortable, but Dr. Turkeltaub dismissed, or ignored, these complaints. For

16

example, in response to a complaint from a lab employee about the inappropriateness of the frequent hugs, Dr. Turkeltaub referred to the complaining employee as a "scrooge." The same employee witnessed Dr. Turkeltaub kissing Ms. Paul's head and suggested to Ms. van der Stelt that he did not think Dr. Turkeltaub's conduct was appropriate.

61.    In or around January 2021, Ms. van der Stelt attended a dissertation party at Dr. Turkeltaub's house.  Because of the COVID-19 pandemic, the party took place outdoors. At some point during the evening, Ms. van der Stelt went inside Dr. Turkeltaub's house to use the bathroom.  While Ms. van der Stelt was in the bathroom, Dr. Turkeltaub opened the door, stepped inside the bathroom with her, and closed the door behind him.  He told Ms. van der Stelt that he intentionally followed her inside the house and entered the bathroom to find her, and that he wanted to show her something behind the shower curtain.  Ms. van der Stelt had not flushed the toilet yet, and Dr. Turkeltaub laughed about seeing her urine in the toilet. Ms. van der Stelt was confused and embarrassed by Dr. Turkeltaub's invasion of her privacy, and she quickly exited the bathroom before he had an opportunity for any further comment or action, as she feared he may seek to physically touch her.

62.    On several occasions, Dr. Turkeltaub attempted to hold Ms. van der Stelt's hand. For example, once while carpooling to work together, Dr. Turkeltaub was uninvitedly telling Ms. van der Stelt about his marital problems when he reached to grab Ms. van der Stelt's hand.  Ms. van der Stelt quickly pulled her hand away.

63.    In working groups and staff meetings, which occurred in a suite in the lab that had multiple couches for seating, Dr. Turkeltaub typically sat on the couch next to Ms.

van der Stelt.  He often moved close to Ms. van der Stelt and brushed his leg against her leg. He would also drape his arm around the back of the couch behind Ms. van der Stelt. When Ms. van der Stelt attempted to move over – i.e., further away from Dr. Turkeltaub on the couch – Dr. Turkeltaub would simply follow, sliding over to maintain his desired close proximity to her.  Ultimately, Ms. van der Stelt stopped wearing skirts/dresses to meetings with Dr. Turkeltaub so that he could not brush her bare legs, and she asked a colleague to sit next to her during meetings.

64.     At another party with colleagues, Dr. Turkeltaub came up behind Ms. van der Stelt and touched her lower back in a flirtatious and intimate manner.

65.     Due to Dr. Turkeltaub's unwelcome and relentless advances, Ms. van der Stelt began to feel uncomfortable at work-related parties and events, became more alert and guarded, and sought to avoid close proximity with Dr. Turkeltaub at such events because she feared Dr. Turkeltaub would act inappropriately towards her.

66.     Ms. van der Stelt was uncomfortable with Dr. Turkeltaub's sexual comments, and she made her feelings clear to Dr. Turkeltaub, both by her explicit and implicit responses thereto, and through her body language.  For example, Ms. van der Stelt referred to Dr. Turkeltaub as the "lab dad" to remind him of his position of power and to point out how highly inappropriate his sexual comments and advances toward his young female employees and students were.  But Dr. Turkeltaub told Ms. van der Stelt that he did not like it when she referred to him in this manner, so Ms. van der Stelt eventually stopped using the term for fear of upsetting him.

67.     In addition to clearly demonstrating her discomfort, verbally and non-verbally, Ms. van der Stelt often reminded Dr. Turkeltaub that she was happily married, in an

effort to thwart further inappropriate behavior.

68.     However, given the power imbalance and Dr. Turkeltaub's control over Ms. van der Stelt's academic and professional career, Ms. van der Stelt feared significant repercussions if she was too forceful in her objections, or if she did not acquiesce to Dr. Turkeltaub's requests for hugs and to carpool together.

69.     Dr. Turkeltaub often reminded Ms. van der Stelt that he had significant influence over her academic success and, ultimately, over her professional career. For example, on one occasion, after Ms. van der Stelt requested feedback on her work, Dr. Turkeltaub admitted that he had not yet reviewed it but told Ms. van der Stelt that she was "getting an A regardless."

70.     In another text message, Dr. Turkeltaub indicated to Ms. van der Stelt that he could give her any grade regardless of the quality of her work but assured her it was "based on [her] performance and not just because [he] like[d] [her]."

71.     On another occasion, Dr. Turkeltaub informed Ms. van der Stelt her "entire grade is determined by" him, an unambiguous reminder that he controlled her success in the PhD program and that her success was contingent on his control over their relationship.

**Dr. Turkeltaub Retaliated Against Ms. van der Stelt when she became Increasingly Vocal in her Opposition to his Inappropriate Conduct**

72.     Ultimately, after Ms. van der Stelt's efforts to resist and politely object to Dr. Turkeltaub's conduct did not deter him from continuing his harassment, in November 2021, Ms. van der Stelt explicitly told Dr. Turkeltaub that she needed "personal space" from him.

73.     Around the same time, Ms. van der Stelt met with Dr. Turkeltaub and told him his

conduct caused an uncomfortable work environment. At this meeting, Dr. Turkeltaub reiterated his strong personal feelings for Ms. van der Stelt, admitted he was jealous that she had made friends in her PhD cohort, and told her that her request for distance was taking a mental toll on him, including causing him difficulties sleeping and concentrating because she occupied his thoughts. He told Ms. van der Stelt that he often thought about her while he was at home with his family.

74. Shortly thereafter, Ms. van der Stelt again spoke with Dr. Turkeltaub, reiterating that she felt uncomfortable with how frequently he was making sexual comments, and that both his sexual comments and his sharing of intimate information about his marital relationship were inappropriate. Ms. van der Stelt also told Dr. Turkeltaub that her spouse was aware of the comments he had made to her, and that she thought Dr. Turkeltaub's wife should be aware as well. Dr. Turkeltaub quickly became defensive, and he attempted to minimize the seriousness of his amorous comments by claiming he was just joking.

75. As Ms. van der Stelt became increasingly vocal in her opposition to Dr. Turkeltaub's sexual comments and innuendos, and as she sought to set boundaries so that their relationship remained strictly professional, Dr. Turkeltaub began to frequently belittle her both privately and in front of her colleagues. For example, Dr. Turkeltaub often stated that Ms. van der Stelt did not understand sarcasm, or that Ms. van der Stelt did not have a sense of humor.

76. Dr. Turkeltaub also began to shun and exclude Ms. van der Stelt from lab activities and communications and sought to alienate her from other lab employees. Dr.

Turkeltaub began relaying most of his lab-related communications to Ms. van der Stelt indirectly through Ms. Paul, rather than directly conveying them to her himself. Dr. Turkeltaub also instructed employees in the lab not to communicate with Ms. van der Stelt. As a result, employees, including Alycia Laks, who was Ms. van der Stelt's successor as an SLP in Dr. Turkeltaub's lab, began avoiding Ms. van der Stelt.

77. When Dr. Turkeltaub did interact with Ms. van der Stelt, his tone and demeanor changed significantly from how he had previously communicated with her. In stark contrast to his previous tone, he berated Ms. van der Stelt in a professional setting within earshot of her colleagues and spoke to her rudely and abruptly. He also stopped responding to emails from Ms. van der Stelt about work-related topics to which he normally would have promptly and enthusiastically responded.

78. Dr. Turkeltaub also downplayed Ms. van der Stelt's contributions to the lab. For example, Ms. van der Stelt learned that Dr. Turkeltaub listed Ms. Laks as an author on a paper published in the Journal of Cognitive Neuroscience, which was based upon data the lab collected when Ms. van der Stelt was the lab manager/research SLP, before Ms. Laks was even hired in the lab. Ms. van der Stelt questioned Dr. Turkeltaub about the decision to identify Ms. Laks as an author, and Dr. Turkeltaub again responded defensively, acknowledging that it was a mistake, but suggesting Ms. van der Stelt was overreacting and needed to get used to such mistakes, as he said they sometimes occur in research.

79. Nonetheless, despite Ms. van der Stelt's protestations, Dr. Turkeltaub's sexually charged comments and avowals of affection still did not abate. For example, in

group email correspondence between Dr. Turkeltaub, Ms. Paul, and Ms. van der Stelt concerning a lecture about the percentage of royalties an inventor employed by Georgetown receives, Dr. Turkeltaub wrote after 10:00 p.m. "your mom keeps doing it" to which Ms. Paul replied "your face keeps doing it," and Dr. Turkeltaub responded "your face keeps doing your mom," clearly referencing a sexual act. Ms. van der Stelt responded to Dr. Turkeltaub the next morning expressing her disgust with his comments by writing "EW."

80.     When, in or around February 2022, Ms. van der Stelt again approached Dr. Turkeltaub with her concerns about the environment he was creating for her, he responded by repeating the strong affection he felt for her. Following the conversation, Ms. van der Stelt texted Dr. Turkeltaub reiterating her need for personal space from him, and Dr. Turkeltaub responded by asking if he could drive to her house before work for the sole purpose of hugging her to relieve his stress.

81.     During subsequent months, Ms. van der Stelt remained professional, but tried to significantly decrease her participation in non-work-related conversations with Dr. Turkeltaub.  Dr. Turkeltaub expressed his displeasure with Ms. van der Stelt's distance, and he repeatedly called Ms. van der Stelt or asked her during meetings to tell him how she felt about him personally.  When Ms. van der Stelt would reiterate her concerns, Dr. Turkeltaub would dismiss them as jealousy and try to make her question her perception of the situation, suggesting that it was "just in [her] head." In one of their meetings, Dr. Turkeltaub took Ms. van der Stelt's hand between his hands and held it throughout the conversation, which lasted at least fifteen minutes. At the conclusion of these conversations, Ms. van der Stelt was often emotional,

and Dr. Turkeltaub would give her a long intimate hug behind his closed office door or tell her that he loved her.  When she rejected these advances, it upset Dr. Turkeltaub, and she feared that he would undermine her academic career, so she often felt forced to accept the hugs although her body language made clear that she did so reluctantly.

82.    Despite Ms. van der Stelt's request for personal space, Dr. Turkeltaub continued to express that he loved Ms. van der Stelt and cared about her greatly.  He told Ms. van der Stelt that he confided in her about "things…[he] would never tell other people."  Dr. Turkeltaub acknowledged that some of his confessions to Ms. van der Stelt were "grossly inappropriate" but that he was "not very good at stopping" himself from acting inappropriately towards Ms. van der Stelt.

83.    Dr. Turkeltaub also often continued to text Ms. van der Stelt about topics unrelated to work, including telling her he was "[t]hinking about" her.

84.    On another occasion, Dr. Turkeltaub wrote to Ms. van der Stelt that he was "feeling stressed and hoping to see" her.  He then asked if she "would be able to come downstairs for a minute to give [him] a hug" if he stopped by her house on the way to work.  Ms. van der Stelt declined and suggested a telephone call rather than an in-person visit.  On another occasion, Dr. Turkeltaub expressed regret over not hugging Ms. van der Stelt that day, saying "I really wanted a hug."

85.    In another message, Dr. Turkeltaub lamented the lack of alone time he had with Ms. van der Stelt, writing "all our alone time is while driving which isn't ideal."  He continued, "I'd like it if we could find time to spend alone together," and suggested places outside of the University to meet.  Ms. van der Stelt sought to

avoid the personal meeting saying that she may not be able to meet "for a little while" given her busy schedule. Dr. Turkeltaub then suggested that he and Ms. van der Stelt schedule regular in-person meetings at the University to find time to be together in a private setting.

86.     Dr. Turkeltaub also continued to pressure Ms. van der Stelt to carpool to the lab with him. Ms. van der Stelt increasingly attempted to avoid carpooling with him, opting to work from home more frequently. Dr. Turkeltaub expressed his displeasure with the infrequent carpooling. For example, on one occasion, Dr. Turkeltaub responded "Booo" when Ms. van der Stelt indicated she would not be carpooling with him that day.

87.     In one conversation, in or around April 2022, Ms. van der Stelt shared with Dr. Turkeltaub that she was feeling stressed about final exams, but that the night before she had spent time with her husband, and that doing so had helped her feel better. Dr. Turkeltaub asked what Ms. van der Stelt's husband said to make her feel better, and she responded that he did not have to say anything, and that he just held her. Dr. Turkeltaub responded by offering to hold Ms. van der Stelt. Ms. van der Stelt scoffed and unambiguously declined, replying that Dr. Turkeltaub was *not* her husband.

88.     In another conversation, Dr. Turkeltaub told Ms. van der Stelt he knew of another PhD student who had switched PhD advisors so that she could have a romantic relationship with her original PhD advisor, suggesting he was interested in pursuing a romantic relationship with Ms. van der Stelt.

89.     In May 2022, Dr. Turkeltaub invited Ms. van der Stelt to meet him at a coffee shop

24

in the morning before beginning work.  Ms. van der Stelt declined his invitation.  In the same text, Dr. Turkeltaub offered Ms. van der Stelt a ride home, which she also declined.

90.   In or around the last week of April 2022, two separate lab members expressed to Ms. van der Stelt their discomfort with Dr. Turkeltaub's relationships with Ms. Paul and Ms. van der Stelt.  Specifically, a lab employee noted the uncomfortably long and intimate hugs Dr. Turkeltaub frequently initiated and/or forced upon Ms. van der Stelt and Ms. Paul, and a graduate student working in the lab told Ms. van der Stelt that she noticed the close relationships between Dr. Turkeltaub, Ms. Paul, and Ms. van der Stelt, and felt like it was neither normal nor appropriate.  The graduate student elaborated that Dr. Turkeltaub seemed to like having Ms. van der Stelt and Ms. Paul by his side at all times, and that Dr. Turkeltaub looked at Ms. van der Stelt as if he was in love with her.

91.   On or around May 2, 2022, Ms. van der Stelt encountered Dr. Turkeltaub by the bathroom in the building they shared on campus. Dr. Turkeltaub attempted to start a personal, emotional conversation with Ms. van der Stelt about his parenting and home life. Ms. van der Stelt told him that he "didn't need to share." Dr. Turkeltaub then complimented the skirt Ms. van der Stelt was wearing and reached down to stroke her inner thigh. Ms. van der Stelt dodged his touch, stepped away, and ran into the bathroom. The encounter left Ms. van der Stelt humiliated and frightened.

92.   A few days later, Ms. van der Stelt was in her office studying for her final exam. Dr. Turkeltaub entered her office, closed the door, and asked to speak with her.  Ms. van der Stelt expected Dr. Turkeltaub wanted to *again* profess to her his

inappropriate feelings towards her. Accordingly, Ms. van der Stelt sought to avoid the conversation, requesting that he wait until the end of May, after her final exams and comprehensive exams were completed, to speak with her. Dr. Turkeltaub disregarded Ms. van der Stelt's wishes, and instead continued to push her into conversation. As a result, Ms. van der Stelt became angry with Dr. Turkeltaub, and expressed to him her general concerns about his close relationships with women in the lab. Ms. van der Stelt told Dr. Turkeltaub that two other people had expressed to her their observance of and discomfort with the same. Ms. van der Stelt also told Dr. Turkeltaub that she felt that he had been gaslighting her over the past year. After their conversation, Ms. van der Stelt worried that Dr. Turkeltaub would tell her to leave his lab, so she sent him a follow-up email outlining her concerns. Dr. Turkeltaub responded that if she thought he was capable of gaslighting her, then she should not study in his lab.

93.     On or around June 2, 2022, Ms. van der Stelt told Dr. Turkeltaub she was going to share her concerns about his actions with Sarah Snider – a research Speech Language Pathologist and faculty member of Georgetown University who had trained and supervised new employees at Dr. Turkeltaub's lab for over ten years, and who often acted as an informal mentor to Ms. van der Stelt – so that Defendants Georgetown and BGE could take appropriate action. Pursuant to Georgetown's Employee Reporting Obligations, Ms. Snider is a mandatory reporter, required to report incidents of sexual harassment within 24 hours of learning of the harassment. In response, Dr. Turkeltaub asked Ms. van der Stelt how they could resolve the situation informally and in a manner that did not involve other faculty.

94.    In the same conversation, Ms. van der Stelt again asked Dr. Turkeltaub to maintain professional boundaries with her.

95.    On or around June 3, 2022, Ms. van der Stelt contacted Ms. Snider and, during a lengthy conversation, reported the hostile environment Dr. Turkeltaub created with his inappropriate sexual conduct and romantic advances toward her and other women working in his lab.  Ms. van der Stelt provided Ms. Snider examples of Dr. Turkeltaub's sexual comments, described how Dr. Turkeltaub shared intimate details about his family and marriage (including that he purchased a sex toy for his wife), and told Ms. Snider that Dr. Turkeltaub had recently tried to stroke her inner thigh.  In response, Ms. Snider told Ms. van der Stelt that she wished Ms. van der Stelt had not reported Dr. Turkeltaub's behavior to her, and asked Ms. van der Stelt not to tell Dr. Turkeltaub that Ms. van der Stelt had spoken with her.

96.    To Ms. van der Stelt's knowledge, Ms. Snider never took any action in response to Ms. van der Stelt's concerns, did not report Ms. van der Stelt's concerns to Georgetown's Title IX office or anyone else, and never otherwise followed up with Ms. van der Stelt, or anyone else, about the concerns Ms. van der Stelt raised with her.

97.    On or around June 4, 2022, Ms. van der Stelt went to a dissertation party held at Dr. Turkeltaub's house.  Because of Dr. Turkeltaub's previous actions, Ms. van der Stelt did not want to attend the event and felt significant anxiety about doing so. However, she felt forced to attend in order to avoid any negative repercussions to her academic career, and she thus did so with the intent of avoiding Dr. Turkeltaub throughout the party.  Despite her best efforts, Dr. Turkeltaub sought out and found

Ms. van der Stelt and hugged her closely, even though Ms. van der Stelt had made clear to Dr. Turkeltaub that she was uncomfortable with him making any physical contact with her.  He then sought to learn details of her upcoming vacation with her husband, to which Ms. van der Stelt provided a minimal response.

98.    This interaction was observed by Rachel Galginaitis, Manager of the Georgetown Center for Brain Plasticity and Recovery, who worked with Ms. van der Stelt when she was a staff member there.  Ms. Galginaitis noticed that Ms. van der Stelt appeared uncomfortable with Dr. Turkeltaub and asked Ms. van der Stelt about her observation during the party.  Ms. van der Stelt shared with Ms. Galginaitis general information about the harassment to which Dr. Turkeltaub had subjected her, including his sexual remarks and belittling comments, and told Ms. Galginaitis that the environment worsened after Ms. van der Stelt told Dr. Turkeltaub that he made her uncomfortable.  Ms. Galginaitis told Ms. van der Stelt that she had noticed Dr. Turkeltaub and Ms. Paul's interactions with each other, and that it gave the appearance of an inappropriate sexual relationship.  In later communications, Ms. Galginaitis referred to Dr. Turkeltaub as a "predator."

99.    Ms. van der Stelt worked remotely for seven weeks in Europe during the summer of 2022, in large part to distance herself from Dr. Turkeltaub's harassment.  During that time, Ms. van der Stelt had work-related email communications with Dr. Turkeltaub and almost weekly work-related Zoom calls.  Throughout the summer, Dr. Turkeltaub made demeaning comments to her, often in the presence of other staff members, and dismissed Ms. van der Stelt's thoughts and opinions during group discussions.

100.    During the summer of 2022, Dr. Turkeltaub again minimized Ms. van der Stelt's contributions on an academic paper.  Dr. Turkeltaub listed Ms. van der Stelt as third author, which suggested that her contributions were less significant than her job successor, when Ms. van der Stelt had written the two protocols used for the data in the paper and had spent extensive time editing the manuscript to ensure the methods were correct.  He listed Ms. Laks as second author on a paper that, to Ms. van der Stelt's knowledge, Ms. Laks had not read or edited at that time.

101.    On or around July 28, 2022, Dr. Turkeltaub and Ms. van der Stelt had an in-person meeting upon her return from Europe.  During this meeting, Dr. Turkeltaub described several decisions about Ms. van der Stelt's thesis tasks that he had made without her input.  Ms. van der Stelt responded by expressing concern, including that she would have liked to have been involved in decisions regarding her thesis tasks, and that excluding her therefrom was disrespectful.

102.    Ms. van der Stelt emailed Dr. Turkeltaub later that same day to request a follow-up meeting.  Dr. Turkeltaub and Ms. van der Stelt met the next day, on or around July 29, 2022, via Zoom.  During the conversation, Dr. Turkeltaub admitted that he felt resentment toward Ms. van der Stelt for being physically away from him while she was in Europe and suggested that he strongly preferred she be physically present in the lab.  In the following weeks, Dr. Turkeltaub continued to discuss decisions on Ms. van der Stelt's thesis work when she was not present and without her input, increasingly made demeaning comments to Ms. van der Stelt in front of fellow lab members, and dismissed her ideas during team meetings.

103.    Most recently, at a conference in October 2022, Dr. Turkeltaub saw Ms. van der

Stelt and hugged her, despite that she had made clear she was uncomfortable with his actions, and, when he released her, brushed the side of her breast with his arm.

104.    Other employees in the lab also reported to Ms. van der Stelt that Dr. Turkeltaub's actions appeared inappropriate to them.  Ms. Laks reported to Ms. van der Stelt that the extended hugs she witnessed between Dr. Turkeltaub and Ms. Paul made her very uncomfortable.  Another lab member told Ms. van der Stelt that she thought it was odd Dr. Turkeltaub always sat and/or walked so physically close to Ms. van der Stelt, as well as the fact that he frequently came to Ms. van der Stelt's office to see her.

## Ms. van der Stelt Formally Reports the Harassment and Defendants Fail to take any Corrective Action

105.    Upon information and belief, Dr. Turkeltaub's pattern of sexually harassing behavior was the subject of multiple formal complaints to the Title IX office, and several employees and students informally shared with Ms. van der Stelt concerns that his actions and relationships with young female students and employees was inappropriate. Colleagues also encouraged Ms. van der Stelt to report Dr. Turkeltaub's behavior. Specifically, upon information and belief, Ms. Galginaitis reported her concerns about Dr. Turkeltaub's inappropriate behavior towards Ms. van der Stelt and Ms. Paul.  Upon information and belief, another PhD student also reported her concerns about Dr. Turkeltaub's inappropriate behavior towards Ms. van der Stelt and other students.

106.    On August 22, 2022, Ms. van der Stelt emailed Dr. Maria Snyder, Georgetown's Associate Dean of Academic Affairs and its Deputy Title IX Coordinator, asking for information about the "Title IX process," and requesting to schedule an

informational session.

107.  On September 16, 2022, Ms. van der Stelt met with Dr. Snyder and Samantha Berner, Georgetown's Title IX Coordinator and Director of Title IX Compliance within Georgetown's Office of Institutional Diversity, Equity, and Affirmative Action (IDEAA). During the meeting, Ms. van der Stelt provided Dr. Snyder and Ms. Berner a detailed account of Dr. Turkeltaub's sexual harassment, both that to which he had subjected her, and that to which she had witnessed him subjecting others. In the meeting, Dr. Snyder told Ms. van der Stelt that Dr. Turkeltaub's comments and actions were inconsistent with University policy.

108.  Although the Title IX office originally told her they could protect her confidentiality, Ms. Berner ultimately informed Ms. van der Stelt that the Title IX office would reveal to Dr. Turkeltaub Ms. van der Stelt's identity as a witness.

109.  During the meeting, Ms. Berner suggested the only solution to Ms. van der Stelt's concerns was for Ms. van der Stelt to leave Dr. Turkeltaub's lab, and explained that the University would assist in reassigning her. Ms. van der Stelt could not continue her research in another lab, and informed Ms. Berner that she wished to continue on with her research. Nonetheless, Ms. Berner suggested a follow-up meeting specifically to discuss other placements, but refused to consider other alternative options that would allow Ms. van der Stelt to remain in the lab and continue with her current research. Thus, Ms. van der Stelt understood that, because of her sexual harassment complaint against Dr. Turkeltaub, the University would force her to change labs and, therefore, abandon her research.

110.  Dr. Snyder directed Ms. van der Stelt to Dr. Guinevere Eden, Director of

Georgetown's Center for the Study of Learning, who was designated by BGE as the student advisor, meaning the faculty member in the department tasked with addressing student concerns. Ms. van der Stelt expressed to Dr. Snyder that she was uncomfortable reporting Dr. Turkeltaub's inappropriate conduct to Dr. Eden because Dr. Eden had been Dr. Turkeltaub's PhD advisor and, upon information and belief, Dr. Eden and Dr. Turkeltaub maintained a close professional relationship. Dr. Snyder dismissed Ms. van der Stelt's concerns and encouraged Ms. van der Stelt to report Dr. Turkeltaub's inappropriate behavior to Dr. Eden.

111. In or around September 2022, Ms. Berner contacted Ms. van der Stelt about serving as a witness in relation to Ms. Galginaitis's report about Dr. Turkeltaub's inappropriate behavior.

112. On or around September 29, 2022, Ms. Berner informed Ms. van der Stelt that the University would review Ms. van der Stelt's allegations. Ms. Berner also "encourage[d]" Ms. van der Stelt "to explore some other options" for lab placements. In response, Ms. van der Stelt reiterated to Ms. Berner that switching labs would cause her significant harm, and in effect penalize her for reporting Dr. Turkeltaub's harassment. Specifically, Ms. van der Stelt explained that she had "generated the research idea and design[]" for her thesis work being conducted in Dr. Turkeltaub's lab, and that transferring her research to a new lab was not possible because it was part of the grant Dr. Turkeltaub received, due in part to her efforts. As an integral and necessary component of her PhD studies, losing her research idea and design would have required Ms. van der Stelt to start all over, develop a *new* research idea, and then design the research therefor. Nonetheless, the

University continued to pressure Ms. van der Stelt to switch labs and suggest that there were no other options available to her. Defendants refused to consider alternatives that would permit Ms. van der Stelt to continue her research in Dr. Turkeltaub's lab, such as by allowing her to work under the guidance of another mentor, including the post- doctoral student who worked in the lab, or Dr. Friedman, who was an investigator on Dr. Turkeltaub's NIH research grant.

113.    On or around October 19, 2022, Ms. van der Stelt met with Dr. Eden and shared general information about the sexual harassment she reported to the Title IX office. Dr. Eden immediately told Ms. van der Stelt that she needed to identify a new lab, and she referred to Dr. Turkeltaub as Ms. van der Stelt's "former mentor" in an email the next day. Accordingly, Ms. van der Stelt understood that, despite her expressed concerns and the serious harm Defendants knew doing so would necessarily cause her, Defendants had nonetheless decided to remove her from Dr. Turkeltaub's lab, thereby forcing her to abandon her research and forfeit much of the progress she had made towards obtaining her PhD.

114.    During their conversation, Ms. van der Stelt explored whether Dr. Eden might be willing to serve as her mentor, but Dr. Eden quickly declined. Upon information and belief, shortly after declining to serve as Ms. van der Stelt's mentor, Dr. Eden took on two students as mentees.

115.    Dr. Eden helped Ms. van der Stelt identify Dr. Greenwald, one of her rotation mentors, as the lab that best suited Ms. van der Stelt's academic and career goals and would allow her to continue her research with as little disruption as possible. Additionally, as Ms. van der Stelt had completed a rotation in Dr. Greenwald's lab,

she knew that she worked well with Dr. Greenwald and that Dr. Greenwald had previously offered Ms. van der Stelt a position in her lab, noting that Ms. van der Stelt would be a good fit for the lab.  In fact, in her post-rotational report about Ms. van der Stelt's rotation in her lab, Dr. Greenwald had expressed willingness to serve as a mentor to Ms. van der Stelt.

116.    Accordingly, per Dr. Eden's suggestion, Ms. van der Stelt approached Dr. Greenwald about the possibility of joining her lab.  When Ms. van der Stelt approached Dr. Greenwald about joining her lab, Dr. Greenwald initially expressed enthusiasm about the idea.

117.    Ms. van der Stelt notified Dr. Snyder and Ms. Berner that she was exploring alternative lab placements, and both affirmed that doing so was the correct course of action.

118.    Accordingly, though Ms. van der Stelt devoted significant time and energy into her research in Dr. Turkeltaub's lab, and despite that his lab's work closely aligned with her career goals and had received a grant based, in part, on her research ideas, Ms. van der Stelt nonetheless acted in accordance with Dr. Eden, Ms. Berner, and Dr. Snyder's instructions to change labs and, on or around October 26, 2022, formally informed Dr. Turkeltaub by email that she was changing thesis labs due to the ongoing uncomfortable and hostile work environment.  Ms. van der Stelt consulted with Dr. Eden about notifying Dr. Turkeltaub of her lab change, and Dr. Eden and Dr. Greenwald proofread and approved Ms. van der Stelt's email to Dr. Turkeltaub before she sent it to him.

119.    On or around October 28, 2022, Ms. van der Stelt had a meeting with Dr. Greenwald

and Dr. Eden to confirm the details of the lab reassignment. However, during their conversation, Dr. Greenwald expressed, for the first time, reluctance about being associated with Ms. van der Stelt because she feared such association could adversely impact her working relationship with Dr. Turkeltaub. Dr. Greenwald informed Ms. van der Stelt that she had spoken with Dr. Abigail Marsh, a Professor in Georgetown's Department of Psychology and the IPN Program, about a possible co-mentorship. Dr. Greenwald explained that when she advised Dr. Marsh that Dr. Turkeltaub's lab had become a hostile work environment for Ms. van der Stelt, Dr. Marsh declined to consider serving as a mentor to Ms. van der Stelt specifically and solely because she did not want to be associated with Ms. van der Stelt's harassment complaint. The conversation with Dr. Marsh apparently flagged concerns for Dr. Greenwald, as Dr. Greenwald reiterated her concern that Dr. Turkeltaub's desire to collaborate with her might diminish if she accepted Ms. van der Stelt in her lab.

120.    On October 30, 2022, Dr. Greenwald emailed Ms. van der Stelt and expressed concern about how she, as Ms. van der Stelt's mentor, might handle Ms. van der Stelt's future interactions with Dr. Turkeltaub, but that she would continue to explore the possibility of a co-mentorship with Dr. Marsh. Ms. van der Stelt asked to participate in Dr. Greenwald's discussion with Dr. Marsh, but Dr. Greenwald advised her that Dr. Marsh did not want her present. Ms. van der Stelt gave Dr. Greenwald permission to share with Dr. Marsh details about the hostile work environment Ms. van der Stelt experienced in Dr. Turkeltaub's lab. After Dr. Greenwald again discussed Ms. van der Stelt's situation with Dr. Marsh, Dr. Marsh refused to re-consider and remained adamant that she would not serve as a co-

mentor.

121.    On or around November 9, 2022, Ms. van der Stelt notified Ms. Berner and Dr. Snyder that she had retained counsel to represent her in her claims of harassment. In the same email, she conveyed to Ms. Berner and Dr. Snyder the concerns Dr. Greenwald expressed about how serving as Ms. van der Stelt's new advisor might negatively impact Dr. Greenwald's relationship with Dr. Turkeltaub.  Ms. van der Stelt explained to Ms. Berner and Dr. Snyder that Dr. Greenwald's stated concerns did not constitute "valid reasoning [on which] to base a lab placement decision." Upon information and belief, the University, despite its knowledge of this clear expression of retaliatory animus, never took any action to address and remedy it, nor to ensure that professors did not base their decisions about whether to work with Ms. van der Stelt, in whole or in part, on her protected activity.

122.    On or around the same day, Dr. Eden informed Ms. van der Stelt that Dr. Greenwald declined to mentor Ms. van der Stelt.  Ms. van der Stelt suggested several other faculty members who could serve as a co-mentor with Dr. Greenwald, but Dr. Greenwald refused to consider any of the co-mentor options Ms. van der Stelt proposed.

123.    On or around November 21, 2022, Ms. van der Stelt and her counsel met with Ms. Berner, Dr. Snyder, and Anna Riegel, Senior Associate Dean of BGE, and discussed her need for additional support in finding her comparable educational opportunities.

124.    On or around December 6, 2022, Ms. van der Stelt met with Dr. Greenwald, during which Ms. van der Stelt requested Dr. Greenwald re-consider serving as her mentor and explained how her thesis work would be a good fit for Dr. Greenwald's lab.

During the meeting, Dr. Greenwald declined to re-consider her position even though, in the same conversation, Dr. Greenwald acknowledged that she had funding for an additional graduate student and thus could, practically, serve as Ms. van der Stelt's mentor. Additionally, Dr. Greenwald disclosed that her supervisor, Dr. Elissa Newport, Director of the Center for Brain Plasticity and Recovery at Georgetown University and BGE, had discouraged her from supporting Ms. van der Stelt as a thesis student.

125. Ms. van der Stelt's experience seeking mentorship from other professors was similarly unsuccessful. She was tasked with identifying and securing a mentor who could satisfy her educational goals and provide her with equal access to educational resources, but not one member of Defendants' faculty who study a clinical population agreed to serve as Ms. van der Stelt's mentor.

126. Notably, multiple Georgetown professors initially expressed a willingness to serve as Ms. van der Stelt's mentor, but subsequently withdrew their support upon learning of Ms. van der Stelt's Title IX complaint. For example, Dr. Friedman, the Director of the Center for Aphasia Research and Rehabilitation and Vice Chair of the Neurology Department at Georgetown University and BGE, declined to speak with Ms. van der Stelt at all when Ms. van der Stelt sought to secure her mentorship, even though Dr. Friedman had previously indicated her willingness to welcome Ms. van der Stelt into her lab after Ms. van der Stelt's rotation therein. Subsequently, Dr. Friedman received a supplemental grant connected to the grant on which Ms. van der Stelt had worked under Dr. Turkeltaub and which would have allowed Ms. van der Stelt to continue her thesis research.

127.    After Dr. Friedman, Dr. Eden, Dr. Greenwald, and Dr. Marsh all declined to mentor Ms. van der Stelt, she began to consider seeking mentors whose focus differed from her education and career goals, but who could still provide research training in a clinical setting.  In or around December 2022, Ms. van der Stelt spoke with Dr. Chandan Vaidya, a Professor of Cognitive Neuroscience in Georgetown's Department of Psychology, and Dr. Rachel Barr, a Professor of Developmental Psychology in Georgetown's Department of Psychology.  Both Dr. Vaidya and Dr. Barr initially identified several research projects that they were leading and which they believed could be a good fit for Ms. van der Stelt. Both Dr. Vidya and Dr. Barr inquired about Ms. van der Stelt's reasons for leaving her former lab and Ms. van der Stelt responded that it was the result of a Title IX complaint. When Ms. van der Stelt attempted to schedule a follow-up call, they both declined a second conversation.

128.    Ms. van der Stelt continued to notify Ms. Berner and Dr. Snyder of the program's refusal to assist in finding her a new position, despite that her attempts to do so were in accordance with what Ms. Berner, Dr. Snyder, and Dr. Eden advised must be done.  On or around December 13, 2023, Ms. van der Stelt filed a formal complaint of discrimination with Georgetown's Title IX office alleging sexual harassment and retaliation.  The formal complaint advised that "potential PhD mentors have been hesitant about mentoring her because of their connections to Dr. Turkeltaub" and that Defendants failed to address this retaliation or provide her with the same resources and opportunities that were available to her before she reported the sexual harassment.  On or around December 22, 2022, in an email to

Ms. Berner and Dr. Snyder, Ms. van der Stelt reiterated that Defendants continued to fail placing her in a "suitable research lab," and noted the drastic change in support for her since she "engag[ed] in the Title IX process."

129.    In response, Dr. Snyder wrote that she "regret[s] [Dr. Greenwald's] unexpected decision not to take [Ms. van der Stelt] on as a mentee" but did not indicate any concrete steps the University would take to ensure it reassigned Ms. van der Stelt to a suitable lab.

130.    In total, seven professors at Georgetown were asked to serve as Ms. van der Stelt's mentor.  Six declined, and the one professor who *was* amenable to mentoring Ms. van der Stelt – as he had little interaction or collaboration with Dr. Turkeltaub – conducted research outside Ms. van der Stelt's area of expertise, and thus would not have been able to provide her training in clinical research through his mentorship.

131.    On multiple occasions, Defendants informed Ms. van der Stelt that she should search for mentors outside the University and BGE.

132.    Although Ms. van der Stelt informed the Title IX office multiple times about the retaliation she was experiencing, the University did not take any effective remedial action – nor any action at all – to ensure that Ms. van der Stelt could transition into a new lab aligned with her academic and career goals.

133.    In or around March 2023, in the midst of an ongoing investigation into his sexual harassment and retaliatory behaviors, Defendants promoted Dr. Turkeltaub from Associate Professor to Professor.

134.    Upon information and belief, at least three male faculty members in the IPN and

under BGE have been the subject of multiple sex discrimination and harassment claims and, in each case, the female students/employees who reported the discrimination and harassment were forced to leave the labs of the male professors, and Defendants failed to take adequate action to protect students/employees, ensure an educational environment and workplace free from sexual harassment and sex discrimination, and provide students with adequate educational opportunities following their complaints of discrimination.

135.   At or around the end of January 2023, Ms. van der Stelt approached possible mentors at the University of Pittsburgh's Department of Communication Science and Disorders. They agreed to mentor Ms. van der Stelt but required that she transfer to their program to receive their mentorship. As a result, Ms. van der Stelt applied to transfer to the University of Pittsburgh's PhD program and received an acceptance for the Fall of 2023.

136.   Consequently, Ms. van der Stelt has been forced to relocate to Pittsburgh, while her husband, who works for the U.S. government, has had to remain in the Washington, D.C. area, where they currently reside together. In addition to the stress caused by multiple years of a long-distance marriage, Ms. van der Stelt has also had to establish a second residence, while maintaining the residence that she purchased with her husband in Arlington, Virginia.

137.    Ms. van der Stelt also received less tuition assistance from the University of Pittsburgh than she previously had from Defendants, as well as less of a living stipend. Therefore, Ms. van der Stelt will need to personally finance additional expenses and costs associated with her tuition and education.  Moreover, she will be required to re-take coursework as a result of her transfer, which thus may delay her graduation.  Further, because Ms. van der Stelt has not had access to a lab since October 2022, and because she lost access to the data sets that she built during the years she spent in Dr. Turkeltaub's lab, Ms. van der Stelt will essentially be forced to start over entirely completing the research components of her PhD program.

138.    The ongoing sexual harassment and retaliation has also caused Ms. van der Stelt significant emotional harm and damage to her professional reputation.

**Defendants Continue to Retaliate Against Plaintiff**

139.    On or around November 17, 2023, after Ms. van der Stelt re-located to Pittsburgh and began her Ph.D program at the University of Pittsburgh, Ms. Berner notified Ms. van der Stelt that it had scheduled a hearing on her Title IX complaint on December 13, 14, and 15, 2023.

140.    On or around November 28, 2023, Ms. van der Stelt responded to Ms. Berner requesting to re-schedule the hearing because the hearing dates conflicted with her exam schedule.

141.    On or around November 29, 2023, Ms. Berner declined to re-schedule the hearing as requested by Ms. van der Stelt.  Instead, Ms. Berner suggested that, if Ms. van der Stelt wanted to participate in a hearing regarding her complaint, Ms. van der Stelt's only option was to reschedule her exams and that Ms. Berner would notify the University of Pittsburgh about the hearing and the Title IX complaint.

142.    On February 1, 2024, Dr. Turkeltaub filed an Answer and Counterclaim against Ms. van der Stelt.  Dr. Turkeltaub's Counterclaim alleges that Plaintiff defamed him and portrayed him in a false light when she disclosed, and discussed, that he sexually harassed her.

**COUNT I: HARASSMENT BASED ON SEX IN VIOLATION OF TITLE IX, 20 U.S.C. § 1681 AGAINST DEFENDANTS GEORGETOWN UNIVERISTY AND GEORGETOWN UNIVERSITY MEDICAL CENTER, BIOMEDICAL GRADUATE EDUCATION**

143.    Ms. van der Stelt incorporates by reference all prior paragraphs of this Complaint, as if fully set forth in this Count.

144.    Defendants Georgetown and BGE constitute education programs or activities receiving federal financial assistance under Title IX, 20 U.S.C. §§ 1681, 1687.

145.    As such, Defendants Georgetown and BGE have a legal obligation under Title IX to ensure that no person is excluded from participation in, denied the benefits of, or subjected to discrimination under its education program or activity, based on sex.

146.    Ms. van der Stelt was excluded from participation in, denied the benefits of, and subjected to discrimination under Defendants' education program or activity based on sex, when Dr. Turkeltaub subjected her to sexual harassment that so undermined Ms. van der Stelt's educational experience that she was effectively denied equal access to Defendants' resources and opportunities.

147.    The harassment was severe, pervasive, and objectively offensive.  Dr. Turkeltaub harassed Ms. van der Stelt on a near-daily basis from approximately September 2020 until she left his lab in approximately October 2022.  Throughout this time-period, Dr. Turkeltaub constantly subjected Ms. van der Stelt to a range of sexually harassing behavior, including making sexual comments and innuendos, sharing

intimate details about his marriage and sex-life, expressing his love and adoration for Ms. van der Stelt, and subjecting Ms. van der Stelt to unwanted sexual touching, including but not limited to putting his hands on the small of her back, brushing his legs up against hers, forcing upon her lengthy and intimate hugs, kissing her head, and attempting to touch her inner thigh.

148.    Dr. Turkeltaub's conduct was unwelcome.

149.    Defendant Turkeltaub was aware that his conduct was unwelcome.

150.    As a result of the sexual harassment, Ms. van der Stelt was denied equal access to Defendants' resources and opportunities, as she experienced significant depression and anxiety, and was forced to avoid the lab where she conducted research, as well as her thesis advisor.  As a result, she lost enthusiasm and excitement about her research and was ultimately forced to change her lab and transfer to a different school.

151.    Additionally, Dr. Turkeltaub had control over Ms. van der Stelt's academic and professional career, and Ms. van der Stelt's progress and success were conditioned upon acquiescing to unwelcome and unlawful sexual advances.  When Ms. van der Stelt objected to the harassment, she was excluded from discussions and meetings, ignored, and deprived of the credit she deserved for her work, including her work on published papers.

152.    Upon becoming aware of the sexual harassment, Defendants Georgetown and BGE failed to take reasonable steps to promptly eliminate the harassment, prevent its recurrence, and remedy its effects.

153.    Defendants had actual knowledge of, and were deliberately indifferent to, the

sexual harassment.

154.   Defendants' actions and omissions allowed the sexual harassment and discrimination to persist and facilitated and contributed to the hostile educational environment.

155.   The harassment culminated in Defendants forcing Ms. van der Stelt to change labs and ousting her from their PhD program.

156.   As a result of Defendants' acts, Ms. van der Stelt suffered significant harm, including economic damage in the form of additional tuition costs, lost tuition assistance, and a reduced living stipend, as well as costs and expenses associated with re-locating, and significant emotional harm and reputational and professional damage.

**COUNT II: HARASSMENT BASED ON SEX (BY EDUCATIONAL INSTITUTION) IN VIOLATION OF THE DCHRA, D.C. CODE § 2-1402.41 AGAINST ALL DEFENDANTS**

157.   Ms. van der Stelt incorporates by reference all prior paragraphs of this Complaint, as if fully set forth in this Count.

158.   Educational institutions are prohibited from engaging in unlawful discriminatory practices based on sex pursuant to the DCHRA, D.C. Code § 2-1402.41.

159.   Sexual harassment is an unlawful discriminatory practice under the DCHRA, D.C. Code § 2-1401.02(31).

160.   Defendants Georgetown and BGE are educational institutions as defined under the DCHRA.

161.   At all times relevant, Defendant Turkeltaub was an agent of Defendants Georgetown and BGE as defined under the DCHRA.

162.   As such, Defendants have a legal obligation under the DCHRA to ensure that the

use of or access to any of their facilities, services, programs, or benefits of any program or activity, are not denied, restricted, abridged, or conditioned based on sex, to any person otherwise qualified.

163. Defendants subjected Ms. van der Stelt to discrimination based on sex that so undermined Ms. van der Stelt's educational experience that she was effectively denied equal access to Defendants' facilities, services, programs, and benefits.

164. The harassment unreasonably altered the terms and conditions of Ms. van der Stelt's education and had the purpose or effect of creating an intimidating, hostile, or offensive work environment. Dr. Turkeltaub harassed Ms. van der Stelt on a near-daily basis from approximately September 2020 until she left his lab in approximately October 2022. Throughout this time-period, Dr. Turkeltaub constantly subjected Ms. van der Stelt to a range of sexually harassing behavior, including making sexual comments and innuendos, sharing intimate details about his marriage and sex-life, expressing his love and adoration for Ms. van der Stelt, and subjecting Ms. van der Stelt to unwanted sexual touching, including but not limited to putting his hands on the small of her back, brushing his legs up against hers, forcing upon her lengthy and intimate hugs, kissing her head, and attempting to touch her inner thigh.

165. Dr. Turkeltaub's conduct was unwelcome.

166. Dr. Turkeltaub was aware that his conduct was unwelcome.

167. As a result of the sexual harassment, Ms. van der Stelt was denied equal access to Defendants' resources and opportunities, as she experienced significant depression and anxiety, and was forced to avoid the lab where she conducted research, as well

as her thesis advisor.  As a result, she lost enthusiasm and excitement about her research and was ultimately forced to change her lab and transfer to a different school.

168.    Additionally, Dr. Turkeltaub had control over Ms. van der Stelt's academic and professional career, and Ms. van der Stelt's progress and success were conditioned upon acquiescing to unwelcome and unlawful sexual advances.  When Ms. van der Stelt objected to the harassment, she was excluded from discussions and meetings, ignored, and deprived of the credit she deserved for her work, including her work on published papers.

169.    Upon becoming aware of the sexual harassment, Defendants Georgetown and BGE failed to take reasonable steps to promptly eliminate the harassment, prevent its recurrence, and remedy its effects.

170.    Defendants had actual knowledge of, and were deliberately indifferent to, the sexual harassment.

171.    Defendants' actions and omissions allowed the sexual harassment and discrimination to persist and facilitated and contributed to the hostile educational environment.

172.    The harassment culminated in Defendants forcing Ms. van der Stelt to change labs and ousting her from their PhD program.

173.    As a result of Defendants' acts, Ms. van der Stelt suffered significant economic damage in the form of additional tuition costs, lost tuition assistance, and a reduced living stipend, as well as costs and expenses associated with re-locating, and significant emotional harm, including mental anguish, anxiety, stress, humiliation,

and reputational and professional damage, and loss of enjoyment of her work and life.

174.    Defendants' acts were wanton, reckless, or in willful disregard for Ms. van der Stelt's legal rights under the DCHRA and were motivated by evil intent.

## COUNT III: HARASSMENT BASED ON SEX (BY EMPLOYER) IN VIOLATION OF THE DCHRA, D.C. CODE § 2-1402.11 AGAINST ALL DEFENDANTS

175.    Ms. van der Stelt incorporates by reference all prior paragraphs of this Complaint, as if fully set forth in this Count.

176.    Employers are prohibited from engaging in unlawful discriminatory practices based on sex pursuant to the D.C. Human Rights Act, D.C. Code § 2-1402.11.

177.    Sexual harassment is an unlawful discriminatory practice under the DCHRA, D.C. Code § 2-1402.11(c-2).

178.    At all times relevant to this Complaint, Ms. van der Stelt was an employee of Defendants under the DCHRA.

179.    At all times relevant to this Complaint, Defendants were Ms. van der Stelt's employer under the DCHRA.

180.    At all times relevant to this Complaint, Dr. Turkeltaub was acting in the interest of Defendants Georgetown and BGE.

181.    Defendants discriminated against Ms. van der Stelt based on sex when they subjected her to unwelcome sexual harassment.  The harassment unreasonably altered the terms and conditions of Ms. van der Stelt's employment and had the purpose or effect of creating an intimidating, hostile, or offensive work environment.  Throughout this time-period, Dr. Turkeltaub constantly subjected Ms. van der Stelt to a range of sexually harassing behavior, including making sexual

comments and innuendos, sharing intimate details about his marriage and sex-life, expressing his love and adoration for Ms. van der Stelt, and subjecting Ms. van der Stelt to unwanted sexual touching, including but not limited to putting his hands on the small of her back, brushing his legs up against hers, forcing upon her lengthy and intimate hugs, kissing her head, and attempting to touch her inner thigh.

182.    Dr. Turkeltaub's conduct was unwelcome.

183.    Dr. Turkeltaub was aware that his conduct was unwelcome.

184.    As a result of the sexual harassment, Ms. van der Stelt was denied equal access to Defendants' resources and opportunities, as she experienced significant depression and anxiety, and was forced to avoid the lab where she conducted research, as well as her supervisor. As a result, she lost enthusiasm and excitement about her research and was ultimately forced to change her lab and transfer to a different school.

185.    Additionally, Dr. Turkeltaub had control over Ms. van der Stelt's academic and professional career, and Ms. van der Stelt's progress and success were conditioned upon acquiescing to unwelcome and unlawful sexual advances. When Ms. van der Stelt objected to the harassment, she was excluded from discussions and meetings, ignored, and deprived of the credit she deserved for her work, including her work on published papers.

186.    Upon becoming aware of the sexual harassment, Defendants Georgetown and BGE failed to take reasonable steps to promptly eliminate the harassment, prevent its recurrence, and remedy its effects.

187.    Defendants had actual knowledge of, and were deliberately indifferent to, the sexual harassment.

188.  Defendants' actions and omissions allowed the sexual harassment and discrimination to persist and facilitated and contributed to the hostile work environment.

189.  The harassment culminated in Defendants forcing Ms. van der Stelt to change labs and ousting her from their PhD program.

190.  As a result of Defendants' acts, Ms. van der Stelt suffered significant economic damage in the form of additional tuition costs, lost tuition assistance, and a reduced living stipend, as well as costs and expenses associated with re-locating, and significant emotional harm, including mental anguish, anxiety, stress, humiliation, and reputational and professional damage, and loss of enjoyment of her work and life.

191.  Defendants' acts were wanton, reckless, or in willful disregard for Ms. van der Stelt's legal rights under the DCHRA and were motivated by evil intent.

**COUNT IV: RETALIATION IN VIOLATION OF TITLE IX, 20 U.S.C. § 1681(a) AGAINST DEFENDANTS GEORGETOWN UNIVERISTY AND GEORGETOWNUNIVERSITY MEDICAL CENTER, BIOMEDICAL GRADUATE EDUCATION**

192.  Ms. van der Stelt incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Count.

*193.*  Retaliation for complaining about or reporting discrimination is unlawful under Title IX of the Civil Rights Act of 1964, 20 U.S.C. § 1681 *et seq.*

194.  Ms. van der Stelt engaged in protected activity when she opposed Dr. Turkeltaub's sexual advances and inappropriate behavior, repeatedly reported the harassment to University faculty and staff and the Title IX office, reported retaliatory actions to the Title IX office, and formally filed a Title IX complaint. Ms. van der Stelt also

engaged in protected activity when she filed a civil action on July 31, 2023.

195.    Defendant knew about Ms. van der Stelt's protected activity.

196.    Because of Ms. van der Stelt's protected activity, Defendants Georgetown and BGE took adverse actions against her, including repeatedly declining to provide her with resources and support, such as a lab in which she could conduct her research, allowing faculty to refuse to work with Ms. van der Stelt because of her Title IX complaint, and ultimately preventing her from continuing in their PhD program and forcing her to transfer to a different school because she raised concerns of sex discrimination, harassment, and retaliation.   Defendant Georgetown further retaliated against Plaintiff when it refused to reschedule the date of the hearing on her Title IX complaint to a date when she was available and forced her to choose between attending the hearing and taking her exams.

197.    When Ms. van der Stelt opposed Dr. Turkeltaub's sexual harassment, Dr. Turkeltaub retaliated against her by undermining her thesis work, including, for example, treating her in a demeaning manner in the workplace, making changes to her thesis without her permission, and even suggesting that she should leave his lab.

198.    As a result of Defendants' acts, Ms. van der Stelt suffered significant harm, including economic damage in the form of additional tuition, lost tuition assistance, and a reduced living stipend, as well as costs and expenses associated with re-locating, and significant emotional harm and reputational and professional damage.

**COUNT V: RETALIATION (BY EMPLOYER) IN VIOLATION OF THE DCHRA, D.C. CODE § 2-1402.61 AGAINST ALL DEFENDANTS**

199.    Ms. van der Stelt incorporates by reference all prior paragraphs to this Complaint,

as if fully set forth in this Count.

200.   Employers are prohibited from retaliating based on any person who has exercised or enjoyed protected rights under the D.C. Human Rights Act, D.C. Code § 2-1402.61.

201.   At all times relevant to this Complaint, Ms. van der Stelt was an employee of Defendants under the DCHRA.

202.   At all times relevant to this Complaint, Defendants were Ms. van der Stelt's employer under the DCHRA.

203.   At all times relevant to this Complaint, Dr. Turkeltaub was acting in the interest of Defendants Georgetown and BGE.

204.   Ms. van der Stelt exercised her protected rights under the DCHRA when she opposed Dr. Turkeltaub's sexual advances and inappropriate behavior, repeatedly reported the harassment to University faculty and staff and the Title IX office, reported retaliatory actions to the Title IX office, and formally filed a Title IX complaint. Ms. van der Stelt also engaged in protected activity when she filed a civil action on July 31, 2023.

205.   Defendants knew about Ms. van der Stelt's protected activity.

206.   Because of Ms. van der Stelt's protected activity, Defendant took adverse actions against her, including repeatedly declining to provide her with resources and support, such as a lab in which she could conduct her research, allowing faculty to refuse to work with Ms. van der Stelt because of her Title IX complaint, and ultimately preventing her from continuing in their PhD program and forcing her to transfer to a different school because she raised concerns of sex discrimination,

harassment, and retaliation. Defendant Georgetown further retaliated against Plaintiff when it refused to reschedule the date of the hearing on her Title IX complaint to a date when she was available and forced her to choose between attending the hearing and taking her exams.

207.     When Ms. van der Stelt opposed Dr. Turkeltaub's sexual harassment, Dr. Turkeltaub retaliated against her by undermining her thesis work, including, for example, treating her in a demeaning manner in the workplace, making changes to her thesis without her permission, and even suggesting that she should leave his lab.

208.     As a result of Defendants' acts, Ms. van der Stelt suffered significant harm, including economic damage in the form of additional tuition, lost tuition assistance, and a reduced living stipend, as well as costs and expenses associated with relocating, and significant emotional harm and reputational and professional damage.

209.     Defendants' acts were wanton, reckless, or in willful disregard for Ms. van der Stelt's legal rights under the DCHRA and were motivated by evil intent.

## COUNT VI: RETALIATION (BY EDUCATIONAL INSTITUTION) IN VIOLATION OF THE DCHRA, D.C. CODE § 2-1402.61 AGAINST ALL DEFENDANTS

210.     Ms. van der Stelt incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Court.

211.     Educational institutions are prohibited from retaliating against any person who has exercised or enjoyed protected rights under D.C. Human Rights Act, D.C. Code § 2- 1402.61.

212.     Defendants Georgetown and BGE are educational institutions as defined under the DCHRA.

213. At all times relevant, Defendant Turkeltaub was an agent of Defendants Georgetown and BGE as defined under the DCHRA.

214. Ms. van der Stelt exercised her protected rights under the DCHRA when she opposed Dr. Turkeltaub's sexual advances and inappropriate behavior, repeatedly reported the harassment to University faculty and staff and the Title IX office, reported retaliatory actions to the Title IX office, and formally filed a Title IX complaint. Ms. van der Stelt also engaged in protected activity when she filed a civil action on July 31, 2023.

215. Defendants knew about Ms. van der Stelt's protected activity.

216. Because of Ms. van der Stelt's protected activity, Defendants took adverse actions against her, including repeatedly declining to provide her with resources and support, such as a lab in which she could conduct her research, allowing faculty to refuse to work with Ms. van der Stelt because of her Title IX complaint, and ultimately preventing her from continuing in their PhD program and forcing her to transfer to a different school because she raised concerns of sex discrimination, harassment, and retaliation.

217. Defendant Georgetown further retaliated against Plaintiff when it refused to reschedule the date of the hearing on her Title IX complaint to a date when she was available and forced her to choose between attending the hearing and taking her exams.

218. When Ms. van der Stelt opposed Dr. Turkeltaub's sexual harassment, Dr. Turkeltaub retaliated against her by undermining her thesis work, including, for example, treating her in a demeaning manner in the workplace, making changes to

her thesis without her permission, and even suggesting that she should leave his lab.

219.   As a result of Defendants' acts, Ms. van der Stelt suffered significant harm, including economic damage in the form of additional tuition, lost tuition assistance, and a reduced living stipend, as well as costs and expenses associated with re-locating, and significant emotional harm and reputational and professional damage.

220.   Defendants' acts were wanton, reckless, or in willful disregard for Ms. van der Stelt's legal rights under the DCHRA and were motivated by evil intent.

## COUNT VII: RETALIATION (BY EMPLOYER) IN VIOLATION OF THE DCHRA, D.C. CODE § 2-1402.61 AGAINST DEFENDANT TURKELTAUB

221.   Ms. van der Stelt incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Count.

222.   Employers are prohibited from retaliating based on any person who has exercised or enjoyed protected rights under the D.C. Human Rights Act, D.C. Code § 2-1402.61.

223.   At all times relevant to this Complaint, Ms. van der Stelt was an employee of Defendants under the DCHRA.

224.   At all times relevant to this Complaint, Dr. Turkeltaub was acting in the interest of Defendants Georgetown and BGE.

225.   Ms. van der Stelt exercised her protected rights under the DCHRA when she opposed Dr. Turkeltaub's sexual advances and inappropriate behavior, repeatedly reported the harassment to University faculty and staff and the Title IX office, reported retaliatory actions to the Title IX office, and formally filed a Title IX complaint. Ms. van der Stelt also engaged in protected activity when she filed a

civil action on July 31, 2023.

226.    Defendant Turkeltaub knew about Ms. van der Stelt's protected activity.

227.    Defendant Turkeltaub retaliated against Ms. van der Stelt when he filed a Counterclaim against her alleging she defamed him and portrayed him in a false light when she made statements, and raised concerns, that he sexually harassed her.

228.    As a result of Defendant's acts, Ms. van der Stelt suffered significant harm, including emotional harm and reputational and professional damage.

229.    Defendant's acts were wanton, reckless, or in willful disregard for, Ms. van der Stelt's legal rights under the DCHRA and were motivated by evil intent.

## COUNT VIII: RETALIATION (BY EDUCATIONAL INSTITUTION) IN VIOLATION OF THE DCHRA, D.C. CODE § 2-1402.61 AGAINST DEFENDANT TURKELTAUB

230.    Ms. van der Stelt incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Count.

231.    Educational institutions are prohibited from retaliating against any person who has exercised or enjoyed protected rights under D.C. Human Rights Act, D.C. Code § 2- 1402.61.

232.    Defendants Georgetown and BGE are educational institutions as defined under the DCHRA.

233.    At all times relevant, Defendant Turkeltaub was an agent of Defendants Georgetown and BGE as defined under the DCHRA.

234.    Ms. van der Stelt exercised her protected rights under the DCHRA when she opposed Dr. Turkeltaub's sexual advances and inappropriate behavior, repeatedly reported the harassment to University faculty and staff and the Title IX office, reported retaliatory actions to the Title IX office, and formally filed a Title IX

complaint.  Ms. van der Stelt also engaged in protected activity when she filed a civil action on July 31, 2023.

235.    Defendant Turkeltaub knew about Ms. van der Stelt's protected activity.

236.    Defendant Turkeltaub retaliated against Ms. van der Stelt when he filed a Counterclaim against her alleging she defamed him and portrayed him in a false light when she made statements, and raised concerns, that he sexually harassed her.

237.    As a result of Defendant's acts, Ms. van der Stelt suffered significant harm, including emotional harm and reputational and professional damage.

238.    Defendants' acts were wanton, reckless, or in willful disregard for Ms. van der Stelt's legal rights under the DCHRA and were motivated by evil intent.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. van der Stelt respectfully requests the following relief:

(a)    Grant judgment for Plaintiff against Defendant on all counts;

(b)    Enter an award of compensatory damages in an amount to be determined at trial;

(c)    Enter an award of consequential damages equal to Plaintiff's additional education and living expense-related costs and expenses related to her transfer to the University of Pittsburgh;

(d)    Enter an award of punitive damages in an amount to be determined at trial;

(e)    Order Defendants to pay the appropriate civil penalties pursuant to D.C. Code 4 DCMR 212.1;

(f)    Order Defendants to provide training on applicable discrimination, harassment, and retaliation laws;

(g)    Enter an award of reasonable litigation costs, expert fees, and attorneys' fees; and,

(h)    That the Court grant any other such relief the Court may deem just and equitable,

and as the nature of this case may require.

## **JURY TRIAL DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local rules of this

Court, Plaintiff demands a trial by jury on all issues.

August 12, 2024                                   Respectfully Submitted,


/s/ *Elizabeth A. Wilson*
Gary M. Gilbert, Esq. (Bar No. MD15808)
Elizabeth A. Wilson, Esq. (Bar No. 491007)
Gilbert Employment Law, P.C.
8403 Colesville Road, Suite 1000 Silver
Spring, MD 20910
Telephone: 301-608-0880
Facsimile: 301-608-0881
Email: Gary-efile@gelawyer.com
Ewilson@gelawyer.com